## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

———————————————————————

UNITED STATES OF AMERICA,

        Plaintiff,

v.

ALTON REAL ESTATE, INC.; EAST PEORIA
REAL ESTATE, INC.; JOLIET REAL ESTATE
HOLDING CO.; MOLINE REAL ESTATE, INC.;
PEORIA REAL ESTATE, INC.; SCHUETZ ROAD
REAL ESTATE, INC.; WOOD RIVER REAL
ESTATE HOLDING CO.; EDWARDSVILLE
REAL ESTATE, LLC; ELGIN REAL ESTATE,
LLC; INVERNESS REAL ESTATE, LLC;
NORTHBROOK REAL ESTATE, LLC;
ROCKFORD REAL ESTATE, LLC;
ST. CHARLES REAL ESTATE, LLC; CR
FINANCE II, LLC; BRAVO CARE OF ALTON,
INC.; BRAVO CARE OF EAST PEORIA, INC.;
BRAVO CARE OF EDWARDSVILLE, INC.;
BRAVO CARE OF ELGIN, INC.; BRAVO CARE
OF INVERNESS, INC.; BRAVO CARE OF
JOLIET, INC.; BRAVO CARE OF MOLINE,
INC.; BRAVO CARE OF NORTHBROOK, INC.;
BRAVO CARE OF PEORIA, INC.; BRAVO
CARE OF ROCKFORD, INC.; BRAVO CARE OF
ST. CHARLES, INC.; BRAVO CARE OF
ST. LOUIS, INC.; BRAVO CARE OF WOOD
RIVER, INC.; and MIDWEST
ADMINISTRATIVE SERVICES, INC.

        Defendants.

———————————————————————

Civil Action No.

## COMPLAINT FOR BREACH OF CONTRACTS

## AND FOR APPOINTMENT OF RECEIVER

The United States, on behalf of the Secretary of Housing and Urban Development ("the Secretary" or "HUD"), respectfully brings this action due to an approximately $146 million default on loan obligations related to thirteen healthcare facilities consisting of twelve nursing homes and one assisted living facility, as identified in Exhibit 1 (collectively, the "Rosewood Facilities"), each of which is owned and operated by entities that are all controlled by the same group of individuals. This Complaint seeks an order appointing a receiver to operate and possess the Rosewood Facilities.

## I. INTRODUCTION

The Rosewood Facilities are owned by thirteen single-asset entity property owners (the "Owners") and operated by thirteen single-asset entity operators (the "Operators"). Twelve of the facilities are licensed or certified by the state of Illinois and one is licensed by the State of Missouri. In the aggregate, they are licensed/certified to provide long-term care to 1,662 residents and are currently serving approximately 1,116 residents. The Owners leased their respective facilities in one master lease to a master tenant, CR Finance II, LLC ("CR Finance" or "Master Tenant"), which in turn subleased each facility to an Operator. The Rosewood Facilities are financed by mortgages insured against default by the Federal Housing Administration ("FHA"), a unit of HUD. Midwest Administrative Services, Inc. ("Midwest") serves as the Rosewood Facilities' management agent.

The Owners have defaulted on their obligations to pay their mortgages, resulting in an unpaid mortgage balance of over $146 million. The Owners also breached their HUD regulatory agreements that require, among other things, timely payment of mortgage obligations. In addition, the Operators and Master Tenant breached their HUD regulatory agreements by failing to timely pay debts incurred related to the operation of the facilities.

2

For the reasons described herein, the United States seeks the appointment of a receiver to manage and operate the Rosewood Facilities while HUD proceeds with non-judicial foreclosures pursuant to HUD's Multifamily Mortgage Foreclosure Act of 1981, 12 U.S.C § 3701 *et seq.* (1981). The United States requests that the receivership last until HUD completes a foreclosure sale for all thirteen facilities and transfers title and operations to the successful purchaser at foreclosure, or acquires title or facilitates the transfer of title and operations to a responsible third party.

## II. JURISDICTION

1.      This Court has subject matter jurisdiction over this civil action under 28 U.S.C. § 1345.

2.      Additionally, this Court has subject matter jurisdiction over this receivership action under 28 U.S.C. § 1331 due to violations of the National Housing Act, 12 U.S.C. §§ 1715n and 1715w, and the regulations implemented through the regulatory agreements that the Owners, Operators, and Master Tenant entered into with HUD.

3.      This Court has personal jurisdiction over each defendant being located, organized, doing business, and/or purposefully availing itself to the benefits in the State of Illinois. Fed. R. Civ. P. 4(k)(1)(A).

4.      This Court also has jurisdiction in this receivership action by virtue of 28 U.S.C § 754.

## III. VENUE

5.      Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391(b) because six of the thirteen Rosewood Facilities are located in the Northern District of Illinois, three in the Southern District of Illinois, three in the Central District of Illinois, and one in the Eastern

District of Missouri. The majority of the defendants are located in this District, and venue is proper due to a substantial part of the events giving rise to the claim(s) occurring in this District.

## IV. PARTIES

6.      Plaintiff is the United States of America suing on behalf of HUD.

7.      Owners include: Alton Real Estate, Inc.; East Peoria Real Estate, Inc.; Joliet Real Estate Holding Co.; Moline Real Estate, Inc.; Peoria Real Estate, Inc.; Schuetz Road Real Estate, Inc.; Wood River Real Estate Holding Co.; Edwardsville Real Estate, LLC; Elgin Real Estate, LLC; Inverness Real Estate, LLC; Northbrook Real Estate, LLC; Rockford Real Estate, LLC; and St. Charles Real Estate, LLC. Each Owners owns one of the thirteen Rosewood Facilities. *See* Exhibit 1.

8.      Owners, other than Schuetz Road Real Estate, Inc., are corporations or limited liability companies organized and doing business under the laws of the State of Illinois. Their principal place of business is located at 11701 Borman Drive, Suite 315, St. Louis, MO 63146.

9.      Schuetz Road Real Estate, Inc. is a corporation organized and doing business under the laws of the State of Missouri. Its principal place of business is located at 11701 Borman Drive, Suite 315, St. Louis, MO 63146. Schuetz Road Real Estate, Inc. and the other Owners leased the Rosewood Facilities, in the aggregate, to the Master Tenant pursuant to an indivisible master lease governed by Illinois law. Some principals of Schuetz Road Real Estate, Inc. reside in Cook County, Illinois.

10.      Operators include:  Bravo Care of Alton, Inc.; Bravo Care of East Peoria, Inc.; Bravo Care of Edwardsville, Inc.; Bravo Care of Elgin, Inc.; Bravo Care of Inverness, Inc.; Bravo Care of Joliet, Inc.; Bravo Care of Moline, Inc.; Bravo Care of Northbrook, Inc.; Bravo Care of Peoria, Inc.; Bravo Care of Rockford, Inc.; Bravo Care of St. Charles, Inc.; Bravo Care of St.

Louis, Inc.; and Bravo Care of Wood River, Inc. The Operators individually operate the thirteen Rosewood Facilities. *See* Exhibit 1.

11.     Operators, other than Bravo Care of St. Louis, Inc., are corporations organized and doing business under the laws of the State of Illinois. Their principal place of business is located at 11701 Borman Drive, Suite 315, St. Louis, MO 63146.

12.     Bravo Care of St. Louis, Inc. is a corporation organized and doing business under the laws of the State of Missouri. Its principal place of business is located at 11701 Borman Drive, Suite 315, St. Louis, MO 63146. Bravo Care of St. Louis, Inc. guaranteed the payment and performance of all the obligations of all the other Operators under their subleases of the Rosewood Facilities in Illinois under a Cross-Guaranty governed by Illinois law. Some principals of Bravo Care of St. Louis, Inc. reside in Cook County, Illinois.

13.     The Owners lease all thirteen properties to CR Finance, which is a limited liability company organized and doing business under the laws of the State of Delaware. Its principal place of business is located at 11701 Borman Drive, Suite 315, St. Louis, MO 63146. CR Finance is the "Master Tenant" for the Rosewood Facilities, and is the lessee under the single, indivisible master lease with the Owners, governing all thirteen Rosewood Facilities. The master lease between the Owners and CR Finance (and its addendum) is governed by Illinois law.

14.     The Operators contracted with Midwest to manage the Rosewood Facilities. Midwest is a corporation organized and doing business under the laws of the State of Illinois and is the management agent for the Rosewood Facilities. Its principal place of business is located at 11701 Borman Drive, Suite 315, St. Louis, MO 63146.

15.     Owners, Operators, Master Tenant, and Midwest are under common control. They share related or identical principals, agents, and/or beneficial owners, namely: Zvi Feiner, Hinde Feiner, Dmitry Godin, Ilya Shulman, Rene C. Yampol, Hillel Yampol, and Mark Yampol.

## V. APPLICABLE LAW

16.     Under Section 232 pursuant to 223(f) and Section 232 pursuant to 223(a)(7) of the National Housing Act, the Secretary is authorized to insure mortgages executed in connection with the refinancing of existing debt on FHA-insured nursing homes, assisted living facilities,[1] intermediate care facilities, and board and care homes. 12 U.S.C. § 1715n(a)(7); 12 U.S.C. § 1715n(f)(4); and 12 U.S.C. § 1715w.

17.     The Secretary is also authorized to promulgate rules and regulations necessary to carry out the various mortgage insurance programs under Title II of the National Housing Act. 12 U.S.C. § 1715(b).

18.     In exchange for the benefits of the Section 232 mortgage insurance program, HUD imposes additional regulatory requirements that mortgagors must follow. These regulations are set forth at 24 C.F.R. parts 200, 207, and 232.

19.     The regulations provide, *inter alia*, that the Federal Housing Commissioner (the "Commissioner") shall regulate the mortgagor by means of a regulatory agreement providing terms, conditions, and standards established by the Commissioner, or by such other means as the Commissioner may prescribe. 24 C.F.R. § 200.105.

---

[1] The Rosewood Facility that is a supportive living facility under Illinois law was determined by HUD to qualify as an "assisted living facility" within the meaning of Section 232 of the National Housing Act, and it must be operated in compliance with the applicable requirements of Section 232 as well as the state law program.

## VI. STATEMENT OF FACTS

### A. The Rosewood Facilities

20.     The Rosewood Facilities consist of a portfolio of twelve skilled nursing homes and one assisted living facility located primarily in the State of Illinois, with one project located in the State of Missouri. *See* Exhibit 1.

21.     Upon information and belief, the Rosewood Facilities consist of 1,662 licensed beds, of which 1,116 are occupied as of August 12, 2018.

22.     HUD's current estimated going-concern value of the Rosewood Facilities is approximately $90 million to 95 million.

23.     The Owners leased the properties to CR Finance, the Master Tenant, through a Master Lease Agreement. *See* Exhibit 2 (Master Lease Agreement). Under the Master Lease Agreement, the Master Tenant agreed to pay the Owners an annual base rent of $14,322,168.36, payable in equal monthly installments, provided that such base rent must always be at least rents equal to 1.05 times the aggregate principal and interest due on the FHA-insured loans, plus escrows and reserves required by the HUD documents, including without limitation for taxes, insurance, mortgage insurance premium, and replacement reserves. *Id*. at ¶ 7.

24.     The Master Tenant, in turn, subleased the Rosewood Facilities to the Operators. *See* Exhibit 3 (Sublease).[2] Each sublease agreements requires the Operators to pay an annual base rent, in monthly installments, to the Master Tenant in an amount no less than 1.05 times the principal and interest on the FHA-insured mortgage on its respective facility, plus all escrows or reserves,

---

[2] Due to the voluminous record, in most instances the transaction and mortgage documents from only one project, the Rosewood Care Center Alton, are attached as exhibits. To the extent this Complaint refers to language in any of the transaction or mortgage-related documents, the quoted language is identical for each of the thirteen Rosewood Facilities.

including without limitation for taxes, insurance, mortgage insurance premium and replacement reserves. *Id*. at 7(a).

25.     The Operators also entered into Cross-Default Guaranty of Subtenants agreements whereby each Operator agreed to guaranty the timely payment of rent obligations and performance of other obligations to the Master Tenant by each other Operator. *See* Exhibit 4 (Cross Default Guaranty of Subtenants). Pursuant to the HUD Master Lease Addendum (and of which the FHA lender and HUD are third party beneficiaries), the Master Tenant assigned such Cross-Guaranty to the FHA lender (now HUD, as assignee). *See* Exhibit 2 at Addendum.

26.     Thus, under this framework, the Operators were supposed to make monthly rent payments to the Master Tenant, which should have passed on the rents to the Owners pursuant to the master lease.

27.     Pursuant to recorded Subordination Agreements, the Owners, Operators, and Master Tenant subordinated the master lease and subleases to the HUD mortgages and HUD regulatory agreements. *See* Exhibit 5 (Master Lease Subordination Agreement).

**B.  FHA-Insured Mortgages**

28.     From 2003 through 2012, Berkadia Commercial Mortgage LLC ("Berkadia"), Highland Mortgage Company, GMAC Commercial Mortgage Bank, and Capmark Finance Inc. (collectively the "Original Lenders")[3] made thirteen loans (the "Loans") to the Owners for the Rosewood Facilities.

---

[3] Berkadia subsequently succeeded to the interests of Highland Mortgage Company, GMAC Commercial Mortgage Bank, and Capmark Finance Inc.

29. HUD insured eleven of the Loans in the portfolio under Section 232/223(f), and two of the Loans (Alton and Elgin) were insured under Section 232/223(a)(7) in 2011 and 2012, respectively.

30. Each Owner executed and delivered to the Original Lenders a mortgage note or deed of trust note (identified herein as "Mortgage Note(s)") whereby each Owner promised to pay the respective Lender, by monthly installments, total principal balances ranging from approximately $9,000,000 to $14,000,000, totaling $168,966,400 for all thirteen Rosewood Facilities. *See* Exhibit 6 (Mortgage Notes).

31. Each Owner agreed that, upon default of the Mortgage Note, the holder of the note could, at its option and without notice, declare the entire principal and accrued interest due and payable. *Id*.

32. Each Owner also executed a mortgage or deed of trust (identified herein as the "Mortgage(s)") and a security agreement with the Original Lenders, their successors or assigns, to secure the payment of each Mortgage Note. *See* Exhibit 7 (Mortgages).

33. In each Mortgage, each Owner agreed to pay the Mortgage Note in the manner provided in therein. *Id*. at ¶ 1.

34. In the event of the Owners' default in making monthly payments, then "the whole of said principal sum remaining unpaid together with accrued interest thereon shall, at the election of the Mortgagee, without notice, become immediately due and payable, in which event the Mortgagee shall have the right immediately to foreclose this mortgage." *Id*. at ¶ 19.

35. Each Mortgage also incorporated the Owners' regulatory agreements with HUD, making them part of the mortgage. Paragraph 3 of the Mortgage for each Rosewood Facility provides that:

[T]he Regulatory Agreement . . . is incorporated in and made a part of this Mortgage. Upon default under the Regulatory Agreement and upon the request of the Secretary of [HUD], acting by and through the Federal Housing Commissioner, the Mortgagee, at its option, may declare the whole of the indebtedness secured hereby to be due and payable . . .

36.     Each Mortgage provides that, upon default, the mortgagee shall be entitled to appointment of a receiver. Paragraph 5 of the Mortgage for each Rosewood Facility provides that:

[U]pon default hereunder Mortgagee shall be entitled to the appointment of a receiver by any court having jurisdiction, without notice, to take possession and protect the property described herein and operate same and collect the rents, profits, and income therefrom . . . .

37.     In December 2013, HUD approved the Operators' request for a revolving accounts-receivable loan ("AR loan") with MidCap Financial, LLC ("MidCap"), in which MidCap has a first lien on the accounts of the Rosewood Facilities as security for this AR loan, subject to an Intercreditor Agreement between the Operators, the mortgagee, and MidCap. This revolving loan provides working capital funds to the Operators for the operation of the Rosewood Facilities, and is expected to remain in place during the pendency of the receivership.

38.     Each Operator entered into a security agreement ("Operator Security Agreements(s)") with the FHA mortgagee (at the time, Berkadia) whereby it pledged certain property and interests in property—including their interests in all fixtures, personal property, licenses, permits, approvals, funds, monies, accounts receivable, and many others—to secure payment of the Mortgage Notes. *See* Exhibit 8 (Operator Security Agreement). Failure to pay the Mortgage Note resulted in a default under the Operator Security Agreement, giving the mortgagee the right to exercise all rights and remedies permitted by the Mortgage (including appointment of a receiver). *Id.* at ¶¶ 8-9.

39.     Each Operator also executed and delivered an Assignment of Leases and Rents to the FHA Mortgagee (at the time, Berkadia), which provides that each Operator's permission to

collect rents terminates upon, among other things, the appointment of a receiver. *See* Exhibit 9 (Assignment of Leases and Rents). Further, Section 2(d) provides that "Operator hereby agrees that Secured Party is entitled to the appointment of a receiver for the Healthcare Facility upon the occurrence of an Event of Default hereunder," with an Event of Default defined as an Event of Default under the Operator's Security Agreement.

40.     The Master Tenant also entered into a security agreement ("Master Tenant Security Agreement(s)") for each Mortgage with the FHA mortgagee (at the time, Berkadia) whereby it pledged certain property and interests in property—including their interests in all fixtures, personal property, licenses, permits, approvals, funds, monies, accounts receivable, and many others—to secure payment of the Mortgage Notes. *See* Exhibit 10 (Master Tenant Security Agreement). Failure to pay the Mortgage Note resulted in a default under the Master Tenant Security Agreement, giving the mortgagee the right to exercise all rights and remedies permitted by the Mortgage (including appointment of a receiver). *Id.* at ¶¶ 9-10.

41.     Berkadia ultimately assigned the Mortgage Notes, Mortgages, Security Agreements, and all ancillary documents for the Rosewood Facilities to Greystone Servicing Corporation, Inc. ("Greystone") beginning in June through August of 2015.

**C. Owner Regulatory Agreements**

42.     In consideration of HUD's mortgage insurance on each of the Rosewood Facilities, and as promulgated under the National Housing Act and its corresponding regulations, each Owner executed a regulatory agreement (identified herein as "Owner Regulatory Agreement(s)") with HUD. *See* Exhibit 11 (Owner Regulatory Agreements).

43.     Each Owner Regulatory Agreement provides additional requirements that each Owner must meet as signatories of FHA-insured Mortgage Notes and Mortgages.

44.     Paragraph 1 of each Owner Regulatory Agreement requires each Owner "to make promptly all payments due under the [FHA-insured] note and mortgage."

45.     Paragraph 11 of each Owner Regulatory Agreement provides that upon a violation of any provision of the Owner Regulatory Agreement, HUD may give written notice of such violation and, if the violation is not corrected within 30 days after such notice or within such time as determined necessary by HUD to correct the violation, without further notice, declare a default under the Owner Regulatory Agreement.

46.     Paragraph 9 of each Owner Regulatory Agreement requires that within 90 days of the end of each fiscal year, each Owner must provide HUD with a complete annual financial report based on an examination of the Owners' books and records.

47.     Upon default, HUD may:

> Apply to any court, State or Federal . . . for the appointment of a receiver to take over and operate the project in accordance with the terms of the [Regulatory] Agreement . . . since the injury to the Secretary arising from a default under any of the terms of this Agreement would be irreparable and the amount of damage would be difficult to ascertain.

### D. Operator and Master Tenant Regulatory Agreements

48.     In addition to the Owners, the Operators and Master Tenant were required to enter into regulatory agreements (identified herein as the "Operator Regulatory Agreement(s)" and "Master Tenant Regulatory Agreement(s)") with HUD. *See* Exhibit 12 (Operator Regulatory Agreements) and Exhibit 13 (Master Tenant Regulatory Agreements).

49.     The Operator Regulatory Agreements and Master Tenant Regulatory Agreements provide additional requirements that the Operators and Master Tenant must meet as beneficiaries of FHA-insured mortgages.

12

50.     Paragraph 1 of the Master Tenant Regulatory Agreements and paragraph 2 of the Operator Regulatory Agreements obligate the Master Tenant and the Operators to make rent payments under the Master Lease Agreement and sublease agreements when due.

51.     Paragraph 1 of the Master Tenant Regulatory Agreements and paragraph 2 of the Operator Regulatory Agreements also make any agreements relating to the operation of the Rosewood Facilities between the Owners, on the one hand, and the Master Tenant or Operators, on the other hand, subordinate to the HUD regulatory agreements.

52.     Paragraph 9 of each Operator Regulatory Agreements also provides that "Operator shall timely pay all debts incurred related to the operation of the Healthcare Facility . . . .",  and Paragraph 5 of each Master Tenant Regulatory Agreement provides that "Master Tenant shall timely pay (or cause Operator to pay) all debts incurred related to the operation of the Healthcare Facility . . . ."

53.     Each Operator Regulatory Agreement at paragraph 8(b) provides that, upon declaring an event of default, HUD may without limitation:

> Terminate or cause the termination of any Borrower-Operator Agreement, seek the appointment of a receiver for the Healthcare Facility, and/or require Borrower to immediately procure a replacement operator (including an interim operator where appropriate) . . . .

54.     Similarly, each Master Tenant Regulatory Agreement at paragraph 5(a) likewise authorizes HUD, upon declaring an event of default thereunder, to terminate or cause the termination of the Master Lease, seek the appointment of a receiver for the Healthcare Facility, terminate any Borrower-Operator Agreement, and/or require the Master Tenant to immediately procure a replacement operator.

55.     Paragraph 2(b) of each Master Tenant Regulatory Agreement and 3(b) of each Operators Regulatory Agreement requires that:

13

> [I]n the event of either a monetary default under this Agreement, the [Owner's] Regulatory Agreement, any other regulatory agreement made for the benefit of HUD relating to the Project, or any note or security instrument with respect to the Project that is insured or held by HUD, [Operator and Master Tenant] shall cooperate in any legal and lawful manner necessary or required to permit the continued operation of the Healthcare Facility for the Approved Use including, as determined by HUD, in consultation with Lender, the necessary conveyance, assignment or transfer of the Permits and Approvals.

### E. Default of the Mortgages and Regulatory Agreements

56.     In August 2015, in accordance with the requirements of paragraph 11 of the Owners Regulatory Agreements and paragraph 8 of the Operator Regulatory Agreements, HUD notified the Owners and Operators that they were in violation of their respective regulatory agreements. Additionally, in June 2018, in accordance with the requirements of paragraph 5 of the Master Tenant Regulatory Agreements, HUD notified the Master Tenant that it was in violation of its Master Tenant Regulatory Agreements. *See* Exhibit 14 (Notices of Violation).

57.     The Notices of Violation listed several violations including, but not limited to, the Owners' failure to pay their Mortgages, the Operators' failure to make lease payments, and the Master Tenant's failure to pay debts incurred related to the operation of each facility. The Notices of Violation further advised these defendants that the violations must be corrected within 30 days.

58.     Notwithstanding the Notices of Violation, the Owners remain in default under the Mortgage Notes, Mortgages, and Owner Regulatory Agreements.

59.     Beginning in January 2015, the Owners only made sporadic and insufficient mortgage payments, and since March 2016, they have made no payments at all.

60.     The Owners currently have a total unpaid principal mortgage balance of approximately $146,655,782.44.

61.     The Owners have also failed to submit annual financial reports to HUD. They have not submitted financial reports since 2014.

62. In February 2015, Berkadia notified each Owner that it was in default of its respective Mortgage as of January 1, 2015, and on October 19, 2016, Greystone notified each Owner that its respective Mortgage was in default and accelerated. *See* Exhibits 15 (Berkadia Notices of Default) & 16 (Greystone Notices of Default and Acceleration).

63. As a result of Owners' continued failure to make mortgage payments in violation of the Owner Regulatory Agreements, Mortgage Notes, and Mortgages, on August 15, 2018, HUD declared each Owner in default pursuant to paragraph 11 of the Owner Regulatory Agreement and Paragraph 3 of the Mortgage. *See* Exhibit 17 (Owner Notices of Default)

64. As a result of Operators' failure to make is required lease payments and failure to cure alleged improper use of project assets, and as a result of Master Tenant's failure to "timely pay all debts incurred related to the operation of [each respective health care facility]," on August 15, 2018, HUD declared each Operator and Master Tenant in default pursuant to paragraph 8 of the Operator Regulatory Agreement and paragraph 5 of the Master Tenant Regulatory Agreement. *See* Exhibits 18 (Operator Notices of Default) & 19 (Master Tenant Notices of Default).

65. On or about August 8, 2018 and August 9, 2018, Greystone assigned the Mortgage Notes and Mortgages to the Secretary of HUD, making HUD the mortgagee.

66. On or about August 8, 2018 and August 9, 2018, Greystone also submitted 13 claims for insurance benefits, for which HUD has paid $151,430,415.82 to date, and expects to pay further amounts pending completion of financial and legal requirements.

67. Due to assignment of the thirteen Mortgage Notes and Mortgages, HUD initiated non-judicial foreclosure proceedings pursuant to the Multifamily Foreclosure Act, 12 U.S.C. § 3701 et seq., through which HUD expects to convey the Rosewood Facilities to the HUD-approved winning bidder, or, if HUD acquires any of the Rosewood Facilities, to sell such

Rosewood Facility to an acceptable third-party purchaser. *See* Exhibit 20 (21-Day Notice Letters); *see also* 12 U.S.C. § 3701 et seq. (providing for a 21-day letter).

68.     The relief requested in this complaint, among other things, is in aid of said foreclosure.

**F.  Mismanagement of the Rosewood Facilities**

69.     While under the Owners' and Operators' control, the operations of the Rosewood Facilities have been characterized by alleged improprieties, in-fighting, and financial mismanagement.

70.     For instance, upon information and belief, the Owners and Operators violated their respective regulatory agreements by misusing the Rosewood Facilities' project funds by transferring or authorizing the use of such funds to or for the benefit of a non-HUD insured affiliated project located in Galesburg, Illinois ("Galesburg Facility").

71.     Upon information and belief, between January 2014 and October 2015, a time in which the FHA-insured mortgage remained in payment default, the principals and/or agents of the Operators used project funds for the Galesburg Facility of approximately $7,000,000.

72.     In its August 2015 Notices of Violation to the Owners and Operators, HUD sent notice that the payments to the Galesburg Facility violated the regulatory agreements. *See* Exhibit 14. HUD also demanded that the Owners and Operators recover the payments and apply them to the Owners' mortgage indebtedness. *Id*.

73.     Upon information and belief, the $7,000,000 improperly paid to the Galesburg Facility was not recovered and applied to the FHA-insured mortgage.

74.     Additionally, the principals and/or agents of the Defendants have been involved in numerous lawsuits, including lawsuits amongst themselves on matters directly relating to the Rosewood Facilities.

75.     These lawsuits have negatively affected the financial and operational stability of the facilities.

76.     For example, Martin Brothers Distributing Co., a supplier of goods to the Rosewood Facilities, sued the Rosewood Facilities and Midwest in the Iowa District Court for Black Hawk County to recover approximately $890,000 in unpaid debts, as well as for unjust enrichment, negligent misrepresentation, and fraud. *See* Exhibit 21 (Martin Brothers Ruling).

77.     Following a September 2017 trial, the court found that the plaintiff was entitled to judgment for the unpaid sums, plus interest. *Id*. The court also held that the Rosewood Facilities and Midwest were liable for the claimed amounts based upon negligent misrepresentation. *Id*.

78.     Additionally, United RX, LLC, another supplier of pharmacy goods and services to the Rosewood Facilities, sued seven of the thirteen Operators, the Master Tenant, Midwest, and a majority of the principals, agents, and/or beneficial owners of the Rosewood Facilities in the Circuit Court of Cook County, Illinois to recover approximately $900,000 in unpaid invoices, as well as for tortious interference, fraudulent conveyances, and unjust enrichments. This litigation remains pending. *See* Exhibit 22 (United RX Complaint).

79.     The Iowa and Illinois courts' findings demonstrate that the Operator and Master Tenants breached their obligations to timely pay, or cause to be paid, all debts incurred relating to the operations of the Rosewood Facilities.

80.     In another lawsuit, filed in the Supreme Court of the County of New York in September 2016, Greystone sued 10 out of the 13 Operators under contracts executed by Mark

Yampol, in connection with attempts to refinance some of the loans relating to certain of the Rosewood Facilities. *See* Exhibit 23 (Greystone Summons and Complaint). In support of the Operators' motion to dismiss, Zvi Feiner submitted an affidavit swearing under penalty of perjury that Mark Yampol did not have any authority to act as an agent for the Operators. *See* Exhibit 24 (Feiner Affidavit). That litigation remains pending.

81.     In another lawsuit, filed in the Circuit Court of Saint Louis County, principals of the Defendants sued each other. Specifically, Hillel Yampol, Mark Yampol, and Midwest, among others, sued Hinde Feiner, Zvi Feiner, and others for interfering in the business operations of the Rosewood Facilities.

82.     In February 2015, the court granted the plaintiffs' petition for injunctive relief and issued an order that, among other things, enjoined Hinde Feiner and Zvi Feiner from being on Midwest's premises or from taking any actions on behalf of the Operators without the express consent of Hillel Yampol. *See* Exhibit 25 (YR Consulting Order and Judgment).

83.     In yet another lawsuit, filed in the United States District Court for the Northern District of Illinois, investors allege that Zvi Feiner and others violated the RICO statute and committed fraud through a scheme to steal over $20 million from investors. *See* Compl., *Shulman v. Feiner*, Dkt. 1, Case No. 17 C 6769 (N.D. Ill. Sept. 19, 2017), attached as Exhibit 26 (RICO Complaint).

84.     According to the complaint, Zvi Feiner used the investors' money to create numerous limited liability companies to hold retirement home facilities, but misrepresented the actual price of the facilities and made bogus promises of investment returns. *Id.*

85. The defendants in the case have filed a counterclaim, alleging that the investor plaintiffs forced Zvi Feiner, under duress, to relinquish his interests in various businesses. *See* Exhibit 27 (RICO Counterclaim).

86. *Shulman v. Feiner* remains pending as Case No. 17 C 6769, in this Court.

87. The existence of multiple lawsuits involving the Defendants and their beneficial owners has contributed to an environment of uncertainty and risk for the patients at the Rosewood Facilities.

88. In February 2016, as a result of protracted disputes between the principals of the Rosewood Facilities, Midwest entered a consulting agreement with R & R Marketing and Management, LLC ("R&R"). *See* Exhibit 28 (R&R Management Consulting Agreement). Under the consulting agreement, R&R manages eleven of the thirteen Rosewood Facilities.

89. Upon information and belief, Mark Yampol and Midwest continue to manage the St. Louis and Alton facilities.

## VII. COUNT I
### (Owners' Breach of Mortgage Notes and Mortgages)

90. The United States realleges paragraphs 1- 89 above as if set forth herein.

91. Each Owner executed and delivered a Mortgage Note promising to pay the note holder, by monthly installments, principal and interest on the FHA-insured Mortgage.

92. In each Mortgage, which secured payment of the Mortgage Note, each Owner agreed to pay the Mortgage Note in the manner provided therein.

93. The Owners have failed to pay the FHA-insured Mortgages since March 2016, leaving a total unpaid principal balance of approximately $146,655,782.44.

94. By failing to pay the FHA-insured Mortgages since March 2016, each Owner has breached its obligations under the Mortgage Note and Mortgage.

95.     Paragraph 19 of each Mortgage provides that upon the Owners' defaults, the mortgagee (HUD) may declare the entire outstanding principal and interest immediately due and payable.

96.     Paragraph 19 of each Mortgage also provides that upon the Owners' defaults, the mortgagee (HUD) shall have the right to immediately foreclose on the Mortgages.

97.     Paragraph 5 of each Mortgage provides that upon the Owners' defaults, the mortgagee (HUD) is "entitled to the appointment of a receiver by any court having jurisdiction, without notice, to take possession and protect the [Rosewood Facilities] . . . and to operate same and collect the rents, profits and income therefrom . . . ."

98.     Due to the aforementioned defaults, HUD is entitled to immediate appointment of a receiver to operate the Rosewood Facilities pending HUD's foreclosure on the Mortgages.

## VIII. COUNT II
### (Owners' Breach of the Regulatory Agreements)

99.     The United States realleges paragraphs 1- 98 above as if set forth herein.

100.    Each Owner entered into an Owner Regulatory Agreement with HUD.

101.    The terms of the Owner Regulatory Agreements were incorporated into the Owners' Mortgages.

102.    Paragraph 1 of each Owner Regulatory Agreement requires the Owners "to make promptly all payments due under the [FHA-insured] note and mortgage."

103.    Paragraph 9 of each Owner Regulatory Agreement requires the Owners to file annual financial reports within 90 days of the end of each fiscal year.

104.    Paragraph 11 of each Owner Regulatory Agreement provides that upon a violation of any provision of the Owner Regulatory Agreement, HUD may give written notice of such violation and, if not corrected within 30 days, declare a default.

105.    The Owners have failed to pay the FHA-insured Mortgages since March 2016, resulting in a breach of the Owner Regulatory Agreements for failing to make promptly all payments due under the Mortgage Notes and Mortgages.

106.    Each Owner has failed to file annual financial reports since 2014, resulting in a breach of the Owner Regulatory Agreements.

107.    In August 2015, HUD issued Notices of Violation to the Owners.

108.    Because the Owners did not cure the aforesaid breach of the Owner Regulatory Agreements related to its failure to make mortgage payments, on August 15, 2018, HUD declared a default.

109.    Upon default, HUD may also apply to any court "for the appointment of a receiver to take over and operate the project in accordance with the [Regulatory] Agreement . . . ."

110.    Based upon the aforesaid defaults and breaches of the Owner Regulatory Agreements, HUD is entitled to immediate appointment of a receiver to operate the Rosewood Facilities.

## IX. COUNT III
### (Operators' Breach of the Regulatory Agreements)

111.    The United States realleges paragraphs 1-110 above as if set forth herein.

112.    After a trial, the District Court for Black Hawk County, an Iowa state court, ruled and entered final judgment that Midwest and the Rosewood Facilities failed to pay approximately $890,000 for goods and equipment delivered to the Rosewood Facilities between approximately June 2014 and July 2015.

113.    By failing to pay vendor invoices as they became due, the Operators breached the Operator Regulatory Agreements requiring that they "timely pay all debts incurred related to the operation of the [respective facility]."

114.     Because of the Operators' breach, HUD is entitled under the Operator Regulatory Agreements to terminate the Operators' authority to operate the Rosewood Facilities, seek the appointment of a receiver, and require the cooperation of the Operators in transitioning to a replacement operator for each facility.

115.     In the alternative, even without a breach of the Operator Regulatory Agreements, HUD is nevertheless entitled to a receiver because the Owners' failure to pay the Mortgage Note and breach of the Owners Regulatory Agreements resulted in a cross-default under the Operator Security Agreement.

## X. COUNT IV
### (Master Tenant's Breach of the Regulatory Agreement)

116.     The United States realleges paragraphs 1-115 above as if set forth herein.

117.     After a trial, the District Court for Black Hawk County, an Iowa state court, ruled and entered final judgment that Midwest and the Rosewood Facilities failed to pay approximately $890,000 for goods and equipment delivered to the Rosewood Facilities between approximately June 2014 and July 2015.

118.     By failing to pay or cause the Operators to pay vendor invoices as they became due, the Master Tenant breached the Master Tenant Regulatory Agreement requiring that it "timely pay (or cause Operator to pay) all debts incurred related to the operation of the [respective facility]."

119.     Because of the Master Tenant's breach, HUD is entitled under the Master Tenant Regulatory Agreements to terminate the Master Tenant's master lease, seek the appointment of a receiver, and require the cooperation of the Master Tenant in an orderly transition to a replacement operator for each facility.

120.     In the alternative, even without a breach of the Master Tenant Regulatory Agreements, HUD is nevertheless entitled to a receiver because the Owners' failure to pay the

Mortgage Note and breach of the Owners Regulatory Agreements resulted in a cross-default under the Master Tenant Security Agreement.

## XI. COUNT V
### (Subordination of Management Agent)

121.    The United States realleges paragraphs 1-120 above as if set forth herein.

122.    As part of the Operator Regulatory Agreements, the Operators agreed that any management agreement entered with a management agent must contain provisions that the Management Agreements could be terminated by HUD for good cause, including for violations of the Owner Regulatory Agreements or violations of the Operator Regulatory Agreement.

123.    Accordingly, all of the Operators' agreements with Midwest (collectively, the "Management Agreements") contained a clause authorizing HUD to terminate the agreements for good cause, including for violations of the Owner Regulatory Agreements or violations of the Operator Regulatory Agreements.

124.    Due to the breaches of the Owners and the Operators, HUD is entitled to terminate Midwest's Management Agreements and any right or interest that Midwest has in any of the Rosewood Facilities.

## XII.   COUNT VI
### (Appointment of Receiver)

125.    The United States realleges paragraphs 1-124 above as if set forth herein.

126.    HUD, as the current mortgagee by way of assignment, is contractually entitled to enforcement of the terms of the Mortgages, specifically the appointment of a receiver noted in paragraph 5 of the Mortgages.

127.    Due to the Owners' ongoing defaults under the Owner Regulatory Agreements, HUD is entitled to appointment of a receiver.

128.    The Defendants' tenure at the Rosewood Facilities has been characterized by improprieties, in-fighting, and financial mismanagement.

129.    Unless a receiver is appointed immediately by this Court to take possession and operate the facilities, HUD will have no effective and/or efficient means to enforce or ensure that all taxes, insurance, utilities, lease obligations, and other expenses for the Rosewood Facilities are paid, and that patients in the facilities are cared for.

130.    HUD requests that The Long Hill Company be appointed as receiver to take immediate possession of and to operate, collect rents, profits, and income on behalf of the Rosewood Facilities until HUD finalizes foreclosure proceedings and/or sale to a third party.

131.    HUD requests that the receivership continue until the Rosewood Facilities are acquired by a successful bidder at foreclosure or a post-foreclosure sale/transfer by HUD.

### XIII. PRAYER FOR RELIEF

WHEREFORE, the United States prays for the following relief:

a.    An order appointing The Long Hill Company, through its wholly owned subsidiary Long Hill at Rosewood LLC,  as receiver to take immediate possession of and to operate, collect rents, profits, and income on behalf of the Rosewood Facilities in accordance with the applicable regulatory agreements and loan documents, with all necessary authority to stabilize the Rosewood Facilities' finances, and take such actions as necessary or appropriate to maintain or secure all licenses, permits, and approvals necessary to continue to operate the Rosewood Facilities as nursing homes/supportive living facility and all Medicaid, Medicare or other provider agreements, to execute or modify contracts, to produce and deliver reliable financial information to HUD, to terminate burdensome and/or wasteful contracts, and to protect the residents and ensure their well-being until such time as HUD has

24

obtained new ownership through foreclosure or sale to an acceptable third party,

and transfers title and operations to the successful purchaser.

b. Such other relief as the Court deems just and appropriate.


Dated: August 17, 2018                    Respectfully Submitted,


                                          CHAD A. READLER
                                          Principal Deputy Assistant Attorney General

                                          JOHN R. LAUSCH, JR.
                                          United States Attorney


                                          /s/ _____
                                          RUTH A. HARVEY
                                          KIRK T. MANHARDT
                                          J. TAYLOR McCONKIE
                                          SHANE HUANG
                                          United States Department of Justice
                                          1100 L Street, N.W., No. 7016
                                          Washington, D.C., 20005
                                          (202) 307-0244
                                          John.T.McConkie@usdoj.gov

                                          Attorneys for the United States