**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
|     **Plaintiff,** | |
|   **v.** | |
| **ALTON REAL ESTATE, INC.; EAST PEORIA REAL ESTATE, INC.; JOLIET REAL ESTATE HOLDING CO.; MOLINE REAL ESTATE, INC.; PEORIA REAL ESTATE, INC.; SCHUETZ ROAD REAL ESTATE, INC.; WOOD RIVER REAL ESTATE HOLDING CO.; EDWARDSVILLE REAL ESTATE, LLC; ELGIN REAL ESTATE, LLC; INVERNESS REAL ESTATE, LLC; NORTHBROOK REAL ESTATE, LLC; ROCKFORD REAL ESTATE, LLC; ST. CHARLES REAL ESTATE, LLC; CR FINANCE II, LLC; BRAVO CARE OF ALTON, INC.; BRAVO CARE OF EAST PEORIA, INC.; BRAVO CARE OF EDWARDSVILLE, INC.; BRAVO CARE OF ELGIN, INC.; BRAVO CARE OF INVERNESS, INC.; BRAVO CARE OF JOLIET, INC.; BRAVO CARE OF MOLINE, INC.; BRAVO CARE OF NORTHBROOK, INC.; BRAVO CARE OF PEORIA, INC.; BRAVO CARE OF ROCKFORD, INC.; BRAVO CARE OF ST. CHARLES, INC.; BRAVO CARE OF ST. LOUIS, INC.; BRAVO CARE OF WOOD RIVER, INC.; and MIDWEST ADMINISTRATIVE SERVICES, INC.,** | Civil No. 18 C 5625<br>District Judge: Hon. John J. Tharp, Jr.<br>Magistrate Judge: Hon. Mary M. Rowland |
|     **Defendants.** | |

**MEMORANDUM OF LAW IN SUPPORT OF THE UNITED STATES' EMERGENCY MOTION FOR APPOINTMENT OF RECEIVER**

## Table of Contents

I.    Introduction ........................................................................................................... 1

II.    Statement of Facts ................................................................................................. 2

    A.    The National Housing Act .......................................................................... 2

    B.    The Rosewood Facilities ............................................................................ 3

    C.    FHA-Insured Mortgages ............................................................................ 5

    D.    HUD Regulatory Agreements .................................................................... 8

    E.    The Owners, Operators, and Master Tenant Breached Their Obligations Under the Mortgage, Mortgage Note, and Regulatory Agreements ............................................................. 9

    F.    Ongoing and Repeated Mismanagement of the Rosewood Facilities .............................. 10

    G.    Administrative Remedies ......................................................................... 14

III.    Argument ............................................................................................................. 14

    A.    The United States Is Entitled to Appointment of a Receiver Based on the Contracts ... 14

    B.    Equitable Factors Further Support Appointment of a Receiver ..................................... 17

        1.    A Receiver is Necessary to Protect the Health and Safety of Residents ................... 18

        2.    A Receiver Is Necessary to Protect HUD's Financial Interest in the Rosewood Facilities .................................................................................................. 19

        3.    A Receiver is Necessary to Advance Congress's Policy of Providing Suitable Housing for Nursing Home Residents ............................................................... 23

    C.    The United States' Entitlement to a Receiver Extends to the Entire Operations and Management of the Rosewood Facilities .................................................................... 24

    D.    The Proposed Receiver Is Qualified and Prepared to Assume Management Operations Until HUD Can Foreclose .......................................................................... 26

    E.    The United States Is Entitled to Emergency Relief ......................................................... 27

IV.    Conclusion .......................................................................................................... 30

## Table of Authorities

**Cases**

*Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314 (8th Cir. 1993) ........................ 22

*Bookout v. First Nat. Mortg. & Discount Co., Inc.*, 514 F.2d 757, 758 (5th Cir. 1975) ............. 29

*Brill & Harrington Inv. v. Venon Sav. & Loan Ass'n*, 787 F. Supp. 250 (D.D.C. 1992) ............ 20

*Citronelle-Mobile Gathering, Inc. v. Watkins*, 934 F.2d 1180 (11th Cir. 1991) ......................... 29

*Federal Home Loan Mortgage Corp. v. Nazar*, 100 B.R. 555 (D. Kan. 1989) ............................ 16

*Federal National Mortgage Assoc. v. Mapletree Investors LP*, No. 10-cv-10381, 2010 WL 1753112, at *3 (E.D. Mich. 2010) ........................................................................ 17

*Garden Homes, Inc. v. United States*, 207 F.2d 459 (1st Cir. 1953) ............................................ 16

*In re McGaughey*, 24 F.3d 904 (7th Cir. 1994) ...................................................................... 17, 20

*JPMorgan Chase, N.A. v. Heritage Nursing Care, Inc.*, No. 06 C 4803, 2007 WL 2608827 (N.D. Ill. Sept. 6, 2007) ......................................................................................... 21, 22

*KeyBank Nat'l Ass'n v. Knuth Ltd.*, 15 So. 3d 939 (Fla. Ct. App. 2009) ...................................... 20

*Netsphere, Inc. v. Baron*, 703 F.3d 296 (5th Cir. 2012) ............................................................ 24

*United States v. Am. Nat'l Bank & Tr. Co.*, 573 F. Supp. 1317 (N.D. Ill. 1983)................ 1, 15, 23

*United States v. Baptist Towers II, Ltd.*, 661 F. Supp. 1124 (N.D. Ill. 1987) ....................... passim

*United States v. Berk & Berk*, 767 F. Supp. 593 (D.N.J. 1991) ...................................... 14, 18, 20

*United States v. Cross Creek Apts. LP*, No. 4:97-cv-208 (S.D. Ind. Dec. 19, 1997).................... 28

*United States v. Drexel View II, Ltd.*, 661 F. Supp. 1120 (N.D. Ill. 1987) ............................ passim

*United States v. Ianniello*, 824 F.2d 203 (2d Cir. 1987) ............................................................. 29

*United States v. Mountain Village Co.*, 424 F. Supp. 822 (D. Mass. 1976) ................................ 16

*United States v. Queen's Court Apartments, Inc.*, 296 F.2d 534 (9th Cir. 1961) ........................ 16

*United States v. West Street Assoc. Ltd.*, No. Civ.A.3:96-cv-01864, 1998 WL 34193430 (D. Conn. July 20, 1998)....................................................................................... 16, 18

**Statutes**

Multifamily Foreclosure Act, 12 U.S.C. § 3701 *et seq.*.................................................... 14, 20, 29

National Housing Act, 12 U.S.C. §§ 1701 *et seq.* ........................................................ 2, 5, 18, 21

**Regulations**

24 C.F.R. Part 200......................................................................................................................... 2

24 C.F.R. Part 232......................................................................................................................... 2

**Secondary Sources**

12 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2983 ................ 28

Restatement (Third) of Property (Mortgages) § 4.3(b).................................................................. 16

# I.  INTRODUCTION

In its complaint, the United States of America, acting on behalf of the Secretary of the Department of Housing and Urban Development (the Secretary or HUD), seeks appointment of a receiver to operate 13 healthcare facilities—12 nursing homes and one supportive living facility—collectively known as the Rosewood Facilities. The defendants in this action include the Rosewood Facilities' owners, operators, master tenant, and management agent (collectively Defendants), each of which is controlled by one or more of the same seven individuals.

Although the Defendants have enjoyed the benefits of HUD's mortgage insurance program, they have, at the same time, repeatedly breached their agreements. Most notably, they failed to pay their mortgages *for over three years*, resulting in an unpaid balance of over $146 million. Prior to filing its complaint, HUD accepted assignment of the Rosewood Facilities' mortgage notes, making HUD the mortgagee with all the rights and remedies available under the mortgage documents. HUD issued notices of default, and now seeks to exercise remedies. Chief among HUD's remedies is the contractual entitlement to appointment of a receiver, the remedy sought by this motion.

The language in the mortgages is clear: upon the default, the mortgagee "shall be entitled to the appointment of a receiver." Courts in this district have repeatedly appointed receivers based on identical HUD-insured mortgage provisions, and the result should be no different here. *See United States v. Drexel View II, Ltd.*, 661 F. Supp. 1120, 1121-22 (N.D. Ill. 1987); *United States v. Baptist Towers II, Ltd.*, 661 F. Supp. 1124, 1125-26 (N.D. Ill. 1987); *United States v. Am. Nat'l Bank & Tr. Co.*, 573 F. Supp. 1317, 1318 (N.D. Ill. 1983).

Expedited consideration of this motion is appropriate for four reasons. First, the mortgage terms unambiguously provide for immediate appointment of a receiver. Second, delay in granting relief could cause serious harm to the residents and patients of the Rosewood Facilities and to the

1

United States' financial interests. Third, the imminent administrative foreclosures have ended the Defendants' practical interest in property they would otherwise control. And finally, the certainty of the merits justifies immediate relief. The Court, therefore, should appoint a receiver without delay to protect the health and safety of the residents and to prevent waste or dissipation of assets from the mortgaged property.

## II.  STATEMENT OF FACTS

### A.  The National Housing Act

The National Housing Act (NHA) authorizes HUD, through the Federal Housing Administration (FHA), to insure eligible mortgage loans. 12 U.S.C. §§ 1709, 1715. Under this insurance program, if the borrower defaults on an insured loan, the mortgage lender can submit a claim to HUD, which will accept assignment of the defaulted mortgage and pay the lender the unpaid principal and interest. HUD's mortgage insurance program, as it applies to nursing homes and assisted living facilities, is designed "to assist in the provision of facilities" for those "who require skilled nursing care and related medical services" and "for the care of frail elderly persons." 12 U.S.C. § 1715w.

To ensure that projects like the Rosewood Facilities serve the purpose intended by Congress, owners, operators, and master tenants of FHA-insured mortgages must follow HUD's regulations and enter into regulatory agreements with HUD. 12 U.S.C. § 1715b; 24 C.F.R. §§ 200.105 and 232.1003; 232.1005. Regulatory agreements contain additional rules and requirements that owners, operators, and master tenants must abide by, including obligations to make timely mortgage payments, submit to HUD regular financial reports, and use project assets only for reasonable operating expenses or approved use. 24 C.F.R. §§ 232.1005, 232.1009.

B.       **The Rosewood Facilities**

The Rosewood Facilities consist of a portfolio of twelve skilled nursing homes and one assisted living facility located primarily in the State of Illinois, with one project located in the State of Missouri. The facilities, which provide long-term care to residents in their respective states, consist of 1,662 licensed beds and are approximately 70 percent occupied. The 13 Rosewood Facilities and their respective locations are as follows:

| Facility name | Location |
|---|---|
| Rosewood Care Center of Alton | Alton, Illinois |
| Rosewood Care Center of East Peoria | East Peoria, Illinois |
| Rosewood Care Center of Edwardsville | Edwardsville, Illinois |
| Rosewood Care Center of Elgin | Elgin, Illinois |
| Rosewood Care Center of Inverness | Inverness, Illinois |
| Rosewood Care Center of Joliet | Joliet, Illinois |
| Rosewood Care Center of Moline | Moline, Illinois |
| Rosewood Care Center of Northbrook | Northbrook, Illinois |
| Rosewood Care Center of Peoria | Peoria, Illinois |
| Rosewood Care Center of Rockford | Rockford, Illinois |
| Rosewood Care Center of St. Charles | St. Charles, Illinois |
| Foxes Grove Supportive Living Community | Wood River, Illinois |
| Rosewood Care Center of St. Louis. | St. Louis, Missouri |

The Rosewood Facilities are organized as a complex network of related entities under common ownership and control. The facilities are owned by 13 single-asset entity property owners (the Owners) and operated by 13 single-asset operators (the Operators).[1] The Owners each leased

---

[1] Ex. D (Rosewood Organizational Chart). Where possible, this Memorandum cites to exhibits attached to the United States' Complaint for Breach of Contract and Appointment of Receiver (Dkt. No. 1), which are numbered sequentially 1 through 28. To the extent this Memorandum relies on exhibits not attached to the Complaint, such exhibits are labelled A, B, C., etc.

their respective facility to a master tenant, CR Finance II, LLC (the Master Tenant). The Master

Tenant, in turn, subleased each facility to one of the 13 Operators. Each Operator then entered into

contracts with the same management agent, Midwest Administrative Services, Inc. (Midwest), to

manage each facility. The following chart shows each of these roles:

| Owner | Operator | Manager | Master Tenant |
|---|---|---|---|
| Alton Real Estate, Inc. | Bravo Care of Alton, Inc. | Midwest Administrative Services, Inc. | CR Finance II, LLC |
| East Peoria Real Estate, Inc. | Bravo Care of East Peoria, Inc. | | |
| Edwardsville Real Estate, LLC | Bravo Care of Edwardsville, Inc. | | |
| Elgin Real Estate, LLC | Bravo Care of Elgin, Inc. | | |
| Inverness Real Estate, LLC | Bravo Care of Inverness, Inc. | | |
| Joliet Real Estate Holding Co. | Bravo Care of Joliet, Inc. | | |
| Moline Real Estate, Inc. | Bravo Care of Moline, Inc. | | |
| Northbrook Real Estate, LLC | Bravo Care of Northbrook, Inc. | | |
| Peoria Real Estate, Inc. | Bravo Care of Peoria, Inc. | | |
| Rockford Real Estate, LLC | Bravo Care of Rockford, Inc. | | |
| St. Charles Real Estate, LLC | Bravo Care of St. Charles, Inc. | | |
| Wood River Real Estate Holding Co. | Bravo Care of Wood River, Inc. | | |
| Schuetz Road Real Estate, Inc. | Bravo Care of St. Louis, Inc. | | |

Master leasing arrangements such as the one used here are an important tool meant to lessen

the financial risk to HUD's insurance fund. The Master Tenant arrangement created an indivisible

lease with the Owners and enabled the Operators to use cash flow from a well-performing facility

to support another facility experiencing liquidity shortfalls. Under this arrangement, the Master

Tenant entered into a cross-default guaranty agreement whereby each Operator agreed to guaranty

the timely payment of rent obligations to the Master Tenant of each other Operator.[2]

---

[2] Compl. Ex. 4 (Cross Default Guaranty of Subtenants). Due to the voluminous record, the transaction
and mortgage documents from only one project, the Rosewood Care Center Alton, are attached as exhibits.

The role of Midwest, the management agent, was to provide services such as accounting, advertising, legal, payroll processing, and others. In performing these services, the Defendants formed a principal/agent relationship and Midwest expressly agreed it was acting as agent for the Owners and Operators.[3] Midwest entered management agreements with each Operator.[4] In 2016, subsequent to disputes between various parties with interests in the Rosewood Facilities, R&R Marketing & Management LLC (R&R) assumed the role of management consultant for 11 of the 13 facilities.[5] Currently, R&R's contract to manage the Rosewood Facilities will terminate on September 15, 2018.[6]

Although organized into separate entities, all 28 entities in the above chart are under common ownership and control. They share related or identical principals, agents, and/or beneficial owners, namely: Zvi Feiner, Hinde Feiner, Dmitry Godin, Ilya Shulman, Rene Yampol, Hillel Yampol, and Mark Yampol.[7]

## C. FHA-Insured Mortgages

Each Owner is the borrower of an FHA-insured mortgage. The Owners obtained financing for the facilities from a variety of lenders between 2003 and 2011 for a total indebtedness of $168,966,400, as illustrated in the following chart. HUD insured eleven of the loans under Section 232/223(f) of the NHA and two of the loans (Alton and Elgin) under Section 232/223(a)(7) of the NHA:

---

To the extent this motion relies upon relevant concepts or language in any of the mortgage-related documents, the quoted language is identical for each of the 13 Rosewood Facilities.
  [3] Ex. E (Management Certification), at ¶ F(10).
  [4] Ex. F (Amended Management Services Agreement).
  [5] Compl. Ex. 28 (R&R Management Consulting & Indemnity Agreement).
  [6] Ex. G (Termination Letter).
  [7] Ex. A (Lukoff Decl.), at ¶ 19.

| Owner | Original Lender | Date | Original Loan |
|---|---|---|---|
| Alton Real Estate, Inc. | Berkadia Commercial Mortgage | March 2011 | $16,069,900 |
| East Peoria Real Estate, Inc. | Highland Mortgage Company | Oct 2003 | $10,665,100 |
| Edwardsville Real Estate, LLC | Highland Mortgage Company | July 2004 | $13,043,300 |
| Elgin Real Estate, LLC | Berkadia Commercial Mortgage | June 2012 | $14,522,200 |
| Inverness Real Estate, LLC | Highland Mortgage Company | Oct 2004 | $14,387,100 |
| Joliet Real Estate Holding Co. | Highland Mortgage Company | April 2004 | $14,717,500 |
| Moline Real Estate, Inc. | GMAC Commercial Mortgage | Nov 2005 | $13,554,600 |
| Northbrook Real Estate, LLC | Capmark Finance, Inc. | Dec 2008 | $14,274,800 |
| Peoria Real Estate, Inc. | Capmark Finance, Inc. | Nov 2006 | $12,422,200 |
| Rockford Real Estate, LLC | Highland Mortgage Company | Nov 2004 | $11,414,900 |
| St. Charles Real Estate, LLC | Highland Mortgage Company | Nov 2004 | $13,107,300 |
| Wood River Real Estate Holding | Capmark Finance, Inc. | April 2008 | $9,324,500 |
| Schuetz Road Real Estate, Inc. | GMAC Commercial Mortgage | June 2005 | $11,463,000 |

In exchange for the above loans, each Owner issued to the lender a mortgage note promising to make monthly principal and interest payments until the loan was extinguished (collectively, the Mortgage Notes).[8] The Mortgage Notes were secured by mortgages on the real property (collectively, the Mortgages).[9] Each Mortgage provides that, upon default, the holder of the Mortgage Note may, at its option and without notice, declare the entire principal and interest due immediately and foreclose the Mortgage.[10] Each Mortgage also unambiguously provides that, upon default, the mortgagee is entitled to appointment of a receiver without notice. Specifically,

> upon default hereunder Mortgagee shall be entitled to the appointment of a receiver by any court having jurisdiction, without notice, to take possession and protect the property described herein

---

[8] Compl. Ex. 6 (Mortgage Notes).
[9] Compl. Ex. 7 (Mortgages).
[10] *Id*. at ¶ 19.

and operate same and collect the rents, profits, and income therefrom . . .[11]

In addition to the Mortgage on the real property, the Owners entered into security agreements pledging a wide-range of personal property as collateral securing the loans.[12] The Operators and Master Tenant also entered into security agreements pledging their assets to secure the Owners' mortgage payments. These security agreements contain cross-default provisions providing that, in the event of a mortgage default by the Owners, the mortgagee may exercise remedies against the Operators' and Master Tenant's collateral (including appointment of a receiver). [13] To further secure repayment of the Mortgage Notes, the Operators also entered into Assignments of Leases and Rents, pledging to the mortgagee the Operators' right and title to rents collected at the Rosewood Facilities.[14] Upon default under the security agreements, each Operator "hereby agrees that [the mortgagee] is entitled to the appointment of a receiver for the Healthcare Facility."[15]

Each Mortgage also incorporated the Owners' regulatory agreements with HUD, making those agreements part of the Mortgage. Due to a cross-default provision, violation of a regulatory agreement results in mortgage default: "[T]he Regulatory Agreement . . . is incorporated in and made a part of this Mortgage. Upon default under the Regulatory Agreement and upon the request of the Secretary of [HUD], . . . the Mortgagee, at its option, may declare the whole of the indebtedness secured hereby to be due and payable . . . ."[16]

---

[11] *Id*. at ¶ 5.
[12] Ex. H (Owner Security Agreement).
[13] Compl. Ex. 8 (Operator Security Agreement) at ¶¶ 8-9; Compl. Ex. 10 (Master Tenant Security Agreement) at ¶¶ 9-10.
[14] Compl. Ex. 9 (Assignment of Leases and Rents).
[15] *Id*. at ¶ 2(d).
[16] Compl. Ex. 7 (Mortgage) at ¶ 3.

7

### D.    HUD Regulatory Agreements

As a condition of HUD's mortgage insurance and to comply with the NHA, the Owners, Operators, and the Master Tenant each entered into a regulatory agreement with HUD.[17] The regulatory agreements provide additional requirements meant to ensure the safety and financial security of the projects. The regulatory agreements also provide consensual remedies in the event of default.

Among many other requirements, the Owners agreed "to make promptly all payments due under the [FHA-insured] note and mortgage."[18] The Owners also agreed that within 90 days of the end of each fiscal year, each Owner would provide HUD with a complete annual financial report based on an examination of the Owners' books and records.[19] Upon a violation of these or any other provision of the regulatory agreement, HUD may give written notice of such violation and, if the violation is not corrected within 30 days or within such time as determined necessary by HUD to correct the violation, HUD may, without further notice, declare a default.[20] Remedies upon default include, among others, immediate possession of the property or application to any court "for the appointment of a receiver to take over and operate the project in accordance with the terms of the [Regulatory] Agreement . . . since the injury to the Secretary arising from a default under any of the terms of this Agreement would be irreparable and the amount of damage would be difficult to ascertain."[21]

The Operators' and Master Tenant's regulatory agreements contain similar provisions. The Operators agreed to make timely rent payments under and their subleases with the Master Tenant,

---

[17] Compl. Exs. 11 (Owner Regulatory Agreement), 12 (Operator Regulatory Agreement), 13 (Master Tenant Regulatory Agreement).
[18] Compl. Ex. 11, at ¶ 1.
[19] *Id*. at ¶ 9.
[20] *Id*. at ¶ 11.
[21] *Id*. at ¶ 11(c)-(d).

and the Master Tenant agreed to make timely rent payments under its master lease with the Owners.[22] The Operators also agreed to "timely pay all debts incurred related to the operation of the Healthcare Facility," and the Master Tenant similarly agreed to "timely pay (or cause Operator to pay) all debts incurred related to the operation of the Healthcare Facility."[23] Upon default of these or any other provisions, HUD may "terminate or cause the termination of [the master lease or subleases]" or "seek appointment of a receiver for the Healthcare Facility."[24] In the event of a mortgage default or default under the Owners' regulatory agreement, the Operators and Master Tenant each agreed to "cooperate in any legal and lawful manner necessary or required to permit the continued operation of the Healthcare Facility for the Approved Use including, as determined by HUD, . . . the necessary conveyance, assignment or transfer of" the legal permits and certificates required to operate the facilities.[25]

**E.      The Owners, Operators, and Master Tenant Breached Their Obligations Under the Mortgage, Mortgage Note, and Regulatory Agreements**

The Owners have repeatedly breached their obligations under the Mortgage Note, Mortgage, and regulatory agreements. In August 2015, HUD issued Notices of Violation (NOVs) to the Owners for their failure to, among other things, make mortgage payments to the FHA-insured lenders.[26] Although the NOVs demanded that the Owners remedy these (and other) violations within 30 days, the violations remained unaddressed. Thus, in August 2018, prior to filing its complaint in this matter, HUD declared the Owners in default under the Mortgages and regulatory agreements.[27]

---

[22] Compl. Ex. 12, at ¶ 2; Compl. Ex. 13, at ¶ 1.
[23] Compl. Ex. 12, at ¶ 9; Compl. Ex. 13, at ¶ 5(b).
[24] Compl. Ex. 12, at ¶ 8(b); Compl. 13, at ¶ 5(a)(1).
[25] Compl. Ex. 12, at ¶ 3(b); Compl. Ex. 13, at 2(b).
[26] Compl. Ex. 14.
[27] Compl. Ex. 17 (Owner Notice of Default).

With respect to the mortgage payments, beginning in January 2015, the Owners made only sporadic and insufficient interest payments, and from March 2016 to the present, they have made no principal or interest payments whatsoever.[28] As of August 14, 2018, the outstanding principal balance on the Mortgages for the 13 Rosewood Facilities was $146,655,782.44.[29] The Owners' continuous and ongoing failure to make mortgage payments violates the Mortgage Notes, paragraph 1 of the Mortgages, and paragraph 1 of the Owners' regulatory agreements. And regarding annual financial statements, the Owners did not submit the required financial statements for fiscal years 2015, 2016, and 2017, all in violation of paragraph 9(e) of the regulatory agreements.[30]

The Operators and Master Tenant breached their respective regulatory agreements as well. The Operators' and Master Tenant's respective regulatory agreements require them to pay or cause to be paid all debts incurred related to the operation of the Rosewood Facilities.[31] Yet, as discussed in greater detail below (*see* section II.F), in September 2017, an Iowa state court entered judgment for $890,000 against the Rosewood Facilities and its management agent, Midwest, for failing to pay vendors under contracts.[32]

## F. Ongoing and Repeated Mismanagement of the Rosewood Facilities

While under the Defendants' control, the operations of the Rosewood Facilities have been characterized by improprieties, in-fighting, and financial mismanagement. For example, in addition to the blatant non-payment of mortgage obligations, the Defendants likely violated their regulatory agreements by transferring or authorizing the use of project funds for a non-HUD

---

[28] Ex. A (Lukoff Decl.), at ¶ 12.
[29] *Id*. at ¶ 13.
[30] Ex. B (Beaudette Decl.), at ¶¶ 11-14.
[31] Compl. Ex. 12, at ¶ 9; Compl. Ex. 13, at ¶ 5(b).
[32] Compl. Ex. 21 (Martin Brothers Ruling).

insured affiliated project located in Galesburg, Illinois (the Galesburg Facility). Zvi Feiner, a principal of the Rosewood Facilities' Owners, also serves as the president and secretary of the Galesburg Facility.[33] Between January 2014 and October 2015, a time in which the FHA-insured mortgage remained in payment default, HUD received information that approximately $6.9 million of project funds may have been diverted to the Galesburg Facility. Based upon this belief, HUD issued Notices of Violation to the Owner and Operator Defendants.[34] The NOVs demanded that the Defendants recover the payments and apply them to the mortgage indebtedness.[35] Yet insofar as HUD can determine, millions improperly paid to the Galesburg Facility has not been recovered and applied to the FHA-insured mortgage.[36] Indeed, when HUD confronted the Owners, Zvi Feiner did not deny the allegation, but merely said that he "understands HUD's position that funds were directly or indirectly used from HUD insured projects to pay for Galesburg" and that he was "operating on the assumption that HUD's conclusion is accurate."[37]

The Defendants have also involved themselves in numerous lawsuits, including amongst themselves, on matters directly relating to the Rosewood Facilities. These lawsuits have contributed to an atmosphere of instability and uncertainty. For example, Martin Brothers Distributing Co., a supplier of goods to the Rosewood Facilities, sued the Rosewood Facilities and Midwest in the Iowa District Court for Black Hawk County to recover approximately $890,000 in unpaid debts, as well as for unjust enrichment, negligent misrepresentation, and fraud.[38] Following a September 2017 trial, the court found that the plaintiff was entitled to judgment for the unpaid

---

[33] Ex. I (Galesburg Corporate File Report).
[34] Compl. Ex. 14 (NOVs).
[35] *See id.*
[36] Ex. B (Beaudette Decl.), at ¶ 15.
[37] Ex. J (Feiner Response Letter), at 4.
[38] Compl. Ex. 21 (Martin Brothers Ruling). The 13 Rosewood Facilities accounted for a total balance of $838,740.60, and another, non-HUD-insured facility, under common ownership and control, accounted for another $51,112.26 balance.

sums, plus interest.[39] The court also held that the Rosewood Facilities and Midwest were liable for the claimed amounts based upon negligent misrepresentation.

In another lawsuit, filed in the Circuit Court of Cook County, Illinois, the plaintiff, United Rx, LLC, brought claims against seven of the Operator Defendants, Midwest, the Master Tenant Defendant, and others, for breach of contract, tortious interference with contract, and fraudulent conveyance, among other claims.[40] Among other allegations, United Rx, LLC alleges that as of July 31, 2017, the defendants in that action received pharmacy goods and services but failed to pay invoices totaling approximately $900,000.[41] This lawsuit remains ongoing.

Other lawsuits demonstrate that considerable uncertainty surrounds the control of the Rosewood Facilities. The beneficial ownership of each of the Owners, Operators, and Master Tenant is split evenly between entities controlled by Zvi Feiner and his family and entities controlled by Hillel Yampol and his family.[42] A cascade of litigation, however, has created uncertainty about who actually controls or has the authority to act for each of the Defendants.

In one lawsuit, filed in the Supreme Court of the County of New York in September 2016, Greystone sued 10 out of the 13 Owners under contracts executed by Mark Yampol, in connection with attempts to refinance some of the loans relating to certain of the Rosewood Facilities.[43] In support of the Owners' motion to dismiss, Zvi Feiner submitted an affidavit swearing under penalty of perjury that Mark Yampol did not have any authority to act as an agent for the Owners.[44] This lawsuit remains ongoing.

---

[39] *Id.*

[40] Compl. Ex. 22 (United Rx Complaint).

[41] *Id.*

[42] Ex. D (Rosewood Organizational Chart). The Feiner-controlled entities also have minority investors who do not appear to hold any officer or management roles in any of the Defendants or affiliates.

[43] Compl. Ex. 23 (Greystone Summons and Complaint).

[44] Compl. Ex. 24 (Feiner Affidavit).

In another lawsuit, filed in the Circuit Court of Saint Louis County, principals of the Defendants sued each other. Hillel Yampol, Mark Yampol, and Midwest, among others, sued Hinde Feiner, Zvi Feiner, and others for interfering in the business operations of the Rosewood Facilities.[45] During the preliminary injunction stage, that court found that associates of the Feiners had "created an atmosphere of fear, chaos, and uncertainty in the Rosewood Offices concerning the Rosewood and Midwest Operations," which left "Rosewood and the patients in its care at risk."[46] Based on those findings, the court granted the plaintiffs' petition for injunctive relief and issued an order that, among other things, enjoined Hinde Feiner and Zvi Feiner from being on Midwest's premises or from taking any actions on behalf of the Operator Defendants without the express consent of Hillel Yampol.[47]

And in yet another lawsuit, filed in this Court, investors allege that Zvi Feiner and others violated the RICO statute and committed fraud through a scheme to steal over $20 million from investors.[48] According to the complaint, Zvi Feiner used the investors' money to create numerous limited liability companies to hold retirement home facilities, but misrepresented the actual price of the facilities and made bogus promises of investment returns.[49] The defendants in the case have filed a counterclaim, alleging that the investor plaintiffs forced Zvi Feiner, under duress, to relinquish his interests in various businesses.[50] This lawsuit remains ongoing.

[45] Compl. Ex. 25 (YR Consulting Order and Judgment).
[46] *Id.* at ¶ 22.
[47] *Id.*
[48] *Shulman v. Feiner*, No. 17 C 6769 (N.D. Ill. Sept. 19, 2017), Compl. Ex. 26 (RICO Complaint).
[49] *Id.*
[50] Compl. Ex. 27 (RICO Counterclaim).

13

### G.     Administrative Remedies

Between June and August 2015, the original lenders each assigned their mortgage interests to Greystone Servicing Corporation, which became the mortgagee for all 13 facilities.[51] Due to the Owners ongoing defaults (described above in Section E), Greystone declared the Owners in default and accelerated the loans on October 19, 2016.[52] On or about August 8 and August 9, 2018, Greystone assigned each mortgage note to HUD under the terms of the FHA-insurance program.[53] Thus, HUD is now the mortgagee of each Rosewood Facility.

In the week before the United States filed its complaint in this case, HUD began the process of exercising remedies available under statute, regulation, and the regulatory agreements. On August 15, 2018, HUD issued Notices of Default to the Owners, Operators, and Master Tenant.[54] And on August 16, 2018, HUD issued letters providing 21 days' notice that HUD intended to pursue administrative foreclosure.[55] *See* Multifamily Foreclosure Act, 12 U.S.C. § 3701 *et seq.*

### III.     ARGUMENT

### A.     The United States Is Entitled to Appointment of a Receiver Based on the Contracts

Federal law governs appointment of a receiver over HUD-insured properties. *United States v. Drexel View II, Ltd. v. United States*, 661 F. Supp. 1120, 1122 (N.D. Ill. 1987). And while appointment of a receiver may be an extraordinary remedy under state law, "[u]nder Federal law, the appointment of a receiver is not a drastic remedy." *United States v. Berk & Berk*, 767 F. Supp. 593, 598 (D.N.J. 1991). In this case, the United States is entitled to a receiver for the

---

[51] Ex. A (Lukoff Decl.), at ¶ 11.
[52] Compl. Ex. 16 (Greystone Notices of Default and Acceleration).
[53] Ex. A (Lukoff Decl.), at ¶ 14.
[54] Compl. Exs. 17, 18, & 19 (Notices of Default).
[55] Compl. Ex. 20 (21-Day Letters).

straightforward reason that the parties have contracted to the appointment of a receiver in exactly this circumstance.

Courts—including courts in this very district—have consistently held that the violation of a HUD-insured mortgage contract and regulatory agreement is enough, by itself, to justify appointment of a receiver. The decision in *Drexel View II* amply demonstrates this principle. There, HUD sought appointment of receiver prior to foreclosure proceedings based on a mortgage clause that was identical to the Mortgage in this case. 661 F. Supp. at 1122-23. The court noted that in situations where owners of HUD-insured properties have defaulted, "courts have not hesitated to appoint a receiver." *Id*. at 1222 (citing cases). Although the court considered numerous factors, it made clear that, in light of the mortgage's contractual provision, proof of default alone was sufficient to support appointment of a receiver. *Id*. (noting that "courts interpreting similar or identical receivership provisions in HUD insured mortgages have found that proof of default was sufficient to warrant appointment of a receiver" and "the fact that the mortgage has been in default for over three years is sufficient to enforce the receivership provision").

The court in *Drexel View II* was not making new law. It was, rather, articulating the longstanding view that contractual provisions in HUD-insured mortgages providing for appointment of a receiver should be honored. *See United States v. Am. Nat'l Bank and Trust Co. of Chicago,* 573 F. Supp. 1317 (N.D. Ill. 1983) (in construing language in a mortgage that was identical to the language in the Rosewood Facilities' Mortgage, noting that "courts have consistently read such clauses to permit the appointment of a receiver") (citing cases); *United States v. Baptist Towers II, Ltd*., 661 F. Supp. 1124, 125 (N.D. Ill. 1987) (in a companion case to *Drexel View II*, holding, in identical language, that the fact of default was sufficient to enforce the contractual right to a receiver). Courts outside this district have reached the same conclusion. *See,*

15

*e.g., United States v. Queen's Court Apartments, Inc.*, 296 F.2d 534, 538-40 (9th Cir. 1961); *Garden Homes, Inc. v. United States*, 207 F.2d 459, 459-60 (1st Cir. 1953); *United States v. Mountain Village Co.*, 424 F. Supp. 822, 824-25 (D. Mass. 1976); *United States v. West Street Assoc. Ltd.*, No. Civ.A.3:96-cv-01864, 1998 WL 34193430, at *8 (D. Conn. July 20, 1998); *Federal Home Loan Mortgage Corp. v. Nazar*, 100 B.R. 555, 558 (D. Kan. 1989) ("In interpreting the receivership provisions in HUD mortgages, courts have found default alone to warrant appointment of a receiver."); *see also* Restatement (Third) of Property (Mortgages) § 4.3(b) ("A mortgagee is entitled to the appointment of a receiver to take possession of the real estate if the mortgagor is in default under the mortgage and the mortgage or other agreement contains . . . a provision authorizing appointment of a receiver to take possession and collect rents upon mortgagor default.").

Here, language in the Mortgages entitling HUD, as mortgagee, to the appointment of a receiver is clear: "upon default hereunder Mortgagee *shall be entitled to the appointment of a receiver by any court having jurisdiction*, without notice, . . ." This language is unequivocal and mandatory. Nor can there be any doubt that the Owners have failed to make required mortgage payments, thereby triggering a default. Beginning in January 2015, the Owners made only sporadic and insufficient payments, and from March 2016 to the present, they have made no principal or interest payments whatsoever. The Owners' non-payment has resulted in a staggering unpaid, accelerated balance of over $146 million. As in the cases cited above, the clear language in the Mortgages and the undisputed default by the Owners is enough, by itself, to justify appointment of a receiver over the Rosewood Facilities.

The Owners' mortgage default also resulted in a breach of their regulatory agreements, each of which demands that the Owners "make promptly all payments due under the note and

16

mortgage."[56] The Owners further breached the regulatory agreements when they failed to submit to HUD required annual financial reports for at least three years, 2015-2017. Thus, under the express terms of the regulatory agreements, HUD is entitled to "[t]ake possession of the project" and "[a]pply to any court . . . for the appointment of a receiver to take over and operate the project in accordance with the terms of this agreement."[57]

**B.     Equitable Factors Further Support Appointment of a Receiver**

As discussed above, the violation of a HUD-insured mortgage contract justifies appointment of a receiver, and that straightforward rule should apply here. But some courts have looked beyond the language of the mortgage contracts and bolstered their rulings through consideration of additional factors. *See, e.g., Federal National Mortgage Assoc. v. Mapletree Investors LP*, No. 10-cv-10381, 2010 WL 1753112 (E.D. Mich. 2010) ("[T]he court will err on the side of caution and consider the parties' consent as a strong factor weighing in the plaintiff's favor, but not dispositive of the inquiry.").

In *Drexel View II* and *Baptist Towers II*, for instance, even though the mortgage language was sufficient by itself, the court noted that certain "special circumstances" warranted appointment of a receiver, including underfunded security deposits, deteriorating assets, and the inability of the owners to pay bills. *See* 661 F. Supp. at 1122; 661 F. Supp. at 1126. The court also considered the federal policy under the National Housing Act of protecting the federal treasury and HUD's investment. 661 F. Supp. at 1122-23; 661 F. Supp. at 1126. The purpose of a receiver is to "protect, conserve, and administer property" at issue in the litigation, *In re McGaughey*, 24 F.3d 904, 907 (7th Cir. 1994), so other equitable factors considered by courts include whether the property is inadequate security for the loan, the length of the mortgagor's default, the unstable financial status

---

[56] Compl. Ex. 11 at ¶ 1.
[57] *Id.* at ¶ 11(c)-(d).

17

of the mortgagor, and the misuse of project funds. *Berk & Berk*, 767 F. Supp. at 597; *West Street Assoc. Ltd.*, 1998 WL 34193430, at *8.

The additional factors considered by some courts justify appointment of a receiver. The "special circumstances" in this case relate to the specialized businesses that the Defendants own and operate. First, the Rosewood Facilities are skilled nursing facilities and an assisted living facility, and the residents are therefore an especially vulnerable population whose health and safety are of paramount concern. Second, this case differs from the typical mortgage case because the value of the collateral securing HUD's mortgages derives from the value of the businesses as going concerns, rather than the market value of the real property on which the Rosewood Facilities are located. Of paramount concern, therefore, is maintaining smooth operations until such time that HUD can complete foreclosure proceedings. And third, this case arises in the context of FHA-insured mortgages, so the Court must therefore consider the congressional policies underlying the National Housing Act, including protection of the public fisc, as well as promoting "skilled nursing care and related medical services" and "the care of frail elderly persons." 12 U.S.C. § 1715w.

1.     <u>A Receiver is Necessary to Protect the Health and Safety of Residents</u>

Litigation relating to the Rosewood Facilities raises serious concerns that the Defendants can meet their commitments to the health and safety of vulnerable residents of the Rosewood Facilities, especially in light of the fact that the Defendants have not filed audited financial statements in several years. Midwest and all 13 facilities are subject to an adverse final judgment in Iowa finding that Midwest and the Rosewood Facilities failed to pay a food service distributor for goods delivered to the facilities from approximately June 2014 through July 2015, and owed a balance of $838,740.60. *See Martin Bros. Dist. Co., Inc. v. Midwest Admin. Servs., Inc.*, Case No.

EQCV128151 (Iowa Dist. Ct. Sept. 19, 2017).[58] A pharmacy services provider also has sued seven of the Operators, Midwest, and other affiliates of the Defendants for failure to pay for pharmacy goods and services provided to seven of the Rosewood Facilities after March 2014, with unpaid balances of $899,392. *See* First Am. Compl., *United RX, LLC v. Bravo Care of Moline, Inc.*, No. 2015 L 012559 (Ill. Cir. Ct. Aug. 11, 2017).[59] And a Missouri court has expressly found that the dispute regarding ownership and control over the Defendants has left the Rosewood Facilities and "the patients in [their] care at risk."[60]

The Defendants' difficulties in paying for food and pharmacy goods and services and the uncertainty surrounding the Defendants' ownership and control suggest that the Rosewood Facilities lack the financial or operational stability to provide the appropriate standard of care for the residents of the facilities.[61] *See Drexel View II*, 661 F. Supp. at 1122 (holding that "equitable considerations weigh in favor of a receiver" because a HUD borrower "did not have the funds to pay its bills, or properly maintain the building" securing the loan); *Baptist Towers II*, 661 F. Supp. at 1126 (same). Interruption of the Rosewood Facilities' operations, especially relating to the food and medical suppliers, would cause serious injury to the residents. The Court should therefore appoint a receiver to ensure continued operation of the facilities.

2.    <u>A Receiver Is Necessary to Protect HUD's Financial Interest in the Rosewood Facilities</u>

Appointment of a receiver is also needed to protect HUD's financial interests. Through the Mortgages and security agreements, the Owners, Operators, and Master Tenant pledged real and

---

[58] Compl. Ex. 21, at 4-5.
[59] Compl. Ex. 22.
[60] Ex. 25, at ¶ 22.
[61] Ex. A (Lukoff Decl.), at ¶ 20.

personal property to secure HUD's debt.[62] But the value of the property securing HUD's debt is inadequate, a factor that strongly weighs in favor of a receiver. *See, e.g., Berk & Berk*, 767 F. Supp. at 597 (in appointing receivers, courts consider whether "the property is inadequate security for the loan"). Whereas the outstanding balance on the Mortgages is over $146 million, HUD estimates that the going-concern value of the Rosewood Facilities ranges between $90 million to $95 million, making HUD under-secured by approximately $55 million to $60 million.[63]

Adding to the potential harm to HUD's financial interests, any interruption of the operation of the facilities would cause an irreversible and precipitous drop in the value of the collateral securing the mortgages, before HUD can carry out an orderly administrative foreclosure under the Multifamily Foreclosure Act, 12 U.S.C. § 3701 *et seq.* Threats to the continued operation of the Rosewood Facilities, such as risks to licensing, operating cash flow, or ability to pay operating expenses, strongly weigh in favor of the appointment of a receiver to "protect, conserve, and administer property" at issue in the litigation. *In re McGaughey*, 24 F.3d 904, 907 (7th Cir. 1994).

Receivership is an appropriate remedy when a debtor collects pledged rents and profits and fails to use that cash flow to make mortgage payments. *See Brill & Harrington Inv. v. Venon Sav. & Loan Ass'n*, 787 F. Supp. 250, 254 (D.D.C. 1992) (inferring an "imminent danger of loss" from nonpayment of loan installments, even without a showing of unlawful or improper diversion of funds); *see also KeyBank Nat'l Ass'n v. Knuth Ltd.*, 15 So. 3d 939, 941 (Fla. Ct. App. 2009) (explaining that, under Florida law, a trial court must appoint a receiver when a secured creditor demonstrates the debtor's failure to use pledged rents and profits to pay a mortgage). In this case,

---

[62] Although HUD has first priority liens on most of the property, its security interests in the rents and profits of the Rosewood Facilities is junior to the interests of another secured creditor. The existence of a senior secured creditor as so some property, however, does not change the fact that HUD holds a security interest in the cash flow of all of the Owners, Operators, and Master Tenant.

[63] Ex. C (Buhlman Decl), at ¶¶ 13-17.

HUD holds a security interest in the rents and profits received by the Operators, and those funds have not been used to repay the debt secured by those rents and profits.

Other facts raise significant doubt about the Rosewood Facilities' financial stability. As highlighted above, the pending litigation suggests that the Rosewood Facilities may not be able to pay operational expenses as they come due, and judgments and delinquent debts may further diminish the value of HUD's collateral, which are already insufficient to cover the balance on the loans.[64] *See JPMorgan Chase, N.A. v. Heritage Nursing Care, Inc.*, No. 06 C 4803, 2007 WL 2608827, at *8 (N.D. Ill. Sept. 6, 2007) (appointing equitable receiver after secured lender demonstrated "worsening condition" of its collateral securing a loan). The lengthy period of default also weighs in favor of appointment of a receiver. *Drexel View II*, 661 F. Supp. at 1122 (holding that three years of default was sufficient, in itself to justify appointment of a receiver); *Baptist Towers II*, 661 F. Supp. at 1126 (same).

Moreover, around the time that food and pharmacy vendors were complaining of unpaid invoices, the Defendants caused funds to be transferred from the HUD-insured Rosewood Facilities to a non-HUD-insured facility in Galesburg under common ownership and control as the Defendants.[65] Diversion of project assets to the accounts of other non-HUD-insured facilities constitutes a violation of the regulatory agreements and federal statute. *See* 12 U.S.C. § 1715z-4a. The Defendants' past misconduct, therefore, heightens the risk that they will dissipate assets pledged as collateral and necessary to the continued operation of the Rosewood Facilities, and further demonstrates indicia that fraud has occurred with respect to the diversions of the Rosewood Facilities' project assets. *See Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc*., 999 F.2d 314, 316-

---

[64] Ex. C (Buhlman Decl.).
[65] Compl. Ex. 14 (NOVs).

21

17 (8th Cir. 1993) (holding that proof of fraud is not required to support receivership appointment, and probability of fraudulent conduct to be sufficient as an element in support of receivership).

Notably, the risk of harm due to continued mismanagement and potentially even fraud is particularly impactful in this case where the United States remains largely in the dark regarding the Owners' finances. Notwithstanding their obligation to file annual financial reports, the Owners have failed to do so for fiscal years 2015, 2016, and 2017.[66] The most recent audited financial report submitted by the Defendants covers the fiscal year ending June 30, 2014, over four years ago.[67] The current principals of the Defendants acquired the Rosewood Facilities in December 2013,[68] so, in other words, HUD has *never* received an audited report covering a full year under current management's control. The Defendants' failure to submit audited financial statements heightens the uncertainty regarding the risk of waste or other jeopardy to the collateral. *See Heritage Nursing Care*, 2007 WL 2608827, at *8.

The Defendants are also owned and controlled by shareholders, officers, and agents who are embroiled in litigation with each other concerning the ongoing ownership and operation of the facilities. Some portions of the dispute have been adjudicated in private arbitration without public access to the proceedings, so external parties such as HUD, other lenders, or operational vendors lack the information to which individuals are authorized to act for the company.[69] Although the United States currently holds no view on the merits of the claims or counterclaims, or the factual veracity of the allegations at issue in the litigation, the fact that the shareholders, officers, and

---

[66] Ex. B (Beaudette Decl.), at ¶¶ 11-15.

[67] *Id.*

[68] S*ee, e.g.,* Compl. Ex. 25 (YC Consulting Order and Judgment), at 3-4.

[69] For instance, in the Missouri the action in which the Yampol family sued the Feiner family for interfering in the business operations, the plaintiffs' petitions for relief were originally filed by agreement in a private Rabbinical Court for mediation. *See YR Consulting, LLC v. Stein*, Cause No. 15SL-CC00049 (Mo. Cir. Ct. Feb. 18, 2015), at n.1 (attached to Complaint as Ex. 25).

agents are engaged in litigation causes the United States great concern that the Defendants are incapable of operating the Rosewood Facilities in a manner that serves the health and safety of its residents or protects HUD's financial interests in its investment. Accordingly, this Court should appoint a receiver that is independent of influence from any of the competing factions among the Defendants' shareholders, officers, managers, and agents, to manage and operate the Rosewood Facilities.

       3.      <u>A Receiver is Necessary to Advance Congress's Policy of Providing Suitable Housing for Nursing Home Residents</u>

Finally, a key consideration is whether appointment of a receiver will advance the policy of the National Housing Act. *See Am. Nat'l Bank and Trust Co.,* 573 F. Supp. at 1318; *Drexel View II*, 661 F. Supp. at 1122-23; *Baptist Towers II*, 661 F. Supp. at 1126. This factor strongly weighs in the United States' favor. The National Housing Act advances the congressional policy of providing suitable skilled nursing care and assisted living facilities to vulnerable populations. 12 U.S.C. § 1715w. The Act promotes this policy, in part, by providing government financing, including loan-insurance for healthcare facilities under Section 232 of the Act. *See* 12 U.S.C. § 1715n(a)(7); 12 U.S.C. § 1715n(f)(4); and 12 U.S.C. § 1715w. "If programs for government funding are to continue, the government must have its investments protected." *Drexel View II*, 661 F. Supp. at 1122. And, moreover, "once a mortgagor defaults, the federal policy to protect the treasury and promote the security of federal investment . . . becomes predominant." *Id*. (citation and internal quotation omitted). In the instant case, the Defendants' ongoing defaults and failure to pay ongoing operating expenses, ongoing litigation regarding ownership and control of the Defendants, and failure to submit trustworthy financial reports, puts the United States' investment at risk and justifies appointment of a receiver.

**C.    The United States' Entitlement to a Receiver Extends to the Entire Operations and Management of the Rosewood Facilities**

As discussed above, the Owners' clear and undisputed mortgage defaults and breach of the regulatory agreements warrant appointment of a receiver. To be effective, the scope of the receiver's authority must extend to the entire operations and management of Rosewood Facilities, not just the Owners' interests. After all, appointment of a receiver over the Owners' interests alone would be relatively meaningless if the Operators, Master Tenant, and management agent stayed in place and continued to operate and mismanage the properties.

Appointment of a receiver may be sought by any party having an interest in property. *See* 12 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2983 (3d ed. 2008). The party seeking a receiver must merely show that it has some legally recognized right in the property. "Secured creditors, lienholders and mortgages" may seek appointment of a receiver because they "clearly have an interest in the property in which they have a security interest that may provide a basis" for a receivership. *Netsphere, Inc. v. Baron*, 703 F.3d 296, 306 (5th Cir. 2012). Here, this test is easily satisfied as to all the Defendants. Not only does HUD have mortgages and security interests in the Owners' property, it also has security interests in the Operators' and Master Tenant's property.

The Operators and Master Tenant entered security agreements pledging their assets to secure the Owners' mortgage payments.[70] The Owners' failure to make mortgage payments triggered a default under these security agreements.[71] In the event of an Owner mortgage default, HUD is entitled to "exercise all of the rights and remedies afforded to [the mortgagee] pursuant to . . . any of the Loan Documents," which documents include the Mortgages.[72] Under these

---

[70] Compl. Ex. 8, at ¶ 1(a)-(b); Compl. Ex. 10, at ¶ 1(a)-(b).
[71] Compl. Ex. 8, at ¶ 8(a)-(b); Compl. Ex. 10, at ¶ 9(a)-(b).
[72] Compl. Ex. 8, at ¶ 9; Compl. Ex. 10, at ¶ 10.

straightforward cross-default provisions, once the Owners failed to pay the Mortgage Notes, the mortgagee (now HUD) became entitled to exercise the remedies available under the Mortgages, which includes appointment of a receiver. The Owners' mortgage default also triggered a default under the Operators' Assignment of Leases and Rents—an agreement that was part of the security package to secure the Owners' mortgage payments—and upon default under that agreement, the Operators agreed unambiguously that the mortgagee "is entitled to the appointment of a receiver" for the Rosewood Facilities.[73]

The Operators' and Master Tenant's regulatory agreements provide additional bases for appointment of a receiver. Upon default under those agreements, HUD may "terminate or cause the termination of [the master lease or subleases]" or "seek appointment of a receiver for the Healthcare Facility."[74] In August 2018, HUD formally declared a default under the regulatory agreements.[75] The simplest demonstration of the non-Owner Defendants' breach is the Iowa state court judgment against the Rosewood Facilities and Midwest for failing to pay vendors approximately $890,000.[76] By failing to pay vendors, the Operators breached their contractual obligation to "timely pay all debts incurred related to the operation of the Healthcare Facility."[77] The Master Tenant similarly breached its obligation to "timely pay (or cause Operator to pay) all debts incurred related to the operation of the Healthcare Facility."[78]

Relatedly, upon a mortgage default or default under the Owners' regulatory agreement (again, both of which have occurred here), the Operators and Master Tenant must cooperate with HUD to ensure the continued operation of the facilities, including by conveying, assigning, or

---

[73] Compl. Ex. 9.
[74] Compl. Ex. 12, at ¶ 8(b); Compl. Ex. 13, at ¶ 5(a)(1).
[75] Compl. Exs. 18 & 19.
[76] Compl. Ex. 21.
[77] Compl. Ex. 12, at ¶ 9.
[78] Compl. Ex. 13, at ¶ 5(b).

transferring the legal permits and certificates required to operate the facilities.[79] Thus, here, the Operators and Master Tenant have a contractual obligation to cooperate in HUD's decision to appoint a receiver to manage and operate the Rosewood Facilities.

As to Midwest, the United States' complaint in this matter does not allege a breach of contract between the United States and Midwest. But such allegations are unnecessary because Midwest certified in writing that "HUD has the right to require the termination of the Management Agreement upon certain defaults of certain loan documents relating to the Project."[80] The management agreements between the Operators and Midwest give HUD the power to terminate the management agreements for "good cause," explicitly listing the Owners' and Operators' breach of the regulatory agreements as examples of good cause.[81] Midwest acted as the Owners' and Operators' agent and expressly agreed to perform all acts in conformity with the Owners' and Operators' regulatory agreements.[82] Yet, as demonstrated by the Iowa court judgment against Midwest and the Rosewood Facilities for failing to pay vendors under contracts, good cause exists to terminate Midwest's management contracts.

## D.    The Proposed Receiver Is Qualified and Prepared to Assume Management Operations Until HUD Can Foreclose

The Mortgages provide that, upon a mortgage default, the United States is entitled to appointment of a receiver "to take possession and protect the property described herein and operate same and collect the rents, profits, and income therefrom."[83] The Owners' regulatory agreement

---

[79] Compl. Ex. 12, at ¶ 3(b); Compl. Ex. 13, at 2(b).
[80] Ex. E (Management Certification), at ¶ C.
[81] Ex. F (Management Services Agreement), at ¶ 15(a).
[82] Ex. E (Management Certification), at ¶ F(10).
[83] Compl. Ex. 7, at ¶ 5.

similarly allows for appointment of a receiver to "take over and operate the project in accordance with the terms of this Agreement."[84]

The United States proposes that the Court appoint Long Hill at Rosewood LLC (Long Hill) as receiver of the Rosewood Facilities. As more fully set forth in the attached Affidavit of David Lawlor, Long Hill has substantial experience managing and operating skilled nursing facilities.[85] The President of Long Hill, David Lawlor, has managed distressed properties in numerous states, including Connecticut, New York, Maryland, Wisconsin, Illinois, Pennsylvania, Delaware, West Virginia, Indiana, and South Carolina, and has led interdisciplinary teams of experienced professionals necessary to solve a variety of operational problems at over 48 properties, including 35 skilled nursing facilities.[86] Mr. Lawlor has served as a court-appointed receiver in numerous matters,[87] and, significantly, possesses the requisite knowledge of the NHA and applicable HUD regulations needed to act as receiver for the Rosewood Facilities.[88]

Pursuant to this Court's case management procedures, the United States will be submitting a proposed order that has been negotiated between Long Hill and HUD.[89] The United States respectfully requests that the Court enter the proposed order appointing Long Hill as receiver.

**E.     The United States Is Entitled to Emergency Relief**

The United States is entitled to the immediate appointment of a receiver. A "general rule" of receivership law provides that "a receiver may be appointed at any stage during the litigation."

---

[84] Compl. Ex. 11, at ¶ 11(d).
[85] Ex. K (Lawlor Decl.).
[86] *Id.* at ¶ 6.
[87] *Id.* at ¶ 8.
[88] *Id.* at ¶ 20.
[89] HUD has also consulted with MidCap Financial, LLC regarding the proposed order. In December 2013, HUD approved the Operators' request for a revolving accounts receivable loan with MidCap, in which MidCap has a first lien on the accounts of the Rosewood Facilities as security for this AR loan, subject to an Intercreditor Agreement between the Operator Defendants, the mortgagee, and MidCap. This revolving loan provides working capital funds to each Operator for the operation of the Rosewood Facilities, and is expected to remain in place during the pendency of the receivership.

56 Am. Jur. 2d Receivers § 56. Federal courts, in fact, may appoint receivers over HUD-insured properties ex parte even before service of a summons and complaint. *See, e.g.*, *United States v. Cross Creek Apts. LP*, No. 4:97-cv-208 (S.D. Ind. Dec. 19, 1997);[90] *see also* 12 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2983 ("notice is not required . . . and the court does have the power to grant an ex parte appointment without notice upon a proper showing of actual emergency").

Several factors present in this case warrant the expedited consideration of this Motion and the immediate appointment of a receiver.

First, the Mortgages provide that HUD, as holder of the Mortgage Notes, is entitled to the appointment of a receiver "without notice."[91] The Defendants therefore agreed to the appointment of a receiver without an opportunity to be heard beforehand. And although the United States has opted not to seek appointment of a receiver without notice, this mortgage provision nevertheless provides a strong basis for the expedited consideration of this Motion.

Second, serious harm to residents and secured creditors will result if the operations of the Rosewood Facilities are interrupted. The current uncertainty regarding ownership and control of the Defendants continues to threaten the ongoing operations of the facilities, because vendors, creditors, employees, and state and federal agencies remain uncertain about which individuals are authorized to act on behalf of the Defendants. Therefore, immediate appointment of a receiver with undisputed authority over the operations and management of the Rosewood Facilities would resolve the uncertainty that threatens the stability of the Defendants.

---

[90] Ex. L (*United States v. Cross Creek Apts. LP*, No. NA97-C-0208-B/G (S.D. Ind. Dec. 19, 1997)) (granting a receiver the day after the United States filed a complaint and motion for a receiver, before defendants were served or filed any appearance).

[91] Compl. Ex. 7, at ¶ 5.

28

Third, the issuance of notices of default on August 15, 2018 and notices of administrative foreclosure on August 16, 2018 communicated to the Defendants, and the individuals currently fighting for control of the Defendants, that HUD is initiating an administrative foreclosure of the Rosewood Facilities. *See* 12 U.S.C. § 3707(a) ("[T]he foreclosure commissioner shall commence foreclosure of the mortgage, by commencing service of a notice of default and foreclosure sale"). In light of the Defendants' past conduct in unlawfully diverting assets from the Rosewood Facilities to the non-HUD-insured Galesburg Facility, and the Defendants' lack of defenses to liability under the mortgages, the immediate appointment of a receiver is necessary to prevent the Defendants from misusing project assets to pay other debts unrelated to the Rosewood Facilities.

Fourth, the certainty of HUD's entitlement the appointment of a receiver and to administrative foreclosure justifies the granting of this motion on an emergency or expedited basis. No hearing is necessary on a motion to appoint a receiver where the record discloses sufficient facts to support the appointment of a receiver. *Citronelle-Mobile Gathering, Inc. v. Watkins*, 934 F.2d 1180, 1189 (11th Cir. 1991) (holding that "the court may approve of the appointment of a receiver without a hearing where the record discloses sufficient facts to warrant it"); *United States v. Ianniello*, 824 F.2d 203, 207 (2d Cir. 1987) (no abuse of discretion for district court not to hold hearing on receivership); *Bookout v. First Nat. Mortg. & Discount Co., Inc.*, 514 F.2d 757, 758 (5th Cir. 1975) ("The appointment of a receiver, otherwise proper, is not to be defeated for lack of sworn pleading or the absence of a full evidentiary hearing."). In this case, the core facts cannot reasonably be disputed: The Owners are in default on HUD-insured mortgages, the collateral securing those mortgages holds far more value as going concerns than as piecemeal assets, the residents of the Rosewood Facilities are an especially vulnerable population, and the Defendants are embroiled in litigation threatening the stability of the operations of the Rosewood Facilities.

Outside of those core facts, additional factors further weigh in favor of the granting of a receiver, as well. In other words, the certainty provided by the documentary record that HUD is entitled to a receiver justifies an expedited and immediate appointment of a receiver.

## IV.   CONCLUSION

For the reasons set forth above, the United States respectfully requests that this Court immediately appoint a receiver to operate the Rosewood Facilities until such time that HUD can foreclose on the properties through its administrative processes.

Dated: August 20, 2018                                      Respectfully Submitted,


CHAD A. READLER
Principal Deputy Assistant Attorney General


JOHN R. LAUSCH, JR.
United States Attorney


/s/

RUTH A. HARVEY
KIRK T. MANHARDT
J. TAYLOR McCONKIE
SHANE HUANG
United States Department of Justice
1100 L Street, N.W., No. 7016
Washington, D.C., 20005
(202) 307-0244
John.T.McConkie@usdoj.gov

Attorneys for the United States