# AMENDED AND RESTATED ADMINISTRATIVE SERVICES AGREEMENT

This Amended and Restated Administrative Services Agreement (this "Agreement") is entered into as of the 30th day of December, 2013, by and between Midwest Administrative Services, Inc., an Illinois corporation (hereinafter "Midwest") and Bravo Care of Alton, Inc., an Illinois corporation (hereinafter "Bravo"), which Agreement replaces that certain Administrative Services Agreement dated December 1, 2007 by and between Midwest and Bravo ("ASA").

WHEREAS, Bravo conducts a skilled nursing facility (the "Facility") at premises located at 3490 Humbert Road, Alton, Illinois, and requires business administrative services on a continuing basis;

WHEREAS, Midwest is in the business of providing business administrative services to its customers in the skilled nursing facility business;

WHEREAS, Bravo wishes to receive business administrative services from Midwest; and

WHEREAS, Midwest agrees to provide the required business administrative services to Bravo according to the terms and conditions of this agreement; and

WHEREAS, Bravo is a subtenant under a Sublease as to the Facility and whose Facility Landlord is Alton Real Estate, Inc. ("Facility Landlord") which, together with any first mortgagee of the real and personal property leased from such Facility Landlord are intended third party beneficiaries of the consent and notice requirements, as is the U.S. Department of Housing and Urban Development ("HUD") as to the subordination, the Program Requirements, as defined herein and other compliance, notice, consent and other rights and requirements set forth herein.

NOW THEREFORE, in consideration of the premises and mutual promises contained herein, the parties agree as follows:

1. <u>Employment of Midwest.</u> Bravo hereby employs Midwest as an independent contractor to provide services to Bravo for the term provided in Section 4 hereof. Midwest agrees to provide the services to Bravo during the term hereof in accordance with the terms and conditions of this Agreement.

2. <u>Services to be Provided.</u> Midwest will provide the following administrative services to Bravo pursuant to the terms and conditions of this Agreement and the attached Schedule

    Accounting and financial reporting services

    Advertising production and media selection

    Audit, review or compilation procurement

    Billing for resident services and products

Exhibit F: Amended Management Services Agreement

Budget reporting, analysis and monitoring

Credit and treasury services

Employee benefits, insurance, health plan, retirement plan administration Financial statement preparation and analysis

Funds, receipt, holding and disbursing

Insurance policy procurement

Legal counsel, document preparation and representation only as permitted under applicable law)

Marketing services

Medicaid and Medicare cost report, procurement

Payroll processing and tax administration

Purchasing system administration, price negotiation and group agreements

Tax return preparation procurement

3. <u>Compensation.</u> Bravo shall pay Midwest as provided in Schedule 1, attached hereto, which may be amended from time to time by agreement of the parties but shall always be in accordance with fair market value.

4. <u>Term & Termination.</u> Subject to Section 15 below, this Agreement is automatically renewed annually for a period of twelve (12) full calendar months unless terminated by either party at least ninety (90) days prior to its anniversary date. In the event Midwest shall not receive the compensation and reimbursement due it under this Agreement, Midwest shall have the right to terminate this Agreement upon 30 days written notice. Either party may terminate this Agreement upon giving thirty (30) days written notice to the other party if they are unable to agree to changes in the fees as set forth in Section 3 to this Agreement. Upon such termination, no party shall have any further obligations hereunder, except for obligations accruing prior to the date of termination. Bravo shall have the right to terminate this Agreement upon any event of default by Midwest which remains uncured for 30 days.

5. <u>Inspection and Turnover of Records.</u> Subject to Section 15 below, all books and records relating to the services provided shall be the property of Bravo and shall be available to Bravo or its designees at any reasonable time. Upon any termination of this Agreement for any reason, such records relating to the periods during which Midwest provided services shall be turned over to Bravo, but until the expiration of four (4) years thereafter, shall be available to Midwest or its designees during regular business hours between 9:00 a.m. and 5:00 p.m. for inspection, audit, examination, copying and transcription.

6. <u>Bank Accounts and Funds.</u> Subject to Section 15 below:

#26883162_v1

    a.  Midwest will act at Bravo's direction with respect to the location, opening, transfer, closing, and management of all deposit accounts and all other decisions with regard to funds of Bravo or monies that are held, received, or transferred by Midwest on Bravo's behalf.

    b.  Any monies received by Midwest on behalf of the Facility shall promptly be deposited in Bravo's accounts and accounted for in the books and records of Bravo.

  7.  <u>Group Purchasing and Other Services.</u> Bravo will provide Midwest with budgets and guidelines for any ancillary products or services to be negotiated under group purchasing contracts, including, but not limited to, skilled nursing facility supplies, employee benefits plans, insurance plans, health plans, and retirement plans (sometimes "Group Purchasing Agreements"). Midwest will use its best efforts to implement any Group Purchasing Agreements in accordance with the provided budgets. The parties will cooperate to adjust the budgets from time to time if necessary. All Group Purchasing Agreements and other contracts entered into on behalf of Bravo shall be executed by Bravo in Bravo's name.

  8.  <u>Representations And Warranties</u>

    a.  Bravo and Midwest represent and warrant each to the other as applicable that: (i) all recitals and representations in this Agreement are true and correct; (ii) the organizations entering into this Agreement are duly organized, validly existing and in good standing under applicable law; (iii) all requisite partnership or corporate action has been taken to permit such organizations to enter into the Agreement and carry out the terms hereof; (iv) the officer or partner signing this Agreement is authorized to do so; (v) neither the execution of this Agreement nor the consummation of the transactions contemplated hereby shall: (a) violate any provision of law or any judgment, writ, injunction, order or decree of any court of competent authority, (b) result in or constitute a breach or default (or an occurrence which, by lapse of time or the giving of notice, or both, would constitute a breach or default) under any indenture, contract, or other commitment or restriction to which Bravo or Midwest is a party or by which either is bound, (c) require any consent, vote or approval which at the time of the transaction involved, has not been obtained, or (d) result in the creation or imposition of any lien or encumbrance upon the Facility or breach any instrument affecting the Facility.

    b.  During the term of this Agreement, Bravo shall use commercially reasonable efforts to pay, keep, observe and perform all payments, terms, covenants, conditions, and obligations to be made, kept, observed or performed by Bravo under any contract, lease, license, concession, service or other agreement or security instrument with respect to the Facility and which may affect Midwest's rights or obligations under this Agreement to the end that Bravo shall not be in default thereunder and such agreements and instruments shall remain in full force and effect.

  9.  <u>Total Loss.</u> Except as may be otherwise provided in any loan documents and subject to the Master Lease and Sublease documents affecting the Facility described in Section 17(g) hereof and otherwise in strict accordance with the HUD Addendum thereto, in the event of damage or destruction to the Leased Premises, the decision to repair, reconstruct, restore or

#26883162_v1

replace the Leased Premises shall be made in accordance with the terms of the HUD Addendum. Bravo may terminate Midwest if a determination is made not to restore or in the event of total loss and upon such event of a partial loss or total loss where Bravo does not terminate, the fees payable to Midwest during the period of any restoration commensurate will be adjusted downward based upon reduced services.

10. <u>Condemnation</u>. Except as may be otherwise provided in any loan documents and subject to the Master Lease and Sublease documents affecting the Facility described in Section 17(g) hereof, the proceeds of any condemnation award or other compensation paid by reason of a conveyance in lieu of the exercise of the power of condemnation, with respect to the Leased Premises or any portion thereof shall be the property of the Landlord and shall be applied by Landlord in accordance with the terms of the HUD Addendum. Master Tenant shall, however, be entitled to recover any amounts payable to it for moving expenses, loss of personal property, and the like so long as they do not affect the Landlord's award. In the event of a total taking, this Agreement shall terminate on the date the property is conveyed or taken.

11. <u>Partial Toss or Taking</u>. If the damage to the Facility or the taking of a portion of the Facility does not, in the reasonable opinion of Master Tenant or as otherwise determined in accordance with the HUD-insured mortgage loan documents and HUD Program Obligations make it impossible to continue to operate the remaining portion as a nursing home, and if all approvals under Bravo's, Landlord's and Master Tenant's HUD Regulatory Agreements to any reduction in beds or units have been obtained then this Agreement shall not terminate. In such case, Midwest's Fee shall be reduced in proportion to the number of beds, which have been rendered unusable.

12. <u>No Management Authority or Duties</u>. Midwest shall not have any management or supervisory authority over Bravo and nothing in this Agreement shall be construed to create any such authority. Midwest's services for Bravo are strictly administrative.

13. <u>Sale and Assignment</u>. If the Facility or any interest therein, or lease thereon is sold, assigned or transferred during the term of this Agreement, whether voluntarily or by operation of law, Midwest shall continue to perform its responsibilities under this Agreement for the benefit of the new owners or lessees to the extent required by this Agreement or any other agreements which are binding on Midwest.

14. <u>Termination for Loan Default</u>. Midwest and Bravo agree that the holder of any mortgage on the real estate, which is occupied by the Facility, may terminate this Agreement upon thirty (30) days' prior written notice of such termination if there is a default under the mortgage loan documents.

15. <u>Subordination</u>. The Parties hereto acknowledge, represent and agree to the following HUD required HUD LEAN Management Agreement provisions. In case of conflict with any other provisions contained herein or in the organizational documents of Midwest, the following HUD LEAN Management Agreement provisions shall govern:

(a) This Agreement shall terminate without penalty upon failure to comply with the provisions of the Management Certification –Residential Care Facility to HUD (Form

#26883162_v1

HUD-9839-ORCF), or for other good cause, including without limitation for violations of the owner's Regulatory Agreement for Multifamily Housing Projects, Healthcare Regulatory Agreement -Operator, and/or Master Tenant's Regulatory Agreement, if any, thirty days after HUD has mailed to Borrower, or Operator, as applicable, a written notice of its desire to terminate the Management Agreement.

(b) In the event that HUD determines that any of the Permits and Approvals reasonably necessary to operate the Healthcare Facility is at substantial and imminent risk of being terminated, suspended or otherwise restricted, if such termination, suspension or other restriction would have a materially adverse effect on the Project, this Agreement shall terminate immediately without penalty upon HUD's issuance of a notice of termination to Borrower, or Operator, as applicable, and Midwest.

(c) This Agreement may not be assigned without the prior written approval of HUD, Operator's Facility Landlord and any mortgage lender with a first mortgage lien on the Facility provided any such approval by HUD shall be deemed an approval by any such Facility Landlord or mortgagee. Any material amendment to this Agreement must be acceptable to HUD in accordance with Program Obligations.

(d) The books, records, and accounts of any agent of Borrower or of Bravo, as they pertain to the operations of the Project, shall be kept in accordance with the requirements of Section 19 of the Regulatory Agreement for Multifamily Housing Projects, and Section 18 and 20 of the Healthcare Regulatory Agreement-Operator and be available for examination as provided in such Regulatory Agreements and the Management Certification provided to HUD, and in any event, by HUD or its authorized representatives after reasonable prior notice during customary business hours at the Project or other mutually agreeable location or, at HUD's request, Midwest shall provide legible copies of such documents to HUD or its authorized representatives within a reasonable time after HUD or its authorized representative makes the request.

(e) This Agreement and all other or subsequent management agreements must be approved by HUD and be consistent with Program Obligations. In the event of a conflict between this Agreement and Program Obligations, Program Obligations shall control.

(f) Any hold-harmless or indemnity provisions or agreements between Midwest and the Borrower or Operator are void and of no effect.

(g) This Agreement commenced as of the date hereof and terminates on the anniversary date of this Agreement and beginning on December 30, 2013 it renews annually each calendar year unless terminated by either party within 90 days of the end of each term. As required by the Management Certification to HUD, an additional Management Agent Certification-Residential Care Facility, Form HUD-9839-ORCF (or successor form), must be submitted to HUD before the Agreement is renewed.

(h) In no event shall Midwest have rights to or claims on funds owed to the Operator.

#26883162_v1

(i) All capitalized terms in this Section 15 are defined in the Healthcare Regulatory Agreement – Operator between Bravo and the U.S. Department of Housing and Urban Development.

(j) All parties acknowledge, represent and agree that this Agreement sufficiently describes the services Midwest is responsible for performing and for which Midwest will be paid fees; to the extent HUD requires further description, the parties will negotiate in good faith to develop the description and Midwest will provide same upon written approval of Midwest.

(k) All parties acknowledge, represent and agree that the compensation paid hereunder will at all times be computed and paid according to HUD requirements.

(l) All parties acknowledge, represent and agree that no provision in this Agreement shall be construed to except Midwest from liability for damages and injuries.

(m) If this Agreement is terminated, Midwest will immediately, not later than ten (10) calendar days from the effective date of the termination, give to Bravo all of the real and personal property in its possession or control, including without limitation any of the Project's cash, trust accounts, investments, books and/or records.

(n) Midwest agrees to comply with the provisions of any Management Certification Residential Facility provided to HUD, which controls in the event of a conflict or inconsistency between this Agreement and such Certification. Midwest acknowledges that Bravo has provided to Midwest copies of all HUD Regulatory Agreements, the mortgage encumbering the real estate (which mortgage loan is insured by HUD), the Operator Security Agreement and Assignment of Rents and Lease from Bravo to the FHA Lender, the Sublease between Bravo and Master Tenant. Midwest shall perform its services consistently therewith. To the extent that any Midwest services involve the handling of any project funds or accounts, or any deposits or withdrawals into any project accounts, Midwest acknowledges receipt of any accounts receivable financing documents and Intercreditor Agreement with FHA Lender, as well as all deposit account and deposit account control agreements affecting the project, and Midwest shall perform all its services consistently therewith.

(o) All compensation or other payments for services provided in connection herewith, shall be subordinated to the extent required to be subordinated pursuant to the Program Obligations.

(p) Midwest shall provide the Facility Landlord with notice of any defaults hereunder and, at such Facility Landlord's option, an opportunity to cure such default; all in form and substance satisfactory to Facility Landlord and if requested shall deliver to Landlord any instrument reasonably requested by Landlord to implement the intent of the foregoing provision.

16. <u>Miscellaneous Provisions.</u>

#26883162_v1

   a. <u>Relationship of parties.</u> The parties intend that an independent contractor relationship be created by this contract. The conduct of the services will lie solely with Midwest. Nothing in this agreement shall create a partnership or joint venture.

  17. <u>Amendments</u> This Agreement may be amended or modified only by a writing signed by both parties.

   a. <u>Severability</u>. If any provision of this Agreement, or any portion thereof; is found to be invalid, illegal or unenforceable, under any applicable statute or rule of law, then such provision or portion thereof shall be deemed omitted, and the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

   b. <u>No Obligation to Third Parties</u>. None of the obligations and duties of Midwest or Bravo under this Agreement shall in any manner be deemed to create any obligations of Midwest or Bravo to, or any rights in, any person or entity not a party to this agreement.

   c. <u>Non-Assignment</u>. Midwest shall have no right to assign this Agreement or any of its rights hereunder without the prior written consent of Bravo.

   d. <u>Binding Effect</u>. This Agreement shall inure to the benefit of and be binding upon the parties hereto, their legal representatives and permitted successors and assigns.

   e. <u>Approvals and Consents</u>. Whenever the approval or consent of either party is required hereunder, such approval or consent shall not be unreasonably delayed or withheld.

   f. <u>Notices</u>. All notices, demands and requests which may or are required to be given by either party to the other hereunder shall be in writing and shall be personally delivered or be sent by certified mail, postage prepaid, addressed as set forth in this Section 17(f) or to such other place as either party may from time to time designate in a written notice to the other party. Notices, demands and requests which shall be served upon either party in the foregoing manner shall be deemed served or given for all purposes hereunder at the time such notice, demand, or request shall be personally delivered or received.

  As to Bravo:  Bravo Care of Alton Inc.
        11701 Borman Drive, Suite 315
        St. Louis, Missouri 63146
        Attn: President

  As to Midwest:  Midwest Administrative Services, Inc.
        11701 Borman Drive, Suite 315
        St. Louis, Missouri 63146
        Attn: President

#26883162_v1

      g. <u>Lease and Sublease</u>. Midwest acknowledges that the Facility is subject to a Master Lease between CR Finance II, LLC, a Delaware limited liability company as Master Tenant, and Alton Real Estate, Inc., as landlord and the owner of the real property and building in which the Facility is located ("Master Lease"), and that certain Sublease between Master Tenant, as Sublandlord and Bravo as Subtenant ("Sublease"). Midwest agrees to abide by the terms of said Master Lease and Sublease.

    18. <u>Waiver</u>. No waiver of any condition or legal right or remedy shall be implied by the failure of Bravo to declare a default, or for any other reason, and no waiver of any condition or covenant shall be valid unless it is in writing signed by Bravo. No waiver by Bravo of a breach of any condition shall be claimed or pleaded to excuse a future breach of the same or any other condition or covenant.

    19. <u>Entire Agreement</u>. This Agreement contains the entire understanding and agreement between the parties. No prior agreement, whether oral or in writing, shall have any effect whatsoever. This Agreement cannot be modified except by a writing signed by the party against whom enforcement of any change is sought.

IN WITNESS WHEREOF, the parties hereto have executed this Administrative Services Agreement the day and year first above written.

BRAVO CARE OF ALTON, INC.

By: _____
Hillel Yampol, Secretary & Treasurer

MIDWEST ADMINISTRATIVE SERVICES, INC.

By: _____
Hillel Yampol, Secretary & Treasurer

#26883162_v1

## SCHEDULE 1

SCHEDULE OF MIDWEST'S FEE
Under Agreement dated as of December 30, 2013
Between

Midwest Administrative Services, Inc and Bravo Care of Alton, Inc.

Administrative Fees

(a) <u>Base Administrative Fee.</u> As Midwest's compensation for its services hereunder, Bravo shall pay Midwest a Base Administration Fee during the term of this Agreement equal to $3,000 per month, prorated and payable monthly. The Base Administration Fee shall be due and payable by Bravo on the first day of each calendar month during the term of this Agreement;

(b) <u>Incentive Administration Fee.</u> In addition to the Base Administration Fee, Bravo shall pay to Midwest an Incentive Administration Fee, to reflect the increased expense, staffing, documentation, incident to the administrative services provided with respect to the larger number of transactions associated with accounting and financial reporting services; the greater media budget associated with advertising production and media selection; audit, review or compilation procurement; increased numbers associated with billing for resident services and products; budget reporting, analysis and monitoring; the greater responsibility for credit and treasury services; the higher number of likely employees and cost f employee benefits, insurance, health plan, retirement plan administration;, the volume of transactions with funds, receipt, holding and disbursing; greater costs associated with Payroll processing and tax administration; the likelihood or needing a more robust purchasing system administration, price negotiation and group agreements. The Incentive Administration Fee shall be payable quarterly, equal to the following percentage of Total Revenues from the Property's operation less the Base Administrative Fee:

| Rate | Total Revenues Category |
|---|---|
| 4.0% | Total Private Revenues |
| 6.0% | Total Medicare Revenues |
| 2.0% | Total Medicaid Revenues |

The Incentive Administration Fee shall be due and payable within thirty (30) days after the end of each three (3) month calendar period. Notwithstanding the foregoing, Bravo may invoice monthly in arrears provided that the Incentive Administrative fee would not exceed 5% of the net revenue for each monthly period. The Incentive Administration Fee, when added to Base Fee, shall not exceed 5%of net revenue.

Effective date: December 30, 2013

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have executed this Schedule 1 to Administrative Services Agreement as of the Effective Date.

Bravo Care of Alton, Inc.

By: _____
Hillel Yampol, Secretary & Treasurer

Midwest Administrative Services, Inc.

By: _____
Hillel Yampol, Secretary & Treasurer