### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | |
| **ALTON REAL ESTATE, INC.; EAST PEORIA REAL ESTATE, INC.; JOLIET REAL ESTATE HOLDING CO.; MOLINE REAL ESTATE, INC.; PEORIA REAL ESTATE, INC.; SCHUETZ ROAD REAL ESTATE, INC.; WOOD RIVER REAL ESTATE HOLDING CO.; EDWARDSVILLE REAL ESTATE, LLC; ELGIN REAL ESTATE, LLC; INVERNESS REAL ESTATE, LLC; NORTHBROOK REAL ESTATE, LLC; ROCKFORD REAL ESTATE, LLC; ST. CHARLES REAL ESTATE, LLC; CR FINANCE II, LLC; BRAVO CARE OF ALTON, INC.; BRAVO CARE OF EAST PEORIA, INC.; BRAVO CARE OF EDWARDSVILLE, INC.; BRAVO CARE OF ELGIN, INC.; BRAVO CARE OF INVERNESS, INC.; BRAVO CARE OF JOLIET, INC.; BRAVO CARE OF MOLINE, INC.; BRAVO CARE OF NORTHBROOK, INC.; BRAVO CARE OF PEORIA, INC.; BRAVO CARE OF ROCKFORD, INC.; BRAVO CARE OF ST. CHARLES, INC.; BRAVO CARE OF ST. LOUIS, INC.; BRAVO CARE OF WOOD RIVER, INC.; and MIDWEST ADMINISTRATIVE SERVICES, INC.,** | Civil No. 18 C 5625<br>District Judge: Hon. John J. Tharp, Jr.<br>Magistrate Judge: Hon. Mary M. Rowland |
| **Defendants.** | |

### FINAL ORDER APPOINTING RECEIVER

Now before the Court is the United States' Complaint and Emergency Motion for the

Appointment of a Receiver and Memorandum in Support ("Receivership Motion"), in which the

United States, on behalf of the U.S. Department of Housing and Urban Development ("HUD"), seeks immediate appointment of a receiver to oversee the operations and management of the thirteen healthcare facilities identified in Exhibit 1 attached hereto (collectively, the "Rosewood Facilities"). The United States seeks appointment of a receiver until HUD completes a foreclosure sale for all thirteen facilities and transfers title and operations to the successful purchaser at foreclosure, or acquires title or facilitates the transfer of title and operations to a responsible third party.

The Court having jurisdiction over this action pursuant to 28 U.S.C. § 1331, and upon consideration of the Complaint, Receivership Motion and accompanying declarations, and the testimony and arguments presented at the hearing on the Receivership Motion, the Court hereby finds, for purposes of the Receivership Motion only, that:

i.      The Rosewood Facilities are each owned by one of the ownership entities identified in the complaint (collectively, the "Owners"), and are leased to CR Finance II, LLC (identified herein as the "Master Tenant"), which then subleased each of the Rosewood Facilities to an operator, as defined in the Complaint (collectively, the "Operators");

ii.      The Rosewood Facilities' mortgages or deed of trust were insured by the Federal Housing Administration ("FHA"), a unit of HUD, pursuant to Sections 232, 223(f), and 223(a)(7) of the National Housing Act.  Each Owner executed and delivered to the original lenders a promissory note (identified herein as the "Mortgage Note(s)") whereby each Owner promised to pay principal balances ranging from approximately $9,000,000 to $14,000,000 for each loan, totaling $168,966,400 for all thirteen Rosewood Facilities;

iii.      To secure payment of the sums due under the Mortgage Notes, each Owner entered into a mortgage or deed of trust ("Mortgage(s)"), Assignment of Leases and Rents, and Security Agreement to secure the lender's interest in the Rosewood Facilities;

iv.      Each Owner entered into a HUD Regulatory Agreement for Multifamily Housing Projects and LEAN Rider ("Owner Regulatory Agreement") with HUD;

v.      Each Operator entered into a Healthcare Regulatory Agreement – Operator ("Operator Regulatory Agreement") with HUD;

vi.      Master Tenant entered into a Healthcare Regulatory Agreement – Master Tenant ("Master Tenant Regulatory Agreement") with HUD for each facility;

vii.      Operators contracted with Midwest Administrative Services, Inc. ("Midwest") to manage the day-to-day operations of the Rosewood Facilities;

viii.      The Mortgage Notes, Mortgages, Regulatory Agreements, Assignment of Leases and Rents, Security Agreements, State and County UCC financing statements, and all ancillary documents of the Owners, Operators and Master Tenant relating to the loans to the Owners for the Rosewood Facilities are collectively referred to as the "HUD Loan Documents."

ix.      On or about August 8, 2018 and August 9, 2018, the prior lender, Greystone Servicing Corporation, Inc., assigned its interest under the Mortgages Notes and Mortgages for the Rosewood Facilities to HUD; as a result of these assignments, HUD is now the mortgagee;

x.      Owners have not complied with their obligations under the Mortgage and Owner Regulatory Agreements by failing to make promptly all payments due under the Mortgage Notes and Mortgages;

xi.      Owners owe an outstanding balance of $146,655,782.44 to HUD, the mortgagee, under the Mortgage Notes;

xii.       HUD is entitled under paragraph 5 of the Mortgages "to the appointment of a receiver by any court having jurisdiction, without notice, to take possession and protect the [Rosewood Facilities] . . . and to operate same and collect the rents, profits and income therefrom";

xiii.      HUD is also entitled to apply for the appointment of a receiver to take over and operate the facilities in the event of a default, pursuant to paragraph 11(d) of each Owner Defendant's Regulatory Agreement;

xiv.      HUD has nominated as receiver Long Hill at Rosewood, LLC (the "Receiver"); which possesses the requisite experience, qualifications, resources, and knowledge of the National Housing Act, the applicable HUD regulations and handbook requirements, and HUD Regulatory Agreements to perform as the receiver of the Rosewood Facilities;

xv.       Long Hill at Rosewood, LLC is willing to act as receiver in this matter;

xvi.      HUD has initiated foreclosure of the Rosewood Facilities pursuant to the Multifamily Foreclosure Act, 12 U.S.C. § 3701 et seq.;

xvii.     Prior to the filing of the Complaint, MidCap Funding IV Trust ("MidCap") (successor-by-assignment to MidCap Financial Trust, formerly known as MidCap Financial, LLC) made a revolving loan facility available to the Operators pursuant to (i) that certain Credit and Security Agreement dated December 30, 2013 among Operators and MidCap (the "MidCap Revolving Credit Agreement" and together with the other "Financing Documents" (as defined in the MidCap Revolving Credit Agreement), the "MidCap Revolving Loan Documents"). Pursuant to the MidCap Revolving Credit Agreement, MidCap provided the Operators with a revolving credit facility in a maximum outstanding principal amount of up to $19,000,000.  As security for the payment of the Obligations (as defined in the MidCap Revolving Credit

Agreement, as used herein the "MidCap Obligations")[1], the Operators granted to MidCap, pursuant to the MidCap Revolving Loan Documents, security interests in and liens upon Operators' accounts receivable and related assets, as more fully described in the MidCap Revolving Loan Documents (the "MidCap Revolving Collateral" and such liens the "MidCap Revolving Liens").  For the avoidance of doubt, neither HUD Advances, as hereafter defined, or any cash held by the Operators or the Receiver that constitutes trust money of the residents of the Rosewood Facilities shall constitute MidCap Revolving Collateral.  Pursuant to that certain Intercreditor Agreement dated as of December 30, 2013 by and between MidCap (as successor-by-assignment to MidCap Financial Trust (f/k/a MidCap Financial, LLC) and HUD (as successor-by-assignment to Greystone Servicing Corporation, Inc., successor-by-assignment to Berkadia Commercial Mortgage LLC) (as amended, the "Intercreditor Agreement"), MidCap and HUD agreed upon the relative priorities between themselves to the Operators' property and assets, including the MidCap Revolving Collateral.

**ACCORDINGLY, IT IS HEREBY ORDERED and DECREED AS FOLLOWS:**

1.      The United States' prayer for the appointment of receiver is granted, and Long Hill at Rosewood, LLC is hereby appointed as "Receiver" for the Rosewood Facilities, including all real property, personal property and related operations on the terms of this Order. The Receiver is vested with all the powers and obligations set forth herein. Notwithstanding the foregoing or anything contained herein, each Operator shall remain the licensed Operator legally

---

[1] As used in this order, (i) "MidCap Obligations" shall include all MidCap Advances (as defined in the Funding Agreement (as defined herein) and for the avoidance of doubt the MidCap Obligations shall be considered to be outstanding until the MidCap Obligations are Paid in Full and (ii) the term "Paid in Full", "Pay in Full" or "Payment in Full" means (A) the payment in full in cash of all of the MidCap Obligations and (B) the termination of all commitments to lend under the MidCap Revolving Loan Documents.

responsible for the Rosewood Facilities, subject, however, to the provisions of this Order. Receiver shall serve until HUD completes a foreclosure sale for all thirteen facilities and transfers title and operations to the successful purchaser(s) at foreclosure, or acquires title or facilitates the transfer of title and operations to a responsible third party, subject to Paragraph 25 of this Order. Upon the occurrence of any of these events and the completion of any other ancillary requirements of this Order, either the United States or Receiver may move this Court for the termination of the receivership.

Defendants' Rights & Obligations

2.    In accordance with N.D. Ill. Loc., R 66.1, the Receiver shall administer the Rosewood Facilities with the powers of a bankruptcy trustee, and Defendants and their respective partners, affiliates, subsidiaries, parents, related companies, employees, members, owners, shareholders, representatives and agents shall immediately deliver possession and control of the Rosewood Facilities to the Receiver, including allowing the Receiver to oversee the operations and the management thereof.

3.    During the term of the receivership, the Defendants shall remain legally responsible for the Rosewood Facilities in their respective capacities as owners, licensed operators, management agent, or master tenant in accordance with the HUD Loan Documents, any lease agreements, local, state and federal laws and regulations, and any other agreements, subject to the provisions of this Order.

4.    Defendants and/or their agents shall immediately provide, surrender, and/or deliver to the Receiver the following, to the extent such items and information are in Defendants' (including their affiliates, agents, employees and other individuals or entities under their control) possession or control:

a.      Defendants' federal employer identification numbers;

b.      copies of any and all service/vendor contracts pertaining to the Rosewood

Facilities including without limitation any and all management and consulting agreements;

c.      copies of any and all leases, lease abstracts, purchase agreements, and the

like pertaining to the Rosewood Facilities;

d.      all open invoices for services or goods relating to the Rosewood Facilities;

e.      a copy of the 2017 year-end financial statements and 2018 year-to-date

(and month-by-month detail) financial statements in both hard copy and electronic format,

including the following: balance sheet, income statement, statement of financial affairs, profit

and loss statements, accounts receivables agings and arrearages, operating statements, current

year budget, sources and uses of cash flow, detailed rent roll, accounts payable agings, check

register, security deposit listing, trial balance, general ledger, contractor statements, lien waivers,

sworn owner statements, construction draws, bank reconciliations, and bank statements, as well

as all licenses for financial and clinical software or other programs utilized in connection with

the Rosewood Facilities' operations;

f.      a complete set of keys (including all masters) and all security and/or

access codes and/or cards to the Rosewood Facilities and a schedule (including full contact

information) identifying each person or entity (including security companies,

municipal/governmental agencies and utility companies) who currently has one or more keys

and/or access cards to the Rosewood Facilities or who has knowledge of any access codes

thereto;

g.      any and all records and information Defendants may have concerning the

Rosewood Facilities and their operations and all passwords required to access such records and

information, including, without limitation, all written and electronic books, records, correspondence, and other information related to: (i) any agreements to which any of the Rosewood Facilities are or may be subject; (ii) any amounts received from the residents or other tenants of the Rosewood Facilities, including resident funds, from the time Defendants took possession of the Rosewood Facilities to the date of entry of this Order; (iii) all liens or other encumbrances on the Rosewood Facilities; (iv) property taxes, assessments, and related appeals; (v) insurance of all types for Defendants, Rosewood Facilities, residents and any other tenants (including, but not limited to, liability, property, hazard, excess liability, auto liability, boiler and machinery, business interruption, professional liability, employee dishonesty, builders risk, construction related insurance, and workers' compensation) related to the Rosewood Facilities; (vi) all maintenance and service contracts; (vii) all invoices for services at the Rosewood Facilities; (viii) all resident and other tenant files, including leases, lease abstracts, purchase agreements, and sample leases from the time Defendants took possession of the Rosewood Facilities to the date of entry of this Order; (ix) a current and accurate copy of all electronic files and other items related to accounting, including tenant escalations/reconciliations from the time Defendants took possession of the Rosewood Facilities to the date of entry of this Order; (x) a schedule of all capital expenditures put into the Rosewood Facilities since Defendants assumed possession of the Rosewood Facilities and any items of deferred maintenance and capital currently required; (xi) a full and complete resident census; (xii) all current or the most recent copy of any ALTA survey, Phase I and Phase II environmental reports, traffic studies, demographic studies, physical condition/engineering reports, building and life-safety code violations, zoning code information related to the Rosewood Facilities, and appraisals; (xiii) all marketing information (in hard copy and electronic format) including, but not limited to,

brochures, photographs (including aerial), maps, signage; (xiv) all other aspects of any of the Rosewood Facilities' records that may be necessary or pertinent to the Receiver's oversight of the management, maintenance and/or operations of the Rosewood Facilities, and/or transfer of the operations; (xv) all state survey results and correspondence with any regulators; and (xvi) all loan documents and records relating to all financing obtained by the Defendants with respect to the Rosewood Facilities and its operations. Defendants shall enter into an appropriate Business Associate Agreement with Receiver pursuant to the Health Information Portability and Accountability Act ("HIPAA") and its implementing regulations;

       h.     any and all insurance loss histories and/or claims on and concerning the management of the Rosewood Facilities and/or its operations from the date Defendants took possession of the same;

       i.     any and all other documents or other information relating to the Rosewood Facilities and the operations.

     5.     Defendants, along with their representatives, servants, contractors, officers, directors, members, agents and employees, shall deliver, or cause to be delivered, immediately to the Receiver (or shall otherwise allow the Receiver appropriate oversight of the following items in a manner acceptable to Receiver, in its discretion), (i) immediate possession and control of the Rosewood Facilities, (ii) all cash on hand, (iii) all cash equivalents and negotiable instruments, and (iv) all sums held in accounts in any financial institutions; provided that the existing cash management shall remain in place, clauses (ii) – (iv) shall be subject to the cash management provisions of the MidCap Revolving Credit Agreement, Operator Security Agreements, and HUD and MidCap deposit account service and control agreements. Defendants and their respective officers, directors, managers, members, affiliates, subsidiaries, related companies,

shareholders, attorneys, professionals, representatives, employees and agents shall continue to provide reasonable cooperation to the Receiver for carrying out its duties hereunder, and timely respond to all reasonable requests made by the Receiver.

6. Defendants shall deliver, or cause to be delivered, immediately to the Receiver: (i) property and effects in any way pertaining or relating to the Rosewood Facilities, (ii) approvals regarding the operation, construction, maintenance, and rentals, including, without limitation, all governmental approvals, permits, or certificates relating in any way to the Rosewood Facilities, and (iii) surveys, plans, drawings, specifications, engineering reports, environmental reports, construction contracts and documents, work reports, advertising materials, forms, deposits, deposit-account records, operating account records, other banking or financial records, contracts for sale, sales lists, service contracts, warranties, leases, lease agreements, licenses, security deposits, rent rolls and rental lists, and all other miscellaneous contracts, documents and instruments, including all security codes and passwords, relating in any way to the Rosewood Facilities.

7. Defendants and their agents shall not perform any act that will limit or decrease the existing coverage under such insurance policies noted in paragraph 4 above.

8. Defendants and their respective officers, directors, managers, members, affiliates, subsidiaries, related companies, shareholders, attorneys, professionals, representatives, employees and agents are enjoined and restrained from interfering, in any manner, with the Receiver in discharging its duties hereunder.

9. Neither the Defendants nor anyone associated therewith or acting under the Defendants' authority or control shall:

    a.   collect, withdraw, or transfer, in any way, funds or revenue derived from the Rosewood Facilities' operations, other than to the Receiver or at Receiver's direction in accordance with this Order;

    b.   remove or destroy any property from the Rosewood Facilities whether constituting property of the Rosewood Facilities or otherwise;

    c.   terminate or cause to be terminated any license, permit, lease, contract, or agreement relating to the Rosewood Facilities, including, without limitation, third party payor agreements without the written approval of HUD and the Receiver; or

    d.   otherwise interfere with the Receiver in carrying out its duties under this Order and applicable law.

<u>Receiver's Rights & Responsibilities</u>

10.    In the discharge of its duties hereunder, the Receiver shall comply with applicable laws and regulations as required to operate and manage the Rosewood Facilities including 12 U.S.C 1715n and 1715w of the National Housing Act, and the implementing regulations at 24 C.F.R §§ 200, 232, the HUD Regulatory Agreements, HUD Loan Documents, MidCap Revolving Loan Documents, HUD handbooks and requirements, and any other relevant local, state, and federal laws, and this Order.

11.    Until further notice of the Court, but subject at all times to the terms of Paragraph 16 and Paragraph 29 below, all persons or entities, including, but not limited to tenants and/or patients residing at the Rosewood Facilities or any portion thereof, and any persons liable thereof, shall pay to the Receiver (or shall pay as instructed by the Receiver and in accordance with this Order) all rents, fees for services rendered, income, or other amounts now due and unpaid, and all

rents, income, or other amounts hereafter to become due. Also subject at all times to the terms of

Paragraph 16 and Paragraph 29 below, Defendants and their representatives, servants, contractors,

officers, directors, members, agents and employees are directed to remit to the Receiver (or shall

remit as instructed by the Receiver and in accordance with this Order) any and all payments,

rents, fees for services rendered, income and profits paid to Defendants or to any representative,

servant, officer, director, member, agent, employee, or affiliate of Defendants on or after the date

of this Order and any deposits in Defendants' possession and control, whether collected before or

after the date of this Order. For avoidance of doubt, from and after the date of this Order, and until

the Court orders otherwise, each tenant or resident, present and future, at the Rosewood Facilities,

and all persons and entities financially responsible for the payment of services rendered on their

behalf, shall pay all sums due to the Receiver (or shall pay as instructed by the Receiver and in

accordance with this Order), and a copy of this Order shall be sufficient authority for such

payment to the Receiver (or as instructed by the Receiver and in accordance with this Order).

12.     The Receiver shall have full and exclusive power and authority to oversee the

management, operations, maintenance, leasing, repair and preservation of any or all of the

Rosewood Facilities, including but not limited to the revenues, rents, issues, income, and profits

subject to the terms of this Order, and shall have the full power and authority to oversee the

conduct of the business thereof and the operation of the Rosewood Facilities to the fullest extent

permitted by the National Housing Act, HUD regulations, HUD Loan Documents, MidCap

Revolving Loan Documents, HUD handbooks and requirements, and any other relevant local,

state, and federal laws, and this Order. Without limiting the foregoing, the Receiver shall have

the power and authority, immediately and upon entry of this Order, to:

        a.   Continue the operations, development, upkeep and repair, and maintenance

of the Rosewood Facilities, secure their residents and tenants, and undertake any action in accordance with the National Housing Act, HUD regulations, Regulatory Agreements, HUD handbooks and requirements, and any other relevant local, state, and federal laws.

b.   Receive all Operator funds and proceeds from the operation of the Rosewood Facilities (whether historical, current, or prospective), including but not limited to, fees for services rendered and accounts receivable from any time period, including all such funds retained by Operators since the time of default, and the Receiver shall deposit or cause to be deposited, all such amounts directly into the Lockbox Accounts in accordance with Paragraph 16 and Paragraph 29. For the avoidance of doubt, neither HUD Advances, as hereafter defined, or any cash held by the Operators or the Receiver that constitute trust money of the residents of the Rosewood Facilities shall constitute MidCap Revolving Collateral.

c.   Receive (whether historical, current, or prospective), all rents and subrents payable to the Master Tenant and/or Owners and any other amounts due or payable under the subleases or Master Lease, insurance claim proceeds, real estate tax refunds, utility deposits, security deposits, earnest money deposits, and profits payable to the Owners from any time period, including all such funds retained by the Owners since the time of default, and the Receiver shall deposit, or cause to be deposited, all such amounts directly into the appropriate account under the control of the Owners or Master Tenant (i.e., earnest money deposits, property insurance proceeds, real estate tax refunds,

real estate purchase option payments, sales of the Owners -owned
personalty, or the like), in accordance with this paragraph, any other
requirements herein, and all applicable loan agreements.

d.   Negotiate, execute, or modify any new, renewed, or current contracts,
agreements, licenses, permits, agreements, or understandings for the use,
maintenance, operation, repair, marketing, and security, restoration, or
improvement of the Rosewood Facilities, in accordance with the HUD Loan
Documents and the MidCap Revolving Loan Documents and upon HUD's
approval.

e.   Pay insurance premiums for hazard, casualty, auto liability, workers
compensation, PLI, employer liability, employee dishonesty, business
interruption, errors and omission, malpractice, and any such other liability
insurance coverage as may be required to keep the Rosewood Facilities and
the Receiver insured, in such amounts and with such coverage as are
required under the Mortgages sought to be foreclosed in this action and the
MidCap Revolving Credit Agreement. All such insurance policies shall
name the Receiver, HUD, and Defendants as additional insureds and shall
name HUD as mortgagee and loss payee with respect to all casualty
policies and otherwise comply with the terms of the MidCap Revolving
Credit Agreement with respect to naming MidCap thereon.

f.   Pay all taxes as necessary to ensure the continued operation of the Rosewood
Facilities and to protect the liens granted under the Mortgages and the
MidCap Revolving Liens.

g.  Establish bank accounts, if necessary, pursuant to the terms of this Order.

h.  Make all repairs, declarations, renewals, alterations, additions, betterments, and improvements in connection with the Rosewood Facilities as may seem judicious to the Receiver, with HUD's prior written approval.

i.  Hire or retain any agents necessary or appropriate to do any of the duties listed above without further approval of this Court, including, but not limited to, attorneys, accountants, consultants, maintenance personnel, security personnel, professionals, brokers, management companies, investment bankers, auction companies, and pay such individuals and companies reasonable compensation for their assistance. Upon entry of this Order, the Receiver and his attorneys, consultants, and professionals may be paid for their pre-receivership work relating to this litigation from the Income or pursuant to the terms of the Funding Agreement, as further defined below.

j.  Upon the entry of this Order, continue to retain R&R Marketing and Management, LLC (the "Consultant") as a consultant on the terms and conditions approved by HUD and MidCap covering the time up to September 15, 2018 (the "Consulting Agreement"); provided, however, that the Consulting Agreement may be extended by the Receiver, with the agreement of the Consultant, for thirty (30) day increments, or such longer time periods as may be agreed by Receiver and Consultant, commencing on September 15, 2018 and continuing thereafter until terminated by Receiver on ten (10) days' notice to Consultant.

k.  In the exercise of its business judgment, terminate, modify, or enter into

vendor contracts pertaining to the Rosewood Facilities as the Receiver may deem appropriate, with no further obligation or liability (including not having to pay any termination fees) under any terminated contract. The Receiver may pay vendors for contracts entered into out of income generated from the Rosewood Facilities. With respect to terminated contracts, the effect of this provision shall be to terminate the contracts and to render them void and unenforceable as between the parties to the contracts, on the one part, and the Receiver and HUD, on the other part, and all without recourse by such parties to the Receiver, Defendants and their agents, or HUD. Receiver shall provide notice to HUD and MidCap three (3) days prior to terminating any third-party payor agreements.

l.  Procure or maintain utility services for the Rosewood Facilities, to include but not be limited to gas/steam, electric, water, sewer, trash, phone, cable, internet, and snow removal, without suffering, regardless of the internal policies of any utility provider, the termination of such service or refusal to authorize any new account based upon previous unpaid bills for services rendered prior to the appointment of the Receiver or during the term of the Receiver, with any and all accounts to be opened or transferred to the Receiver's name, where appropriate. Further, the Receiver is not responsible for any utility bills or other debts accruing prior to its appointment, nor is the Receiver personally responsible for any bills during the receivership.

m.  Take possession of all cash and funds belonging to or for the benefit of Defendants in bank accounts associated with the Rosewood Facilities (no

matter from what time period), whether in the name of the Rosewood Facilities, any of the Defendants, or any of the Defendants' respective affiliates, agents or employees, and to open, transfer and change all such bank accounts into the name of the Receiver, if appropriate, or otherwise take such actions as necessary to ensure such bank accounts are under the control of the Receiver, all in compliance with legal requirements and consistent with this Order.

n.   With respect to any bank account in the name of Defendants or otherwise maintained by Defendants or their agent in connection with the Rosewood Facilities' operations: (i) require said bank to convert the deposit account name to such name as requested by the Receiver; (ii) modify the authorized signors on the deposit account to those persons requested by the Receiver; (iii) delete any signors to the account as requested by the Receiver; and (iv) ensure compliance with other similar requests made by the Receiver, including, but not limited to using the Defendants' TIN (FEIN or SSN) while naming the account as a receivership account.

o.   Institute, prosecute, defend, and/or settle such legal proceedings as the Receiver deems necessary relating to the Rosewood Facilities and to collect any such sums which may be due from any sources relating to the Rosewood Facilities; provided that if any of the foregoing involves a claim in excess of $100,000, the Receiver shall not settle such claim without prior written consent of HUD and MidCap, to the extent that approval by MidCap is required pursuant to the MidCap Revolving Loan Documents.

p.  Cooperate with HUD in locating a new operator for each of the Rosewood Facilities and enter into an operations transfer agreement and/or purchase and sale agreement, as applicable, with such new operator or new owners to ensure the uninterrupted care for the residents of the Rosewood Facilities and the orderly transfer of operations, subject to and incompliance with all applicable laws of the State of Illinois or the State of Missouri, as applicable, and in compliance with all rules and regulations of any and all applicable agencies.

q.  Take such other actions as may be reasonably necessary to manage, operate, transfer, and preserve the Rosewood Facilities, or as otherwise authorized by the HUD Loan Documents and/or the Court so long as, in each case, such actions are in compliance with the MidCap Revolving Credit Agreement and Intercreditor Agreement.

13.  The Receiver shall be entitled to compensation for its services and reimbursement of its expenses (including attorneys' fees and expenses) on the terms and conditions set forth in the Funding Agreement (herein, "Funding Agreement"), and which Funding Agreement is approved attached hereto as Exhibit 2, and which shall be executed promptly by Receiver, HUD, and MidCap upon the entry of this order.

14.  The Receiver shall oversee the management of the Rosewood Facilities as would a prudent person, taking into account the effect of the Receiver's oversight on the interest of HUD as regulator and mortgagee, and the interests of patients, clients, and residents of the facilities. To the extent the Receiver receives sufficient receipt from the Rosewood Facilities, the Receiver shall undertake the following:

a. pay the Operating Expenses (as defined in the Funding Agreement), including amounts that accrue and become due under the subleases on and after the date of this Order.

b. obtain and maintain casualty and liability insurance required in accordance with the HUD Loan Documents or applicable to the Rosewood Facilities at the time the Receiver took possession, or shall find more cost-effective replacement insurance of comparable coverage with replacement insurers and naming the Receiver, HUD and Owners, Operators, and Master Tenant as additional insureds, and, should Receiver seek replacement insurance, existing insurers of the Rosewood Facilities are hereby Ordered to release claims history on existing policies to Receiver.

c. use reasonable efforts to maintain the Rosewood Facilities in at least the same condition as existed at the time the Receiver took possession, excepting reasonable wear and tear and damage by casualty.

d. make other repairs and improvements necessary to comply with building, life-safety, and other similar codes or with such other contractual obligations, subject to the limitations set forth herein.

e. take such other actions as may be reasonably necessary to preserve the Rosewood Facilities, or as otherwise authorized by the Court, provided sufficient funds are available.

f. pay any and all other outstanding obligations to suppliers incurred in arm's length transactions who, prior to entry of this Order, supplied materials, business supplies, and/or labor to or for the benefit of the Rosewood Facilities, but only to the extent that Receiver shall determine, in its sole judgment, that it is prudent to do so in order

to maintain the business relationships with such suppliers for the benefit of the

Rosewood Facilities, provided sufficient funds are available from the Rosewood

Facilities, and without making the Receiver or the receivership estate liable for any

other antecedent debts relating to the Rosewood Facilities.

15.     Any receipts received by the Owners shall be applied to the payment of the HUD

Obligations until the payment in full of the HUD Obligations.

16.     Operators' current cash management system shall remain in place, including the

payment of all proceeds of receivables, all other cash collections of Operators and all other

proceeds of the MidCap Revolving Collateral into the Lockbox Accounts (as used herein,

Lockbox Accounts shall mean the deposit accounts of each Operator for the initial deposit of

government receivables that are be subject to Lockbox Agreements in favor of MidCap (first

lien) and HUD (second lien); for deposit of other revenues that are subject to Lockbox

Agreements (commercial accounts) in favor of MidCap (first) and HUD (second lien)). The

Receiver is authorized to take such actions to effectuate this arrangement and utilize Operators'

cash management system in accordance with and subject to the terms of this Order, including,

without limitation, Paragraph 29 below.  All Lockbox Accounts, all Deposit Account Control

Agreements and Deposit Account Restriction Agreements (each as defined in the MidCap

Revolving Credit Agreement) and all lockbox account agreements, lockbox account control

agreements and deposit account control agreements (as listed in Supplemental Schedule 3B of

the Intercreditor Agreement); and collectively, herein, the "Lockbox Agreements"), deposit

account agreements, deposit account and instruction agreements, blocked account agreements

and similar bank account agreements that were in place prior to the entry of this Order shall

remain in effect and are hereby ratified and reaffirmed and all sweep instructions set forth

therein shall remain in place and shall not be modified without the prior written consent of MidCap and HUD unless and until such time as the MidCap Obligations are Paid in Full. For the avoidance of doubt, modifications of the Master Tenant Deposit Account Control Agreement shall require only HUD consent, and the HUD Lockbox Agreements shall remain in place until the HUD loans are paid in full or HUD otherwise approves.  The Receiver may obtain a deposit account control agreement or similar agreement in favor of MidCap and HUD with respect to each deposit account and securities account that is owned or maintained by an Operator or by the Receiver with respect to the Rosewood Facilities, each of which agreements shall be in form and substance acceptable to HUD and MidCap. For the avoidance of doubt, with respect to any bank accounts associated with the operation of the Rosewood Facilities, prior to or after the issuance of this Order, those bank accounts shall remain or become subject to the liens of HUD and MidCap, and subject to the MidCap Revolving Loan Documents and HUD Loan Documents.

17.    The Receiver shall perform its obligations hereunder and make disbursements in accordance with, and subject to, the terms of this Order and the Funding Agreement.

18.    Consistent with this Court's Local Rules, and those specifically related to receivers,[2] the Receiver's responsibilities shall, to the extent not specifically addressed herein, comply with the Local Rules providing that duties of receivers shall be similar to those of bankruptcy trustees. The Receiver shall refer to bankruptcy trustee duties and obligations or seek guidance from this Court pursuant to Paragraphs 24 and 37 of this Order in the event that direction or assistance is needed.

19.    Advances[3]

---

[2] N.D. Ill. L.R. 66.1.
[3] As used herein, the term "Advance" shall have the meaning given such term in the Funding Agreement.

(a)     So long as no Termination Event (as defined in the Funding Agreement) has occurred, following entry of this Order through the Termination Date, and in all events in accordance with and subject to the terms of the Funding Agreement, the Receiver may request from MidCap advances which are necessary to pay Operating Expenses (as defined in the Funding Agreement) by complying with the procedures set forth in MidCap Revolving Loan Documents for requesting "Revolving Loans" thereunder (including, without limitation, delivering a "Borrowing Base Certificate" and "Notice of Borrowing" to MidCap. Advances by MidCap shall be repaid in accordance with the terms of the MidCap Revolving Credit Agreement and the Funding Agreement. No Defendant shall have the right to request any protective or other advances under the MidCap Revolving Loan Documents, and MidCap shall have no obligation to make any advances, protective or otherwise, to any Defendant, and the terms of making Advances to the Receiver shall be subject to the terms of the Funding Agreement.

(b)     The Receiver may request from HUD advances or any additional cash needs of the Receiver pursuant to the HUD Loan Documents, Section 207(k) of the National Housing Act, the Funding Agreement, and this Order. Advances from HUD (other than the payment of Receiver Expenses) may only be requested after first requesting advances, to the extent of availability under the MidCap Revolving Loan Documents, for operating expenses pursuant to this Order and the MidCap Revolving Loan Documents, . If the Receiver is in need of funds in excess of any Advances under the MidCap Revolving Loan Documents, the Receiver may request such funding from HUD in accordance with the terms of the Funding Agreement and this Order.

(c)     The Receiver is expressly authorized (but not obligated) to borrow funds from MidCap and/or HUD in accordance with this Order and the Funding Agreement.

(d)     HUD shall have the right to apply such funds (or any amount of such funds) as HUD receives from the Receiver, pursuant to the terms of this Order, to reduce the indebtedness owed to HUD by Defendants. In the event that HUD advances funds pursuant to Section 207(k) of the National Housing Act, the terms of the HUD Loan Documents (the "HUD Advances"), the Funding Agreement, and this Order during the pendency of the receivership to enable the Receiver to perform its duties hereunder, such HUD Advances shall be considered Debt pursuant to the terms of the Mortgages.

(e)     The Receiver shall use proceeds of Advances to fund Operating Expenses (as defined in the Funding Agreement).

20.     All persons who have a Claim[4] (except MidCap, its affiliates, HUD and regulatory authorities, including but not limited to the Centers for Medicare and Medicaid Services) against the Owners, Operators and Master Tenant are hereby enjoined from (a) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding that was or could have been commenced before the commencement of the receivership, or to recover a Claim against the Owners, Operators, and Master Tenant that arose before the commencement of the receivership; (b) the enforcement, against the Owners, Operators, and Master Tenant or their real or personal property, of a judgment obtained before the commencement of the receivership; (c) any act to obtain possession of, or to exercise control over, the Owners, Operators, and Master Tenant real or personal property; (d) any act to create, perfect, or enforce any lien against the Owners,

---

[4] "Claim" means (a) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

Operators, and Master Tenant real or personal property; (e) any act to create, perfect, or enforce against the Owners, Operators, and Master Tenant real or personal property any lien to the extent that such lien secures a Claim that arose before the commencement of the receivership; (f) any act to collect, assess, or recover a Claim against the Owners, Operators, and Master Tenant that arose before the commencement of the receivership; and (g) the setoff of any debt owing to the Owners, Operators, and Master Tenant that arose before the commencement of the receivership against any Claim against the Owners, Operators, and Master Tenant (collectively, a "Pre-Receivership Claim"). However, any and all statutory or contractual limitation periods applicable to any cause of action arising out of or in connection with a Pre-Receivership Claim, to the extent that any such statutory or contractual periods of limitation have not expired as of the date of this Order, shall be hereby tolled during the pendency of this Order. This shall mean that any applicable statutory or contractual periods of limitation that have begun to run shall be interrupted and cease running during the pendency of this Order. Holders of any such Pre-Receivership Claims may, however, send the Receiver written notice of such claims, along with supporting documentation, in order for the Receiver to review such claims, and such creditors shall be permitted to discuss with the Receiver the nature of such claims (and when and how they might be paid in the future). This paragraph shall not apply to any enforcement action brought forth against the Owners, Operators, or Master Tenant by MidCap, any affiliate of MidCap, the United States or HUD.

21.    Liability

        a.    Neither HUD nor the Receiver shall be liable for any obligations (including, without limitation, obligations between, on the one part, Defendants, and, on the other part, one or more employees, directors, agents, shareholders, creditors, members, and/or

representatives of Defendants), whether or not such obligations have been liquidated and whether or not such obligations are conditional, that arose prior to this Order and that relate in any way to the acquisition, ownership, maintenance, operation, financing, sale or use of the Rosewood Facilities and of any part of it. Defendants shall remain fully obligated for all obligations.

b.      This Order shall not impose upon either HUD or the Receiver any liability to any party for any claims, actions, or causes of action relating to the Rosewood Facilities that arise out of or relate to events or circumstances occurring prior to the appointment of the Receiver (including but not limited to any liability resulting from the performance of services rendered by third parties on behalf of Defendants, and any liability to which Defendants are currently or may ultimately be exposed under any applicable laws pertaining to the ownership, management, and operations of the Rosewood Facilities).

c.      To the extent the Receiver continues the services of any current employees, agents, or other personnel with respect to the Rosewood Facilities, the Receiver shall not be liable for any claims of any nature whatsoever of such employees, agents, or other personnel that arose prior to the date and time of the entry of this Order, which claims include, but are not limited to, liabilities related to unemployment and/or worker's compensation claims, claims or violations related to Employee Retirement Income Security Act of 1974 or any other claims relating to employee benefits or employee benefits plan.

d.      The Receiver and its employees, agents, representatives, attorneys, officers, directors, partners, shareholders, members, affiliates, successors or assigns (the "Receiver-Related Persons") shall have no personal liability related to the Rosewood Facilities and they shall have no claim asserted against them, except for claims due to negligence, fraud,

bad faith, misuse of funds, willful misconduct, violations of federal, state or local law, or their breach of the terms and provisions of this Order.

e.     No party may commence litigation or discovery in any form against the Receiver-Related Persons (except to enforce rights granted herein) without first receiving a ruling from this Court, after notice and a hearing, that the Receiver-Related Persons are not protected by the provisions of this Order or applicable law.

22.     Neither the Receiver nor HUD nor MidCap shall be deemed in any way to be an owner or operator of any of the Rosewood Facilities. If the Receiver shall have acted in accordance with the  terms and conditions of this Order, the Receiver shall have no liability as to any claims, actions, or causes of actions of any third parties who have or would have claims against Defendants or any officer, director, or shareholder thereof (including, without limitation, any claims under any federal or state environmental laws), except that the Receiver is legally responsible for any violation of law caused by it or Receiver-Related Persons.

23.     The Receiver shall have no rights other than as expressly set forth in this Order, Funding Agreement, or this Court's Local Rules, and shall have no right to commence any action against HUD or the United States, its officers, agents, or employees.

24.     The Receiver may, but is not directed to, apply to this Court at any time during the receivership period for further direction and guidance to assist the Receiver in fulfilling its functions thereunder.

25.     Termination.   The Receiver may, at any time, in its sole discretion and business judgment, file a motion requesting that it be terminated, discharged and released from all its appointments as Receiver, which such motion shall be scheduled and heard on an expedited basis.  It shall be grounds for discharge of the Receiver, upon the Receiver's request, if, among

other things, there are insufficient funds to operate the Rosewood Facilities or the Receiver is not able to pay vendors it believes, in its sole discretion, must be paid in order to ensure the safety and well-being of the residents or the Defendants interfere with the ability of the Receiver to carry out its duties. Receiver must provide for a 30-day transition period to allow the appointment of a replacement receiver and must cooperate with such transition. HUD may also, at any time, file a motion requesting that the Receiver be terminated, discharged and released from all its appointment as Receiver.  Receiver shall be entitled to payment of all fees and expenses, including without limitation attorneys' fees and expenses, incurred to and including the date of transition to a replacement receiver, termination, discharge or release pursuant to the terms of the Funding Agreement and this Order.

26.    The Receiver is precluded from paying any claim that arose before this Order, unless the Receiver receives prior authorization from either HUD or this Court.

27.    Receiver shall cooperate and provide timely responses to any requests or demands from HUD or the appointed Foreclosure Commissioner related to the pending foreclosure of the Rosewood Facilities pursuant to 12 U.S.C. § 3701 et seq. and may act on behalf of the Defendants related to the foreclosure.

28.    Modifications.   Upon the consent of HUD, MidCap, and the Receiver to modify or alter the Funding Agreement, HUD, MidCap or the Receiver may file a modified or altered Funding Agreement with this Court. Upon motion to this Court, HUD, MidCap, or the Receiver may request that this Final Order Appointing Receiver or Funding Agreement be modified or altered for good cause and at the Court's discretion. Any motion for modification of the Funding Agreement or modified Funding Agreement by consent may only be filed after 60 days of the issuance of this Final Order Appointing Receiver and/or after 60 days of a previously filed motion

for modification of the Funding Agreement or modified Funding Agreement by consent.

29. Lockbox Accounts. From and after the date of entry of this Order until the Payment in Full of all of the MidCap Obligations, Operators, Midwest and the Receiver shall deposit, and cause to be deposited, on a daily basis, all collections, fees, cash, proceeds from accounts receivables and all other proceeds from the Operators' property and assets, including the Rosewood Facilities, directly into one or more of the Lockbox Accounts (except, for the avoidance of doubt, HUD Advances). Pursuant to the HUD Loan Documents, the Intercreditor Agreement and Rider, the MidCap Revolving Loan Documents, all of which shall remain in effect and are hereby ratified and reaffirmed, the Lockbox Banks (as defined in the MidCap Revolving Loan Documents) shall transfer all of Operators' funds paid into the Lockbox Accounts into the Payment Account (as defined in the MidCap Revolving Credit Agreement). Notwithstanding any other provision of this Order, all accounts receivables or amounts that arise from the operation of the Rosewood Facilities by the Operators or Midwest that are collected by the Receiver and the Defendants shall be held in trust for the benefit of HUD and MidCap subject to the terms of the Intercreditor Agreement whether or not such monies are actually remitted to the Lockbox Accounts.

30. Notwithstanding anything to the contrary set forth in this Order:

a. No real estate proceeds, sublease or master lease rents, property insurance proceeds, real estate tax refunds, reserves or escrows held under the HUD mortgage loan documents, proceeds of any sale or disposition of any real estate or landlord property, option payments, or other funds or items related to the ownership of the facility, or any collateral of the Master Tenant pledged to HUD, shall at any time be deposited into the Lockbox Accounts or applied to the MidCap Obligations;

b.      Receiver shall have no power or authority to borrow on behalf of the Owners, Master Tenant, or Midwest, or to grant or permit liens (other than the HUD Mortgages and Assignments of Rents), on any of the Rosewood Facilities real estate that secures the HUD mortgage loan, or to borrow funds on behalf of the Operators except pursuant to the MidCap Revolving Loan Documents, and solely for benefit of the Operators subject to the Intercreditor Agreement or to amend the Intercreditor Agreement (except with Midcap and HUD approval) or to authorize any of the foregoing. Notwithstanding the preceding sentence, Receiver is authorized to borrow necessary operating funds from a third party if the financing provides for the Payment in Full of the Midcap Obligations.  Receiver is authorized to take such actions in advance to review alternative lender qualifications, proposals or conduct other diligence as may be deemed necessary or appropriate.  Any such alternative financing must be approved by HUD.

c.      Receiver shall have no power or authority to terminate or modify the Master Lease or any sublease, or to enter into new leases or sub-leases, or to convey, transfer, agree to transfer or authorize transfer of title to any Rosewood Facility, or to enter into contracts to transfer or authorize the transfer of operations of any Rosewood Facility except upon prior HUD written approval, or to market, or retain brokers, or to conduct environmental studies, or similar professionals; but shall provide access to HUD and its contractors for such purposes;

d.      Unless and until and only for so long as the Operators become and remain current on all sublease rents and operating expenses, the Receiver shall have no power or authority to use or authorize the use of income arising from one Rosewood Facility to pay obligations of another Rosewood Facility, except as set forth in the Cross-Guaranty of Subtenants and in the MidCap Revolving Loan Documents (subject to the Intercreditor Agreement).  All reporting shall be done on a consolidated and per project basis; and

e.     Receiver shall have no power or authority to operate, maintain, or take actions in a manner that is in any way inconsistent with the MidCap Revolving Loan Documents, HUD Loan Documents and Regulatory Agreements and/or HUD requirements, or to grant liens or security interests on, or use or apply, accounts, project income, or any other property of the Rosewood Facilities to secure, pay or collateralize any obligations or for the benefit of any facility, entity or individual other the Rosewood Facilities covered by this Order, or to authorize any of the foregoing. If there is any conflict or inconsistency between this provision and any other provision in this Order or the Funding Agreement or any other Order, this provision shall prevail, and the Receiver shall take all action necessary to ensure compliance with all HUD requirements and the MidCap Revolving Loan Documents.

31.     Liens. All liens and security interests granted to MidCap and HUD, respectively, pursuant to the MidCap Revolving Loan Documents and the HUD Loan Documents, respectively, shall continue unaltered, in full force and effect, and with the same priority, notwithstanding the filing of the Complaint or entry of this Order. Without limiting the foregoing, any Advances funded by MidCap after the entry of this Order shall be secured by the MidCap Revolving Liens with the same priority as in effective immediately prior to the entry of this Order without regard to the effect (if any) under the Intercreditor Agreement resulting from the appointment of the Receiver.

32.     Use of Advances. The Receiver shall not use proceeds of Advances received pursuant to the Funding Agreement or this Order, or any cash, collections or other amounts received by the Receiver to:  (a) object to, challenge or contest in any manner, or to raise any defenses to, the amount, validity, extent, perfection, priority, or enforceability of the MidCap Obligations or the HUD Obligations or any liens or security interests with respect thereto, or any

other rights or interests of MidCap or HUD, object to the MidCap Revolving Loan Documents or the HUD Loan Documents or assert any claims or causes of action against MidCap or HUD, including, without limitation, for lender liability or otherwise; (b) sell or transfer any of the Owners, Operators or Master Tenant real or personal property outside the ordinary course of business except as specifically permitted with the prior written consent of MidCap and HUD; (c) incur any new indebtedness outside the ordinary course of business other with the prior written consent of MidCap and/or HUD, as applicable to the extent of any security interest therein; (d) modify the rights of MidCap or HUD under this Order or the MidCap Revolving Loan Documents or the HUD Loan Documents; or (e) prevent, hinder, or otherwise delay MidCap's or HUD's assertion, enforcement, or realization on the Owners, Operators or Master Tenant real or personal property, as applicable, in accordance with the MidCap Revolving Loan Documents or the HUD Loan Documents or this Order.

33.     Reporting Requirements; Covenants; Access to Collateral.

The MidCap Revolving Loan Documents and HUD Loan Documents are hereby ratified, affirmed, and incorporated herein by this reference. The Receiver shall perform all of the Owners, Operators and Master Tenant obligations under, and comply with all covenants and conditions applying to Owners, Operators and Master Tenant as are set forth in, the MidCap Revolving Loan Documents and HUD Loan Documents (including, without limitation, all reporting requirements), except to the extent such MidCap Revolving Loan Documents and HUD Loan Documents are expressly modified by the terms of this Order..

34.     Reporting Obligations.

        a.     A status hearing will be held on Monday, September 17, 2018, at 2 p.m. for purposes of providing an initial report to the Court as to the status of the implementation and

operation of the Receivership.

b.      Due to the scope of the Receiver's obligations in this matter, the Receiver is directed to prepare and file with the Court an initial written report within thirty (30) days of the September 17 status hearing (rather than the twenty-one (21) day period for which N.D. Ill. Loc., R 66.1 provides), in which to provide an inventory of all property, real, personal or mixed, of which the receiver has taken possession or control, together with a list of the then-known liabilities of the estate and a report explaining such inventory, and shall list the receipts and disbursements and summarize the activities of the Receiver. Thereafter the Receiver shall file similar periodic reports on a monthly basis, and within forty-five (45) days after termination of the receivership, a full and complete report, under oath, setting forth receipts and disbursements and reporting acts and transactions regarding the execution of the trust of its office as Receiver, including a current inventory of the funds, assets, and property remaining in the receivership, interest in and claims against same, and all debts and obligations contracted and expenditures made, in addition to the information to be provided in the above mentioned initial and monthly reports. The Receiver is further directed to serve copies of each such report on the attorneys of record for HUD, MidCap, and any other party who submits a written request to the Court and the Receiver to be served with copies of such requests. Any party having objection to the Receiver's report shall file a written objection with the Court no later ten (10) business days after the date of the later of (i) the Receiver's filing such report with the Court and (ii) the Receiver's serving such report on such person or entity to the extent required to be served on such person or entity. Any objection not filed within the time prescribed by this Order shall be deemed waived.

c.      The Receiver's report shall set forth the following information, unless otherwise agreed by HUD and Receiver:

  i. an inventory of all property, real, personal or mixed, of which the

    Receiver has taken possession or control;

  ii. a list of the then known liabilities of the estate;

  iii. a report explaining inventory;

  iv. current inventory of the funds, assets, and property remaining in the

    receivership, interest in and claims against same, and all debts and

    obligations contracted and expenditures made;

  v. all receipts, disbursements, cash flow, and all material changes in the assets

    in the Receiver's charge, or interests in or claims against the assets, that

    have occurred during the preceding month;

  vi. balance sheets, statements of income and expenses, statement of cash flows,

    and budget vs. actual comparison report; census information ; an aged

    payables report and an aged receivables report;  a capital expenditures

    report including the type and amount of each capital expenditure (which

    shall include expenditures for life and safety) made or proposed during the

    preceding month; and bank statements with monthly reconciliations for the

    preceding month; the condition of each facility;

  vii. any recommendations as to actions needed to preserve and protect each

    facility or to otherwise carry out the Receiver's duties;

  viii. the current status of all licenses, permits, and other governmental

    entitlements and/or approvals;

  ix. a summarization of the activities of the Receiver; and

  x. any other information the Receiver determines is relevant to the

receivership and/or the Rosewood Facilities.

d.     The Receiver shall provide reports regarding the status of it operations as directed by the Departments of Health and Centers for Medicare and Medicaid Services ("CMS").

35.     The Receiver is appointed for the benefit and protection of the Rosewood Facilities and its residents, as well as the rights and interests of HUD and MidCap. All actions of the Receiver pursuant to this Order shall be for the benefit and protection of the Rosewood Facilities and its residents, HUD, and MidCap. Nothing contained herein shall in any way limit, alter or impair the rights and interests of HUD or MidCap in Rosewood Facilities or its operations, including the income, revenues and profits therefrom.

36.     The Receiver shall post a fiduciary bond with the Clerk of the Court in the amount of $500,000.00 conditioned upon the faithful performance of its duties as the Receiver.

37.     The Receiver or any other party in interest, at any time, on proper notice to the parties who have appeared in this action, may apply to this Court for further or other instructions or powers necessary to enable the Receiver to properly fulfill its duties hereunder solely with respect to the Rosewood Facilities' operations.

38.     MidCap is directed to deliver copies of the MidCap Revolving Loan Documents to the Receiver.

IT IS SO ORDERED.


September 7, 2018
Date

John J. Tharp, Jr.
United States District Court
Northern District of Illinois

## ROSEWOOD FACILITIES

| Owner Defendant | Operator Defendant | Facility Name | Address |
|---|---|---|---|
| Alton Real Estate, Inc. | Bravo Care of Alton, Inc. | Rosewood Care Center of Alton | 3490 Humbert Road Alton, IL 62202 |
| East Peoria Real Estate, Inc. | Bravo Care of East Peoria, Inc. | Rosewood Care Center of East Peoria | 900 Centennial Drive East Peoria, IL 61611 |
| Edwardsville Real Estate, LLC | Bravo Care of Edwardsville, Inc. | Rosewood Care Center of Edwardsville | 6277 Center Grove Road Edwardsville, IL 62025 |
| Elgin Real Estate, LLC | Bravo Care of Elgin, Inc. | Rosewood Care Center of Elgin | 2355 Royal Blvd. Elgin, IL 60123 |
| Inverness Real Estate, LLC | Bravo Care of Inverness, Inc. | Rosewood Care Center of Inverness | 1800 West Colonial Parkway Inverness, IL 60067 |
| Joliet Real Estate Holding Company | Bravo Care of Joliet, Inc. | Rosewood Care Center of Joliet | 3401 Hennepin Drive Joliet, IL 60431 |
| Moline Real Estate, Inc. | Bravo care of Moline, Inc. | Rosewood Care Center of Moline | 7300 34th Avenue Moline, IL 61265 |
| Northbrook Real Estate, LLC | Bravo Care of Northbrook, Inc. | Rosewood Care Center of Northbrook | 4101 Lake Cook Road Northbrook, IL 60062 |
| Peoria Real Estate, Inc. | Bravo Care of Peoria, Inc. | Rosewood Care Center of Peoria | 1500 West Northmoor Road Peoria, IL 61614 |
| Rockford Real Estate, LLC | Bravo Care of Rockford, Inc. | Rosewood Care Center of Rockford | 1660 South Mulford Road Rockford, IL 61108 |
| St. Charles Real Estate, LLC | Bravo Care of St. Charles | Rosewood Care Center of St. Charles | 850 Dunham Road St. Charles, IL 60174 |
| Schuetz Road Real Estate, Inc. | Bravo Care of St. Louis, Inc. | Rosewood Care Center of St. Louis | 11278 Schuetz Road St. Louis, MO 63146 |
| Wood River Real Estate Holding Company | Bravo Care of Wood River, Inc. | Foxes Grove Supportive Living Community | 395 East Edwardsville Road Wood River, IL 62095 |

Exhibit 1: Rosewood Facilities

## FUNDING AGREEMENT

This FUNDING AGREEMENT ("Agreement") is entered into as of August XX, 2018, by and between the United States Department of Housing and Urban Development (the "HUD"), with its headquarters located at 451 7th Street SW, Washington, DC 20410, Long Hill at Rosewood, LLC, a Connecticut limited liability company (the "Receiver" or "Long Hill"), solely in its capacity as receiver for the Defendants (as defined herein), with its principal place of business located at 580 Long Hill Avenue, Shelton, CT 06484, and MidCap Funding IV Trust, a Delaware statutory trust ("MidCap"), acting individually as a Lender and as administrative agent for the lenders from time to time party to the MidCap Revolving Credit Agreement (as defined below) with its principal place of business located at c/o MidCap Financial Services, LLC, as servicer, 7255 Woodmont Avenue, Suite 200, Bethesda, MD 20814, related to the receivership of thirteen healthcare facilities consisting of twelve nursing homes and one supportive living facility identified in Exhibit 1 of the Order (collectively, the "Rosewood Facilities").

## RECITALS

A.     Alton Real Estate, Inc., East Peoria Real Estate, Inc., Joliet Real Estate Holding Co., Moline Real Estate, Inc., Peoria Real Estate, Inc., Schuetz Road Real Estate, Inc., Wood River Real Estate Holding Co., Edwardsville Real Estate, LLC, Elgin Real Estate, LLC, Inverness Real Estate, LLC, Northbrook Real Estate, LLC, Rockford Real Estate, LLC, and St. Charles Real Estate, LLC (hereafter, the "Owners") each owns one of the Rosewood Facilities.

B.     Bravo Care of Alton, Inc., Bravo Care of East Peoria, Inc., Bravo Care of Edwardsville, Inc., Bravo Care of Elgin, Inc., Bravo Care of Inverness, Inc., Bravo Care of Joliet, Inc., Bravo Care of Moline, Inc., Bravo Care of Northbrook, Inc., Bravo Care of Peoria, Inc., Bravo Care of Rockford, Inc., Bravo Care of St. Charles, Inc., Bravo Care of St. Louis, Inc., and Bravo Care of Wood River, Inc. (hereafter, the "Operators") each operates one of the Rosewood Facilities.

C.     CR Finance II, LLC is the "Master Tenant" for the Rosewood Facilities, and is the lessee under the single, indivisible master lease with the Owners, governing all thirteen Rosewood Facilities. Master Tenant entered into separate subleases with each Operator.

D.     From 2003 through 2012, Berkadia Commercial Mortgage LLC ("Berkadia"), Highland Mortgage Company, GMAC Commercial Mortgage Bank, and Capmark Finance Inc. (collectively the "Original Lenders") made thirteen loans to the Owners (the "Loans"), all of which were insured by the Federal Housing Administration ("FHA"), a unit of HUD, pursuant to Sections 232, 223(f), and/or 223(a)(7) of the National Housing Act.  Each Owner executed and delivered to the Original Lenders, a promissory note (identified herein as the "Note(s)") whereby each Owner promised to pay the Original Lenders principal balances ranging from approximately $9,000,000 to $14,000,000 for each loan, totaling $168,966,400 for all thirteen Rosewood Facilities.  Berkadia succeeded to the interest of the Original Lenders.

1

E.     To secure payment of the sums due under the Notes, the Owners entered into mortgages or a deed of trust (which include assignments of rents) (identified herein as the "Mortgage(s)"), Security Agreements, and ancillary documents ("HUD Loan Documents") with the Original Lenders, which were subsequently assigned by Berkadia to Greystone Servicing Corporation, Inc. ("Greystone") beginning in June through August of 2015, and then assigned by Greystone to HUD on August 8, 2018 and August 9, 2018.

F.     The Owners are in default of their obligations under the HUD Loan Documents by virtue of various acts and failures to make payment on the Loans as well as to take other actions in accordance with the HUD Loan Documents.

G.     To further secure the obligations of the Owners, Operators and Master Tenant, and their obligations under their respective leases and the Cross-Guaranty, the Operators granted security interests to FHA lender via Operator Security Agreements and assigned leases and rents via recorded Assignments of Leases and Rents; and Master Tenant granted liens and security interest to FHA lender pursuant to Master Tenant Security Agreements (with assignments of leases and rents) to secure the HUD loan documents and its obligations under the Master Lease.

H.     Due to Owners', Operators', and Master Tenant's (collectively, "Defendants") numerous defaults under their respective security agreements, regulatory agreements or Mortgages, the United States, on behalf of HUD, filed its Complaint on August 17, 2018 in the United States District Court for the Northern District of Illinois (the "Court") and subsequently filed an Emergency Motion for the Appointment of Receiver and Memorandum in Support.  The Court issued an interim order appointing a receiver on August 21, 2018.  Prior to the entry into this agreement, the Court shall have entered into a Final Order Appointing Receiver (the "Order").

I.     Prior to the date hereof, MidCap entered into a Credit and Security Agreement dated December 30, 2013 with Operators (the "MidCap Revolving Credit Agreement"), pursuant to which MidCap provided the Operators with a revolving credit facility in a maximum outstanding principal amount of up to $19,000,000.

WHEREAS, MidCap, Receiver and HUD have agreed to enter into this Agreement to ensure that the Receiver has the necessary credit support to fund the operating expenses relating to the Rosewood Facilities that are anticipated to be incurred on and after the Receiver's appointment and to ensure that the Receiver has the necessary funds to pay its expenses, in each case as provided for and further detailed herein and in the Order.

NOW THEREFORE, in consideration of the mutual covenants contained herein, it is agreed by and between HUD, MidCap and Receiver as follows:

2

1. <u>Defined Terms</u>. All capitalized terms used in this Agreement (including in the recitals above) which are not defined herein, but which are defined in or by reference in the Order, shall have the same meanings herein as therein.

2. <u>Cash Management System</u>. HUD and MidCap acknowledge and agree that, from and after the date hereof and until the MidCap Obligations are Paid in Full, the Operators' cash management system shall remain in place in accordance with Paragraphs 16 and 29 of the Order, including (a) the payment of all proceeds of Operators' receivables and all other cash collections of the Operators into the Lockbox Accounts and (ii) the transfer of all amounts on deposit in the Lockbox Accounts to MidCap in accordance with the existing Lockbox Agreements, it being understood and agreed that all amounts on deposit in the Lockbox Accounts shall be transferred to MidCap on a daily basis as required by the terms of the MidCap Revolving Credit Agreement. MidCap, HUD and Receiver agree and acknowledge that all amounts transferred to MidCap from the Lockbox Accounts shall be applied to the outstanding MidCap Obligations (including, without limitation, fees, costs and expenses incurred by MidCap, including attorneys' fees) in accordance with Section 2.11 of the MidCap Revolving Loan Document.

3. <u>Funding, Operating Budget, and Advances</u>.

(a) <u>Funding</u>. On and after the entry of the Order and until a Termination Event (as defined herein), and in accordance with this Agreement and the Order, MidCap and HUD agree that Receiver shall be permitted to (a) request Advances in accordance with the MidCap Revolving Loan Documents to fund the Operating Expenses of the Rosewood Facilities in accordance with the Operating Budget and (b) request funding from HUD to pay (i) any Operating Expenses in accordance with the Operating Budget to the extent not funded by Advances under the MidCap Revolving Loan Documents, (ii) the Receiver Expenses as set forth in the Receiver Expense Budget, and (iii) any reasonable expenses of the Rosewood Facilities that exceed the Operating Budget, subject to the terms of this Funding Agreement.

(b) <u>Operating Budget</u>. The Receiver shall make operating disbursements strictly in accordance with, and subject to, the terms of the Order and a budget (as such budget may be amended from time to time, the "Operating Budget"). The Operating Budget shall be reasonably acceptable to HUD and MidCap and may not be amended without the prior written consent of HUD and MidCap. The Receiver shall not make disbursements in excess of the budgeted items in the Operating Budget or at a time other than the times set forth in the Operating Budget; *provided that* any unused budgeted amounts from one week may be carried forward to the next week and *provided further that* there shall be an allowed 10% variance to the aggregate amount of disbursements scheduled to be made during any calendar week as set forth in the Operating Budget for such calendar week (*e.g.*, on an aggregate weekly budgeted line item basis. The Receiver shall provide to MidCap and HUD the first Operating Budget within forty-five (45) days after entry of the Order. In the interim, the MidCap and HUD shall work with the Receiver in good faith to approve operating expenditures on a weekly basis (or as otherwise agreed) and shall ensure that the reasonable and necessary operating expenses of the Rosewood Facilities are being funded.

(c)    MidCap Advances. On and after the entry of the Order and until the Termination Event, Receiver may request MidCap to advance to Receiver, in accordance with the MidCap Revolving Loan Documents, (i) pending preparation of an Operating Budget, those amounts necessary to pay the Operating Expenses of the Rosewood Facilities in accordance with Section 3(b) of this Agreement and (ii) after preparation of the Operating Budget, those amounts set forth in the Operating Budget (including variances allowed hereunder, but specifically excluding any Receiver Expenses, collectively, the "Operating Expenses") (collectively, an "Advance").  MidCap agrees to make such Advances requested in accordance with the immediately prior sentence to the Receiver so long as (A) all conditions precedent set forth in Section 7.2 of the MidCap Revolving Loan Documents are satisfied (other than the existence of defaults based on failure to pay rents under the operating leases and the existence the Existing MidCap Defaults (as defined herein) and other than compliance with the provisions of the MidCap Revolving Credit Agreement identified on Exhibit C attached hereto), (B) the aggregate amount of all Advances in any given calendar week shall not exceed 110% of the aggregate amount of expenses scheduled to be paid during such calendar week as set forth in the Operating Budget, unless otherwise agreed to in writing by HUD and MidCap and (C) immediately prior to and after giving effect to the requested Advance, the Revolving Loan Outstandings shall not exceed the Revolving Loan Limit (as such capitalized terms are defined in the MidCap Revolving Credit Agreement).  In addition to the Advances requested by the Receiver and funded by MidCap, MidCap may (in its sole discretion and without notice) make Advances to pay any and all unpaid principal, interest, fees, costs, expenses and other amounts payable or reimbursable to MidCap pursuant to the MidCap Revolving Credit Agreement, in each case when due and payable, and all such Advances shall constitute MidCap Obligations for all purposes. For purposes of clarity, no Advance shall be requested, and MidCap shall not be obligated to fund any Advance that is requested, to pay or reimburse the Receiver for the Receiver's fees, costs and expenses incurred by the Receiver or the Receiver's agents, contractors, professionals, and consultants, including, but not limited to, reasonable attorneys' fees and expenses and any amounts relating to the purchase of a bond (collectively, the "Receiver Expenses"), which Receiver Expenses shall be paid in accordance with Section 4 of this Agreement.

(d)    HUD Advances.  In the event that any such Advances provided by MidCap are not sufficient to cover the Operating Expenses, or an Advance is not funded due to failure to satisfy clause (c) above, or the Receiver is requesting payment of Receiver Expenses, the Receiver shall request advances from HUD to cover the Receiver Expenses and any shortfall on the Operating Expenses, and HUD shall have the discretion to make such advances in accordance with Section 207(k) of the National Housing Act and the HUD Loan Documents, of which such advance(s) will be added to the indebtedness to HUD; provided, however, in the event HUD does not fund any such advances, the Receiver shall have the immediate right to file a motion with the Court to terminate this Agreement and be discharged and released as Receiver.

(e)    Use of Advances.  MidCap and HUD agree that, in accordance with the Order, the Receiver shall be permitted to use the Advances from MidCap strictly in accordance with and subject to the Order, this Agreement and the Operating Budget; and the advances from

4

HUD strictly in accordance with and subject to the Order, this Agreement, the Operating Budget and the Receiver Expense Budget.

(f)     HUD Security Interests and Liens. Each HUD Advance made to, or at the request of the Receiver, shall be deemed necessary to protect the residents residing at the Rosewood Facilities and preserve the collateral securing the loans under Section 207(k) of the National Housing Act and the HUD Loan Documents and shall be secured by the collateral securing the loans made by HUD.

(g)     MidCap Security Interests and Liens. Each Advance made by MidCap shall constitute a protective advance under applicable law and the MidCap Revolving Loan Documents and shall be secured by the MidCap Revolving Collateral.

4.     Receiver Expenses and Receiver Expense Budget.

(a)     Receiver's Compensation.  The Receiver shall be compensated for its services consistent with the fee schedule attached hereto as Exhibit A.

(b)     Payment of Receiver Expenses.  Upon the Receiver's appointment and to and including the date of termination of the Receiver's appointment (for any reason, including due to one or more bankruptcy filings), HUD agrees to pay the Receiver Expenses.  The Receiver Expenses shall be due and owing on the first day of each month in advance based upon a budget for such Receiver Expenses (the "Receiver Expense Budget") and HUD shall pay the amounts set forth in the Receiver Expense Budget to the Receiver of the first day of each month.  After the end of each month, the Receiver shall provide HUD with invoices detailing the actual Receiver Expenses incurred for that month.  Objections, if any, to any such invoice may only be made by HUD and shall be made in writing to the Receiver (and the Receiver's counsel) within five (5) business days of the date of receipt by HUD of each invoice and shall describe in reasonable detail the basis for each such objection.  If an objection is timely received, the Receiver may pay that portion of the Receiver Expenses not subject to the objection.  All of the Receiver Expenses subject to objection may be paid after resolution of the objection confirmed in writing, or entry of an Order from the Court allowing payment thereof.  Any objections made after the timeframe set forth above shall be null and void.

(c)     Pre-Receivership Fees and Expenses.   The Receiver shall include in the first Receiver Expense Budget any and all fees and expenses incurred by Receiver and its counsel in preparing for the receivership.  HUD shall pay such amounts to Receiver within 5 days of receipt of such Receiver Expense Budget.

5.     Term. This Agreement shall terminate upon (a) entry of an order by the Court terminating this Agreement based upon a motion filed by one of the parties hereto and only after appropriate notice and a hearing, or (b) entry of an order terminating the receivership action, after the filing of a motion, notice and a hearing if necessary.  Additionally,  upon the earliest to occur of (i)  the occurrence of an Event of Default (as such term is defined in the MidCap Revolving Loan Documents) other than those certain events of default that existed under the MidCap Revolving Credit Agreement, which events of default are set forth on

Exhibit B attached hereto (the "Existing MidCap Defaults") and Defaults and Events of Default arising after the date of this Agreement as a result of any breach of any of the provisions set forth on Exhibit C attached hereto, (ii) December 30, 2018, (iii) the Receiver obtaining (or filing any motion or other request seeking to obtain) credit that does not provide for the Payment in Full of the MidCap Obligations on the closing date of such financing, (iv) the entry of an order by a court of competent jurisdiction reserving, amending, supplementing, staying all or any part, vacating or otherwise modifying the Order in a manner that is adverse to MidCap under the Revolving Credit Agreement without the prior written consent of MidCap; (v) any person or entity exercises any right or remedy against all or any portion of the MidCap Collateral or (vi) the termination or resignation of Long Hill of Rosewood, LLC as the Receiver (the events described in clauses (i) through (vi), each a "Termination Event"), MidCap may elect to terminate its agreement to provide Advances hereunder by giving written notice of such termination to counsel for the Receiver and counsel for the Plaintiff (a "Termination Notice") and filing a copy of such written notice with the Court (the date of such notice, the"Termination Date"). Upon the Termination Date, any and all obligations of MidCap to make Advances under this Agreement shall immediately terminate without notice to or consent from any person or entity (other than the delivery of a Termination Notice in accordance with this paragraph) and without further order from the Court. From and after the Termination Date until the MidCap Obligations are Paid in Full, the Receiver and the Defendants shall continue to comply with the terms of the Order and all amounts received in the Lockbox Accounts shall continue to be applied to the MidCap Obligations in accordance with Paragraph 29 of the Order, except as otherwise provided by the Intercreditor Agreement. Notwithstanding the occurrence of the Termination Date or anything herein to the contrary, all of the rights, remedies, benefits and protections provided to MidCap under this Agreement and the Order shall survive the Termination Date.

      6.    <u>MidCap Forbearance</u>. In reliance upon the covenants and agreements set forth in this Agreement, and subject to the terms and conditions of this Agreement and the Order (MidCap shall forbear, during the period commencing on the date of entry into this Agreement and ending on the Termination Date (the "Forbearance Period"), from exercising its rights and remedies under the MidCap Revolving Loan Documents arising out of the Existing MidCap Defaults and Defaults or Events of Default arising after the date of this Agreement as a result of any breach of any of the provisions set forth on Exhibit C attached hereto. Upon the termination of the Forbearance Period, the agreement of MidCap to forbear pursuant to this Section 5 shall automatically and without any further action terminate and be of no further force and effect, it being expressly agreed that the effect of such termination will be to permit MidCap to exercise all rights and remedies in respect of the Existing MidCap Defaults immediately in accordance with the MidCap Revolving Loan Documents and/or applicable law. Notwithstanding anything to the contrary in this Section 6 or any other provision of the Order or this Agreement, (a) at all times from and after the entry of this Order until the MidCap Obligations are Paid in Full (including during the Forbearance Period), interest on the MidCap Obligations shall continue to accrue at the default rate of interest pursuant to the terms of the MidCap Revolving Credit Agreement and (b) all reserves against the "Borrowing Base" (as defined in the MidCap Revolving Credit Agreement) shall remain in place and MidCap shall be permitted to establish additional reserves in accordance with the terms of the MidCap Revolving Credit Agreement.

7.     Intercreditor Agreement Matters.  MidCap agrees to waive the requirement set forth in Section 2.3(b) of the Intercreditor Agreement requiring delivery of written notice to MidCap thirty (30) days in advance of the commencement of any action or undertaking to take physical possession, control, operation or management of any of the Facilities; provided that such waiver shall apply solely with respect to (i) the filing of the Complaint for Breach of Contracts and For Appointment of Receiver by HUD on August 17, 2018 (the "Receivership Complaint") and the subsequent appointment of Long Hill as Receiver and (ii) the sending of the "21-Day Notice Letters" attached as Exhibit 20 to the Receivership Complaint.  In reliance upon this Agreement and MidCap's forbearance at paragraph 6 above, until the Termination Date, HUD shall not deliver a Possession Date Notice (as defined in the Intercreditor Agreement) with respect to the matters described in the proviso to the immediately prior sentence or for any other reason, except with respect to the service and publication of the Notice of Default and Foreclosure Sale in accordance with Section 3708 of the Multifamily Mortgage Foreclosure Act (which notice HUD shall provide to MidCap within two (2) Business Days after such service and publication with respect to each Rosewood Facility).  Upon delivery of any such Possession Date Notice with respect to the service of the Notice of Default and Foreclosure Sale or any Possession Date Notice delivered after the Termination Date, the terms of the Intercreditor Agreement shall control.

8.     Representations and Warranties.

(a)     Receiver Representations. The Receiver hereby represents and warrants to HUD and MidCap as follows:

(i)     Receiver has the power and authority to execute, deliver and perform its obligations under this Agreement, all of which have been duly authorized by all proper and necessary action.

(ii)     This Agreement constitutes the legal, valid and binding obligation of Receiver, except as otherwise ordered by the Court, enforceable against Receiver in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, or similar laws affecting the enforcement of creditors' rights generally and by equitable principles.

(b)     HUD Representations. HUD hereby represents and warrants to the Receiver and MidCap as follows:

(i)     HUD has the power and authority to execute, deliver and perform its obligations under this Agreement, all of which have been duly authorized by all proper and necessary action.

(ii)     This Agreement constitutes the legal, valid and binding obligation of HUD, except as otherwise ordered by the Court, enforceable against HUD in accordance with its terms, except as such enforceability may be limited by sovereign immunity and applicable laws affecting the enforcement of creditors' rights generally and by equitable principles.

(c) <u>MidCap Representations</u>. MidCap hereby represents and warrants to HUD and the Receiver as follows:

(i) MidCap has the power and authority to execute, deliver and perform its obligations under this Agreement, all of which have been duly authorized by all proper and necessary action.

(ii) This Agreement constitutes the legal, valid and binding obligation of MidCap, except as otherwise ordered by the Court, enforceable against MidCap in accordance with its terms, except as such enforceability may be limited by sovereign immunity and applicable laws affecting the enforcement of creditors' rights generally and by equitable principles.

9. <u>No Challenge</u>. Without limiting anything to the contrary set forth herein, the Receiver shall not, and the Receiver acknowledges and agrees that it will not and will not encourage any other person or entity to, at any time, contest or challenge, or initiate, prosecute or voluntarily participate in any claim, action or proceeding to contest or challenge, the validity, perfection, priority or enforceability of the MidCap Obligations, the MidCap Revolving Loan Documents or the MidCap Revolving Collateral.

10. <u>Effectiveness of Agreement</u>. This Agreement shall be effective upon (a) execution by HUD, MidCap and Receiver and (b) entry of an Order appointing Long Hill as Receiver of the Rosewood Facilities.

11. <u>Miscellaneous</u>.

(a) <u>Relationship of Parties.</u> Nothing contained in this Agreement shall constitute or be construed to be or create a partnership, joint venture or lease between MidCap, HUD and Receiver with respect to the Rosewood Facilities.

(b) <u>Successors and Assigns.</u> This Agreement shall be binding upon the parties hereto and their respective successors and assigns.

(c) <u>Notices.</u> All notices, demands, and requests to be made hereunder by one party to the other shall be in writing, and shall be delivered by hand; mailed by certified mail, return receipt requested; or sent by overnight courier service, with postage prepaid, as follows:

To the Receiver:

Long Hill at Rosewood, LLC
c/o The Long Hill Company
580 Long Hill Avenue
Shelton, CT 06484
Attn: David M. Lawlor

With a copy to:

Greenberg Traurig, LLP
77 West Wacker Drive
Suite 3100
Chicago, IL 60601
Attn: Nancy A. Peterman

To HUD:

U.S. Department of Housing and
Urban Development
451 7th Street SW
Washington D.C. 20410
Attn: Roger Lewis
Email: roger.lewis@hud.gov

To MidCap:

c/o MidCap Financial Services, LLC, as servicer
7255 Woodmont Avenue, Suite 200
Bethesda, Maryland 20814
Attn: Account Manager for Rosewood (HUD) transaction
Facsimile: 301-941-1450
E-mail: notices@midcapfinancial.com

with a copy to:

c/o MidCap Financial Services, LLC, as servicer
7255 Woodmont Avenue, Suite 200
Bethesda, Maryland 20814
Attn: General Counsel
Facsimile: 301-941-1450
E-mail: legalnotices@midcapfinancial.com

Such notices shall be deemed to be effective (i) upon receipt, if hand delivered, (ii) three (3) days after mailing, if mailed by certified mail or (iii) the next business day after transmittal, if sent by overnight courier service.

(d)     Entire Agreement; Amendments. This Agreement contains the entire agreement between the parties hereto with respect to the subject matter hereof, and no prior oral or written representations, covenants or agreements between the parties with respect to the subject matter hereof shall be of any force or effect. Any amendments or modifications to this Agreement shall be of no force or effect unless in writing and signed by MidCap, HUD and Receiver.

(e)     <u>Governing Law and Venue.</u> Federal law shall govern all matters arising out of, in connection with or relating to this Agreement, including, without limitation, its validity, interpretation, construction, performance and enforcement. By execution and delivery of this Agreement, each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the United States District Court for the Northern District of Illinois, and any appellate court entitled to hear appeals from that jurisdiction, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such Court.

(f)     <u>Severability.</u> If any term or provision of this Agreement or the application thereof to any person or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Agreement or the application of such term or provision to persons or circumstances other than those to which it is held invalid or unenforceable shall not be affected thereby, and each term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

(g)     <u>Waivers.</u> No waiver of any term, provision or condition of this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deemed to be or construed as a further and continuing waiver of any such term, provision or condition of this Agreement.

(h)     <u>Costs.</u> In any proceeding or legal action to enforce this Agreement, each party shall be responsible for its own expenses, including attorney's fees.

(i)     <u>Counterparts.</u> This Agreement may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Signature pages may be detached from multiple separate counterparts and attached to a single counterpart. Delivery of an executed signature page of this Agreement (or any notice or agreement delivered pursuant to the terms hereof) by facsimile transmission or other electronic transmission shall be as effective as delivery of a manually executed counterpart hereof.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement through their duly authorized representatives of the day and year first above written.

Long Hill at Rosewood, LLC            U.S. Department of
solely in its capacity as Receiver under the Order     Housing and Urban Development


By: _____       By: _____


Name: _____      Name: _____

MIDCAP FUNDING IV TRUST

By:    Apollo Capital Management, L.P.
Its:    Investment manager

    By: Apollo Capital Management GP, LLC
    Its: General Partner

    By:_____
    Name:
     Authorized Signatory

<u>Exhibit A</u>
Fee Schedule


Receiver shall be compensated for all services rendered on an hourly basis. Receiver's hourly rates range from $150 per hour to $500 per hour. Notwithstanding the foregoing, Receiver agrees that its monthly fees shall not exceed 2.75% of the aggregate gross revenues of the Rosewood Facilities (the "Cap"). To the extent that the scope of the Receiver's duties are modified, expanded or otherwise changed, HUD and Receiver agree that they will discuss modifications to this fee schedule, including, without limitation, modifications to eliminate or increase the Cap on the monthly fees.

A preliminary budget, with hourly rates of the above-referenced professionals, is attached hereto as <u>Schedule 1</u>.

**The Long Hill Company**
**HUD Transaction (IL, MO)**
**Preliminary Budget**

| | Rate | Hours | | | | | Dollars | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Week1 | Week2 | Week3 | Week4 | Week5 | Week1 | Week2 | Week3 | Week4 | Week5 |
| Lawlor | $ 500 | 30 | 15 | 10 | 5 | 5 | $ 15,000 | $ 7,500 | $ 5,000 | $ 2,500 | $ 2,500 |
| Thorne | $ 500 | 30 | 15 | 10 | 5 | 5 | $ 15,000 | $ 7,500 | $ 5,000 | $ 2,500 | $ 2,500 |
| Nickse | $ 500 | 15 | 15 | 10 | 5 | 5 | $ 7,500 | $ 7,500 | $ 5,000 | $ 2,500 | $ 2,500 |
| Griffin | $ 225 | 40 | 40 | 40 | 40 | 40 | $ 9,000 | $ 9,000 | $ 9,000 | $ 9,000 | $ 9,000 |
| Finance Staff | $ 150 | 40 | 40 | 40 | 40 | 40 | $ 6,000 | $ 6,000 | $ 6,000 | $ 6,000 | $ 6,000 |
| McShane | $ 275 | 20 | 20 | 32 | 32 | 32 | $ 5,500 | $ 5,500 | $ 8,800 | $ 8,800 | $ 8,800 |
| Biondi | $ 350 | 30 | 30 | 30 | 30 | 30 | $ 10,500 | $ 10,500 | $ 10,500 | $ 10,500 | $ 10,500 |
| King | $ 275 | 40 | 40 | 40 | 40 | 40 | $ 11,000 | $ 11,000 | $ 11,000 | $ 11,000 | $ 11,000 |
| | | 245 | 215 | 212 | 197 | 197 | $ 79,500 | $ 64,500 | $ 60,300 | $ 52,800 | $ 52,800 |

| | Month 1 | Thereafter |
|---|---|---|
| **Professional Fees** | **$ 257,100** | **$ 211,200** |
| Administrative Charge (10%) | $ 25,710 | $ 21,120 |
| Total Fees and Administrative | $ 282,810 | $ 232,320 |

*Note: This schedule represents our preliminary budget, subject to change based upon existing conditions of the Rosewood Facilities. Actual billings could be higher or lower than above estimates.*

EXHIBIT B
Existing MidCap Defaults

1.     An Event of Default under Section 10.1(a) of the MidCap Revolving Credit Agreement as a result of Borrowers making certain unpermitted Distributions.

2.     An Event of Default existing under Section 10.1(a) of the MidCap Revolving Credit Agreement as a result of Borrowers failing to satisfy the financial covenants set forth in Section 6.2 and 6.3 of the MidCap Revolving Credit Agreement for the Defined Periods (as defined in the MidCap Revolving Credit Agreement) ending as of the last day of each calendar month beginning with June 30, 2015 and continuing through and including period ending as of April 30, 2018.

3.     An Event of Default existing under Section 10.1(p) of the MidCap Revolving Credit Agreement as a result of an "Event of Default" existing under the Affiliated Revolving Credit Agreement (as defined in the MidCap Revolving Credit Agreement) as a result of the borrowers thereunder failing to satisfy the financial covenants thereunder for the Defined Periods (as defined in the Affiliated Revolving Credit Agreement) ending as of the last day of each calendar month beginning with June 30, 2015 and continuing through and including period ending as of April 30, 2018.

4.     An Event of Default existing under Section 10.1(d) of the MidCap Revolving Credit Agreement as a result of the acceleration of the "HUD Loan" (as defined in the MidCap Revolving Credit Agreement) prior to its stated maturity.

5.     An Event of Default existing under Section 10.1(h) of the MidCap Revolving Credit Agreement as a result of a judgment for the payment of money aggregating in excess of $50,000 being rendered against certain Operator Defendants, which was not stayed, and enforcement proceedings being commenced by the judgment creditor.

6.     An Event of Default existing under Section 10.1(p) of the MidCap Revolving Credit Agreement as a result of an "Event of Default" existing under the Affiliated Revolving Credit Agreement (as defined in the MidCap Revolving Credit Agreement) as a result of a judgment for the payment of money aggregating in excess of $50,000 being rendered against certain borrowers thereunder, which was not stayed, and enforcement proceedings being commenced by the judgment creditor.

Exhibit C
Excluded MidCap Revolving Credit Agreement Provisions

1.      Section 10.1(a) of the MidCap Revolving Credit Agreement, <u>solely</u> as a result of failure of Operator Defendants to comply with any of the financial covenants set forth in the MidCap Revolving Credit Agreement

2.      Section 10.1(p) of the MidCap Revolving Credit Agreement

3.      Section 10.1(f) of the MidCap Revolving Credit Agreement, <u>solely</u> as a result of the appointment of the Receiver pursuant to the Order

Exhibit D
Instructions for HUD Advances

**Submissions:**

- Submit all invoices and supporting documentation electronically
  to:  Nicole.M.Johnson@hud.gov; Roger.Lewis@hud.gov; Tim.P.Gruenes@hud.gov with
  cc to Peggy.A.Russo@hud.gov
- Submit monthly reconciliation referenced below to Nicole.M.Johnson@hud.gov

**Receiver fees:**

(a) Upon the Receiver's appointment and to and including the date of termination of the
Receiver's appointment (for any reason, including due to one or more bankruptcy
filings), HUD agrees to pay the Receiver Expenses.  The Receiver Expenses shall be
due and owing on the first day of each month in advance based upon a budget for
such Receiver Expenses (the "Receiver Expense Budget") and HUD shall pay the
amounts set forth in the Receiver Expense Budget to the Receiver on the first day of
each month.

(b) The Receiver shall include in the first Receiver Expense Budget any and all fees and
expenses incurred by Receiver and its counsel in preparing for the receivership.
HUD shall pay such amounts to Receiver within five (5) business days of receipt of
such Receiver Expense Budget.

(c) Monthly Reconciliation & Objections: After the end of each month, the Receiver
shall provide HUD with invoices detailing the actual Receiver Expenses incurred
for that month.  Objections, if any, to any such invoice may only be made by HUD
and shall be made in writing to the Receiver (and the Receiver's counsel) within
five (5) business days of the date of receipt by HUD of each invoice and shall
describe in reasonable detail the basis for each such objection.  If an objection is
timely received, HUD shall pay that portion of the Receiver Expenses not subject to
the objection.  All of the Receiver Expenses subject to objection may be paid after
resolution of the objection confirmed in writing, or entry of an Order from the Court
allowing payment thereof.  Any objections made after the timeframe set forth above
shall be null and void.

**Funding advances for operating expenses** (to cover those amounts not funded under the
MidCap Loan Documents in accordance with the Funding Agreement):

- Receiver will submit an aggregated invoice by 10am EST on or before the 20th day of
  each month
  - System generated invoice from Receiver is acceptable
- Supporting documentation, invoices, etc. must be included to justify expenses, by
  individual facility.
- HUD commits to processing invoices within five (5) business days via EFT

.

**Emergency funding advances** (to cover amounts not available under the A/R line pursuant to the terms of the A/R Loan Documents)**:**

- Receiver will submit an aggregated invoice to HUD by 10am EST
  - System generated invoice from Receiver is acceptable
- Supporting documentation, invoices, etc. for the emergency request must be included to justify expenses, by individual facility
- HUD commits to processing invoices within twenty-four hours (typically by close of the next business day for request received prior to noon).  via EFT

**Monthly Reconciliation:** After the end of each month, the Receiver shall provide HUD with documentation detailing the actual Operating Expenses, including emergency advances, paid during the prior month. Any amounts advanced but not expended for permissible purposes will be deducted from a future advance request.